PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 Broadway
New York, NY 10036-4039
(212) 858-1723
Kerry A. Brennan (KB-2400)

Attorneys for Plaintiff
VENTURA FOODS, LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VENTURA FOODS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SUPREME OIL COMPANY,<br>INCORPORATED a.k.a. ADMIRATION<br>FOODS,<br><br>Defendant. | 07 CV 7338<br><br>**DECLARATION OF TERRY SPLANE,<br>VICE PRESIDENT OF MARKETING,<br>VENTURA FOODS, LLC** |

I, TERRY SPLANE, declare under penalty of perjury:

1. I am the Vice President of Marketing of Ventura Foods, LLC ("Ventura"). The statements made herein are based on my personal knowledge, company records, or as otherwise indicated.

2. Ventura is one of the leading producers in the United States of shortening, edible oils, dressings, margarine, sauces, and flavor bases (the "Ventura Products") and has been in this business through its predecessors since 1960.

3. Ventura Products are sold to end consumers through retail stores, food manufacturers, broad-line food and specialty distributors, and foodservice operators in the commercial and institutional non-commercial market segments.

4. Ventura has manufacturing and distribution plants in thirteen locations in nine states across the country; the plants are operated and managed by approximately 2000 employees.

5. Ventura's total annual sales are over $1 billion.

6. MEL-FRY® is the brand name for Ventura's clear soy liquid fry shortening. The product is a clear vegetable oil.

7. MEL-FRY® shortening has a number of important quality specifications for superior frying for food, including the following: 1) it is extra filtered ("fractionated") for total clarity, higher stability, and maximum fry life; 2) it is formulated to resist flavor transfer and to prevent greasy aftertaste; 3) it heats quickly; and 4) it has a high smoke point.

8. The MEL-FRY® mark was adopted and first used in commerce for vegetable shortening in July 1961 by one of Ventura's predecessors in interest—The Glidden Company (d.b.a. Durkee Famous Foods), a major player in the food industry—and has been in continuous use to the present. The MEL-FRY® brand is a companion to Ventura's MELVO® brand for solid shortening.

9. The MEL-FRY® mark was registered (U.S. Registration No. 774,679) on August 4, 1964, in the U.S. Patent and Trademark Office (the "USPTO"); the registration became "incontestable" in 1969; has been renewed; and is still in active status with

record title in the name of Ventura. True and accurate copies of the USPTO registration for MEL-FRY and its current status are attached hereto as Exhibit A. The slogan "The Long Lasting Liquid Frying Shortening" was first used by Ventura's predecessor, Durkee, in the 1950s and has been used continuously since at least as early as 1997 on Ventura's MEL-FRY labels as shown.

10. Ventura acquired the MEL-FRY® mark, goodwill, and registration from Conopco, Inc., another major player in the food industry, by assignment signed December 31, 1997, and recorded in the USPTO in February 1998.

11. One reason that Ventura acquired MEL-FRY® was because MEL-FRY® was a strong brand in the Northeastern United States and New York City in particular.

12. A true and accurate copy of the original MEL-FRY® label, submitted to the USPTO in 1962, is shown attached hereto as Exhibit B.

13. True and accurate copies of the MEL-FRY® labels used for the 1984 and 2004 renewal applications filed in the USPTO are attached hereto as Exhibit C.

14. MEL-FRY® shortening is usually sold in two bulk sizes: in 10-quart jugs, three to a case; and in 35-pound containers (approximately five gallons by volume), sold by the unit. The 10-quart yellow jugs account for a substantial portion of Ventura's total MEL-FRY® sales, both nationally (approximately one-third) and regionally in the Northeast (approximately one-half).

15. Ventura has rigorous special programs in place in its plants to ensure the food safety of its products, including MEL-FRY® shortening. Ventura treats the production of its products as a continuous system to guarantee food safety from harvest to table.

Quality Management is located in each plant and supports all phases of materials receipt, handling, processing, and finished food quality control. Customer service personnel are in place to meet Ventura customers' ongoing needs.

16. The 10-quart MEL-FRY® shortening container is shown below on the left. On the right is the defendant's MEGA-FRY container:



17. Both products are presented in rectangular, upright, 10-quart jugs in a nearly identical bright yellow color. They both have rounded edges, a twist-top opening, a rectangular handle formed in the top of the jug, and distinct bottom and top sections sandwiching a narrower middle section that bears the front and back labels (which are all in identical rounded-square shape and size). Supreme Oil Company, Incorporated a.k.a. Admiration Foods ("Supreme") uses a dark-colored square shaped label, the same size and in the same location on the yellow container, for MEGA-FRY as Ventura Foods does on its MEGA-FRY product. The Ventura MEL-FRY word logo is horizontally bisected with shading. The MEGA-FRY logo also has shading across

the letters. On the labels, MEGA-FRY and MEL-FRY® appear in big, bold capital letters above significantly smaller, centered phrases in yellow lettering. The phrases are as follows: "The Long-Lasting Liquid Frying Shortening" (MEL-FRY) and "The Longest Lasting Frying Oil" (MEGA-FRY). Both labels prominently feature artwork consisting of a profile view of grille sided frying baskets principally containing French fries. The bottom half of both the MEL-FRY and MEGA-FRY back labels also consists of a bright yellow rounded-rectangular area detailing the ingredients.

18. The MEL-FRY® label and packaging illustrated and described above was first used by Ventura immediately upon its acquisition of the brand on December 31, 1997, and, from then to the present, has been used continuously in the same way.

19. The term MEL in the MEL-FRY® mark is an arbitrarily derived coinage.

20. The composite term MEL-FRY® has no meaning or significance in the food or foodservice industry except as Ventura's trademark.

21. The MEL-FRY® mark symbolizes Ventura's reputation and goodwill for reliably consistent high-quality shortening, backed by Ventura's rigorous food safety and quality control procedures, as well as its customer service.

22. The overall commercial impression or "look" of the MEL-FRY® label and packaging is "trade dress" owned by Ventura. The trade dress consists of the 10-quart container and label colors, color combinations, layout, and overall image.

23. Like the MEL-FRY® word mark, this trade dress symbolizes Ventura's goodwill and indicates the true source of the MEL-FRY® shortening.

24. At the time Ventura purchased MEL-FRY®, the mark and trade dress were already well-known and recognized in the industry as trade symbols indicating a single source for the product. Ventura continued use of the trademark and trade dress seamlessly from the point of view of customers.

25. The color yellow that is part of the trade dress is non-functional. It is not the same as the color of the oil inside. It is not necessary for any competitor to use yellow packaging in this way to compete effectively in the marketplace. In fact, the other main sellers of liquid shortening use white or clear containers, and none that I am aware of aside from Ventura (and Supreme) uses 10-quart containers. Apart from Supreme, no other competitor in the manufacturing or commercial foodservice market uses a combined trademark and trade dress for shortening resembling the Ventura MEL-FRY® "look." For example, Hunt/Wesson, Bunge, and AC Humko, all use shortening packaging distinct from the MEL-FRY® "look." True and accurate pictures of competitors' packaging are attached hereto as Exhibit E2. In fact, even Supreme itself uses different white jugs for its other oils and shortenings. A true and accurate picture of Supreme's products' packaging from Supreme's website at http://admirationfoods.com/shortenings.php is attached hereto as Exhibit E1.

26. Attached hereto as Exhibit D is a true and accurate current print-out from the U.S. Patent and Trademark Office's online "TARR" database that shows the details of Supreme's U.S. Trademark Application Serial No. 78827774.

27. With current annual sales in excess of $75 million, MEL-FRY® is a very commercially successful brand. According to Ventura company records, annual sales are shown in pounds as follows:

| Year | Lbs. |
|---|---|
| 2004 | 57.1 million |
| 2005 | 64.0 million |
| 2006 | 69.8 million |
| 2007 | Not yet available |

28. I estimate that MEL-FRY® occupies a 14-16% share of the national market for manufacturing and commercial foodservice shortening.

29. I estimate that MEL-FRY® occupies a 25-27% share of the Northeast market for manufacturing and commercial foodservice shortening.

30. A large majority of sales and deliveries are made through foodservice distributors.

31. Ventura has an internal sales force of over 60 salespeople and, in addition, uses salespeople employed by foodservice brokers in markets that require extra sales staff, such as New York City.

32. Due to its longevity as a symbol of superior product quality, MEL-FRY® is well and favorably known throughout the industry.

33. Ventura advertises and promotes MEL-FRY® in the following ways:

   a. Membership in the National Restaurant Association and attendance at its national show, where Ventura is a sponsor of the "Menu Master" awards.

   b. Participation in regional and local distributor shows across the country.

    c. Advertising in national publications including Nation's Restaurant News, Modern Food Service, Total Food Service and Plate Magazine.

    d. On-site fry tests and personal sales calls.

34. Ventura has advertised MEL-FRY® extensively. Its current annual advertising budget for trans-fat free alternatives is over $320,000, with the MEL-FRY® trans-fat free product featured in all ads (true and accurate copies of representative samples of ads featuring MEL-FRY® are attached as Exhibit F).

35. The principal MEL-FRY® users and customers are foodservice operators, including institutional cafeterias and restaurants.

36. Ventura's MEL-FRY® market is national in scope.

37. MEGA-FRY and MEL-FRY® shortening are directly competitive products as they have the same composition, function, use, and purpose; are sold in virtually identical 10-quart yellow jugs; and are sold to the same classes of buyers and users.

38. While Supreme's MEGA-FRY infringement confuses buyers and users of MEL-FRY® shortening in all categories, the New York City metropolitan area restaurant market is especially vulnerable for the following reasons: first, there is a heavy concentration of restaurants in this territory; second, many of the restaurants are relatively small and do not have elaborate supply requisition or purchase systems; and third, shortening sales to such small foodservice providers tend to be of a relatively small number of units for a relatively low purchase price. For example, a typical purchase for a foodservice operator is 1-2 cases per week at $45-$60 per case.

39.  Many foodservice operators receive regular replenishment shipments every week. Therefore, once a purchase order is set, the order is unlikely to be noticed or changed.

40.  A large number of restaurants in New York City serve ethnic foods of all descriptions, such as Middle Eastern cuisine. Such small restaurants are often owned and operated by the applicable sector of the ethnic community. These owners and operators often make the supply purchases for and cook the food served at the restaurants. These customers are often recent immigrants who were not educated in the United States and who do not have a full command of English as a second language. Thus, these potential MEL-FRY® customers are relatively less sophisticated when it comes to distinguishing brands in the course of making relatively small purchases of shortening at relatively low costs.

41.  For many small ethnic restaurants, a typical purchase of MEL-FRY® shortening in the 10-quart yellow jugs would be for 1-2 cases costing about $45-$60 per case. Their purchases are small because their storage space is small. The 10-quart three-pack is the most popular size with small foodservice providers, including ethnic restaurants.

42.  Supreme sells its MEGA-FRY shortening in the containers illustrated above. Supreme has infringed Ventura's MEL-FRY® trademark and trade dress by confusing and attempting to confuse customers and potential customers, including those in the small restaurant community.

43.  Supreme also uses its MEL-FRY® look-alike MEGA-FRY to get a "foot in the door" to make sales. Due to the long history of MEL-FRY® and its recognition in the trade, Supreme is able to use its MEL-FRY® look-alike MEGA-FRY to attract initial

interest of potential customers. Even if by the time of actual purchase the customer realizes that MEGA-FRY is not MEL-FRY®, the damage to Ventura has been done.

44. Apart from confusing customers and diverting sales, Supreme also threatens the reputation of MEL-FRY® as a symbol of high-quality shortening. The elaborate food safety and quality control procedures used by Ventura were outlined above.

45. If customers who buy MEGA-FRY are dissatisfied with the product, they are likely to turn elsewhere for their shortening needs, and certainly not to Ventura.

46. In 2002, Ventura Foods brought a trademark and dress infringement suit in this Court (02 Civ. 4519, before the Honorable Barbara S. Jones) against Nice Blends Corporation for its use of the mark MY FRY for cooking oil in packaging shown in the Complaint exhibits (Exhibit G, hereto) and below:



Judge Jones determined that the MY FRY infringement constituted an "exceptional case" and awarded Ventura Foods attorney fees pursuant to 15 USC 1117(a), noting the "substantial similarity" between the products and that "Defendant intentionally copied [Ventura Foods'] mark and trade dress in bad faith to capitalize on [Ventura Foods'] reputation and goodwill." Attached hereto as Exhibit H, is a true and accurate copy of this Court's Order dated May 13, 2003 (02 Civ. 4519), Slip Op. at

2 – 3. Supreme's MEGA-FRY trademark and trade dress in this case are at least as similar to Ventura Foods' as was Nice Blends' mark and trade dress which the Court condemned in the earlier suit.

47. Ventura learned of the MEGA-FRY infringement on or about March 2007. Through its counsel, Ventura sent a cease and desist letter to Supreme's counsel on May 22, 2007. A true and accurate copy of such letter is attached hereto as Exhibit I.

48. On or about June 28, 2007, Ventura received a letter from Supreme's counsel rejecting Ventura's demand. A true and accurate copy of such letter is attached hereto as Exhibit J. Subsequent communications between Ventura and Supreme have not led to a resolution of this matter.

49. In sum, Supreme's marketing of its MEGA-FRY product is likely to confuse customers and users; to divert sales; and to tarnish the goodwill of MEL-FRY® with inferior or potentially inferior shortening product.

50. As Supreme's continuing sales and marketing of its MEGA-FRY product are irreparably harming Ventura's rights and reputation, it is imperative that Supreme's harmful actions be halted as quickly as possible. Therefore, a hearing should be scheduled as soon as reasonably possible to address Ventura's request for a preliminary injunction during the pendency of this action.

51. Ventura has not previously sought the relief requested in the order to show cause or request for preliminary injunction.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 16, 2007

_____
Terry Splane