PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 Broadway
New York, NY 10036-4039
(212) 858-1723
Kerry A. Brennan (KB-2400)

Attorneys for Plaintiff
VENTURA FOODS, LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VENTURA FOODS, LLC, | 07 CV 7338 |
| Plaintiff, | |
| v. | |
| SUPREME OIL COMPANY, INCORPORATED a.k.a. ADMIRATION FOODS, | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF

## ORDER TO SHOW CAUSE AND

## PRELIMINARY INJUNCTION

## Table of Contents

Page

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ......................................................................... 2

    1.    Ventura Background ................................................................ 2

    2.    Ventura's MEL-FRY® Brand ................................................. 3

    3.    Ventura's MEL-FRY® Trade Dress ........................................ 4

    4.    Ventura's MEL-FRY® Shortening ........................................... 5

    5.    Advertising and Sales Success ................................................ 6

    6.    Customers and Channels of Trade .......................................... 7

    7.    This Court's Prior Termination of a Very Similar MEL-FRY Infringement ........................................................................... 7

    8.    Supreme's MEGA-FRY Infringement ..................................... 9

    9.    Ventura's Enforcement Efforts Against Supreme ..................... 12

ARGUMENT: VENTURA IS ENTITLED TO A PRELIMINARY INJUNCTION ................. 12

A.  VENTURA'S MEL-FRY® WORD MARK AND TRADE DRESS ARE VALID AND ENFORCEABLE .......................................................................... 12

    1.    Word Mark ............................................................................ 13

    2.    Packaging .............................................................................. 13

B.  SUPREME'S MEGA-FRY WORD MARK AND TRADE DRESS ARE LIKELY TO CAUSE CONFUSION .......................................................................... 15

    1.    The Marks and Dress Are Confusingly Similar ....................... 15

    2.    The Products Are Identical ..................................................... 18

    3.    The MEL-FRY® Mark and Dress Are Very Strong ................. 18

    4.    Supreme Intends to Confuse ................................................... 19

    5.    Low Buyer Care Exacerbates Confusion ................................ 22

i

6.    Actual Confusion Is Not Required..............................................................23

7.    Supreme Threatens Ventura's Reputation for Quality.............................23

CONCLUSION.................................................................................................................25

**Table of Authorities**

Pages

C<small>ASES</small>

*20th Century Wear, Inc. v. Sanmark-Stardust, Inc.*,
    815 F.2d 8 (2d Cir. 1987) ................................................................ 19

*A&H Sportswear v. Victoria's Secret*,
    237 F3d 198 (3d Cir 2000) .............................................................. 16

*American Home Prods v. Morton-Norwich*,
    202 USPQ (BNA) 824 (SDNY 1978)................................................ 16

*American Chicle Co. v. Topps Chewing Gum*,
    208 F.2d 560 (2d Cir. 1953) ............................................................ 21

*AMF Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir. 1979) ...................................................... 15, 24

*Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*,
    283 F.2d 551 (9th Cir. 1960) ........................................................... 14

*Banff, Ltd. v. Federated Dep't Stores, Inc.*,
    841 F.2d 486 (2d Cir. 1988) ............................................................ 18

*Beer Nuts, Inc. v. Clover Foods Co.*,
    805 F.2d 920 (10th Cir. 1986) ......................................................... 18

*Block Drug Co. Inc. v. Den-Mat Inc.*,
    17 U.S.P.Q.2d 1315 (TTAB 1989), *aff'd*, 895 F.2d 1421,
    17 U.S.P.Q.2d 1318 (Fed. Cir. 1990) .............................................. 15

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*,
    973 F.2d 1033 (2d Cir. 1992) .......................................................... 14

*Cadbury Beverages, Inc. v. Cott Corp.*,
    73 F.3d 474 (2d Cir. 1996) .............................................................. 22

*Centaur Comm. v A/S/M Comm*,
    830 F.2d 1217 (2d Cir. 1987) .......................................................... 14

*Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*,
    659 F.2d 695 (5th Cir. 1981) ........................................................... 16

*CPC Int'l, Inc. v. Balzola Foods Corp.*,
    1984 U.S. Dist. LEXIS 15764, 224 USPQ 85 (S.D. Fl. 1984)................ 21

*El Greco Leather Products Co., Inc. v. Shoe World, Inc.,*
806 F.2d 392 (2d Cir. 1986) ............................................................................ 24

*Ford Motor Co. v. Summit Motor Products, Inc.,*
930 F.2d 277 (3d Cir. 1991) ............................................................................ 22

*Freedom Sav. and Loan Ass'n v. Way,*
757 F.2d 1176 (11th Cir. 1985) ...................................................................... 19

*Fun-Damental Too, Ltd. v. Gemmy Industries Corp.,*
111 F.3d 993 (2d Cir. 1997) .............................................................. 8, 20, 21

*GoTo.com, Inc. v. Walt Disney Co.,*
202 F.3d 1199 (9th Cir. 2000) ........................................................................ 16

*Goya Foods, Inc. v. Condal Distributors, Inc.,*
732 F. Supp. 453 (S.D.N.Y. 1990) .................................................................. 23

*Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway and Sons,*
523 F.2d 1331 (2d Cir. 1975) .......................................................................... 16

*Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.,*
281 F.2d 755 (2d Cir. 1960) .............................................................................. 9

*In re Research and Trading Corp.,*
793 F.2d 1276 (Fed. Cir. 1986) ...................................................................... 22

*Inc. Pub. Corp. v. Manhattan Magazine, Inc.,*
616 F. Supp. 370 (S.D.N.Y. 1985), *aff'd,* 788 F.2d 3 (2d Cir. 1986)............... 17

*Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.,*
411 F.2d 1097 (2d Cir. 1969) .......................................................................... 18

*Kraft v. Allied,*
831 F. Supp. 123 (SDNY 1993) ...................................................................... 16

*LeSportsac v. K Mart,*
754 F.2d 71 (2d Cir. 1985) .............................................................................. 12

*LeSportsac, Inc. v. K Mart Corp.,*
607 F. Supp. 183 (E.D.N.Y. 1984), *aff'd,* 754 F.2d 71 (2d Cir. 1985).............. 20

*Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.,*
834 F.2d 568 (6th Cir. 1987) .......................................................................... 21

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,*
799 F.2d 867 (2d Cir. 1986) ...................................................................... 18, 23

*Lon Tai Shing Co. v. Koch + Lowy,*
    19 U.S.P.Q.2d 1081 (S.D.N.Y. 1990)..................................................................... 20

*Mktg Displays v. TrafFix,*
    200 F3d 929 (6th Cir 1999) .................................................................... 16

*Mobil Oil Corp. v. Pegasus Petroleum Corp.,*
    818 F.2d 254 (2d Cir. 1987) .......................................................... 16, 19, 24

*Nabisco, Inc. v. PF Brands, Inc.,*
    191 F.3d 208 (2d Cir. 1999) .................................................................... 23

*Nikon Inc. v. Ikon Corp.,*
    987 F.2d 91 (2d Cir. 1993) .................................................................... 20

*Osem Food Industries Ltd. v. Sherwood Foods, Inc.,*
    917 F.2d 161 (4th Cir. 1990) .................................................................... 18

*Paddington v. Attiki Importers,*
    996 F.2d 577 (2d Cir. 1993) ................................................ 13, 14, 17, 19

*Perfect Fit Industries v. Acme Quilting Co.,*
    618 F.2d 950 (2d Cir. 1980) .................................................................... 25

*Playboy Enterprises, Inc. v. Chuckleberry Pub., Inc.,*
    687 F.2d 563 (2d Cir. 1982) .............................................................. 19, 25

*Polaroid Corp. v. Polarad Electronics Corp.,*
    287 F.2d 492 (2d Cir. 1961) .................................................................... 15

*RJR Foods, Inc. v. White Rock Corp.,*
    603 F.2d 1058 (2d Cir. 1979) .................................................................... 17

*S.C. Johnson & Sons v. Johnson,*
    116 F.2d 427 (2d Cir. 1940) .................................................................... 24

*Spring Mills v. Ultracashmere House,*
    689 F.2d 1127 (2d Cir. 1982) .................................................................... 16

*SquirtCo v. Seven-Up Co.,*
    628 F.2d 1086 (8th. Cir. 1980) .................................................................... 18

*Stamford Foundry Co. v. Thatcher Furnace Co.,*
    200 F. 324 (S.D.N.Y. 1912)..................................................................... 15

*Sterling Drug v. Bayer,*
    14 F3d 733 (2d Cir 1994) .................................................................... 16

*The Sports Authority, Inc. v. Prime Hospitality Corp.,*
  89 F.3d 955 (2d Cir. 1996) ............................................................... 19

*Time, Inc. v. Petersen Pub. Co. L.L.C.,*
  173 F.3d 113 (2d Cir. 1999) ............................................................. 19

*Ty, Inc. v. Jones Group, Inc.,*
  237 F.3d 891 (7th Cir. 2001) ........................................................... 19

*Ventura Foods LLC v. Nice Blends Corporation,*
  02 CV 4519 (BSJ) ........................................................................... 8

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.,*
  529 U.S. 205 (2000) ....................................................................... 13

*Yale Elec. Corp. v. Robertson,*
  26 F.2d 972 (2d Cir. 1928) .............................................................. 24

## STATUTES AND CODES

United States Code
  Title 15, section 1114(1) ................................................................. 15

United States Code
  Title 15, section 1115(b) ................................................................. 13

United States Code
  Title 15, section 1125(a) ................................................................. 15

## OTHER AUTHORITIES

5 McCarthy on Trademarks section 30:47 ............................................. 12

## MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION

### PRELIMINARY STATEMENT

Plaintiff, Ventura Foods, LLC, ("Ventura") requests a preliminary injunction to stop Defendant, Supreme Oil Company, Incorporated a.k.a. Admiration Foods ("Supreme"), from using the MEGA-FRY trademark and trade dress, shown on the right, below, because they are likely to cause confusion with – and therefore infringe – Ventura's MEL-FRY® trademark and trade dress, shown on the left, below, thereby causing irreparable injury to Ventura because the products – liquid shortening for cooking – are directly competitive.



700768620v2

The cooking oils of the parties are staples sold to commercial foodservice providers. Control of the quality of such products is important to protect ultimate consumers. Ventura's MEL-FRY® mark is an industry standard – in use for 40 years and incontestably registered. With the intent to confuse customers and poach on the good-will of this well-established brand, Supreme has blatantly imitated the overall commercial impression of Ventura's mark and trade dress in order to attract potential buyers. Confusion is very likely because the products are sold in relatively small quantities at relatively low prices. Ventura's mark and trade dress are valid and infringed; therefore, a preliminary injunction should issue.

## STATEMENT OF FACTS

The following is supported by the accompanying Declaration of Terry Splane, Vice President of Marketing, Ventura Foods, LLC (the "Ventura Declaration") and exhibits (the "Ventura Declaration Exhibits") attached thereto.

1.    <u>Ventura Background</u>.

Ventura is one of the leading producers in the United States of shortening, edible oils, dressings, margarine, sauces, and flavor bases (the "Ventura Products") and has been in this business through its predecessors since 1960. Ventura Decl. ¶ 2. Ventura Products are sold to both ultimate consumers through retail stores as well as to food manufacturers and commercial foodservice providers. Ventura Decl. ¶ 3. Ventura has manufacturing and distribution plants in thirteen locations in nine states across the country; the plants are operated and managed by approximately 2000 employees. Ventura Decl. ¶ 4.

Ventura's total annual sales are over $1 billion. Ventura Decl. ¶ 5.

2.    Ventura's MEL-FRY® Brand.

MEL-FRY® is the brand name for Ventura's clear liquid shortening. The product is a clear vegetable oil that is similar in appearance to, for example, Wesson oil on the retail shelf. Ventura Decl. ¶ 6.

The term MEL in the MEL-FRY® mark is an arbitrarily derived coinage. Ventura Decl. ¶ 19. The composite term MEL-FRY® has no meaning or significance in the food or foodservice industry except as Ventura's trademark. Ventura Decl. ¶ 20.

The MEL-FRY® mark was adopted and first used in commerce for vegetable shortening in July 1961 by Ventura's predecessor in interest – The Glidden Company (d.b.a. Durkee Famous Foods), a major player in the food industry – and the mark has been in continuous use to the present.[1]

The MEL-FRY® mark was registered (U.S. Registration No. 774,679) on August 4, 1964, in the U.S. Patent and Trademark Office (the "USPTO"); was made "incontestable" in 1969; has been renewed; and is still in active status with record title in the name of Ventura. Ventura Decl. ¶ 9 and Ex. A.

Ventura acquired the MEL-FRY® mark, goodwill, and registration from Conopco, Inc., another major player in the food industry, by assignment signed December 31, 1997, and recorded in the USPTO in February 1998. Ventura Decl. ¶ 10.

One reason that Ventura acquired MEL-FRY® was because MEL-FRY® was a strong brand in the Northeastern United States and New York City in particular. Ventura Decl. ¶ 11.

---

[1] The MEL-FRY® brand is a companion to Ventura's MELVO® brand for solid shortening. Ventura Decl. ¶ 8. The original MEL-FRY® label, submitted to the USPTO in 1962, is shown in Ventura Decl. Ex. B. The MEL-FRY® labels used for the 1984 and 2004 renewal applications filed in the USPTO are shown in Ventura Decl. Ex. C. *See also* Ventura Decl. ¶¶ 12-13.

The MEL-FRY® mark symbolizes Ventura's reputation and goodwill for reliably consistent high-quality shortening, backed by Ventura's rigorous food safety and quality control procedures, as well as its customer service. Ventura Decl. ¶ 21. Due to its longevity as a symbol of superior product quality, MEL-FRY® is well and favorably known throughout the industry. Ventura Decl. ¶ 32.

   3.    Ventura's MEL-FRY® Trade Dress.

The overall commercial impression or "look" of the MEL-FRY® label and packaging is "trade dress" owned by Ventura. The trade dress consists of the 10-quart container and label colors, color combinations, layout, and overall image. Ventura Decl. ¶ 22. Like the MEL-FRY® word mark, this trade dress symbolizes Ventura's goodwill and indicates the true source of the MEL-FRY® shortening. Ventura Decl. ¶ 23.

The MEL-FRY® label and packaging illustrated and described above was first used by Ventura immediately upon its acquisition of the brand on December 31, 1997 and, from then to the present, has been used continuously in the same way. Ventura Decl. ¶ 18.

On the label below the MEL-FRY brand, Ventura displays the slogan: "The Long-Lasting Liquid Frying Shortening." This slogan was first used by Ventura's predecessor, Durkee, in the 1950s and has been used continuously since at least as early as 1997 on Ventura's MEL-FRY labels as shown. Ventura Decl. ¶ 9.

At the time Ventura purchased MEL-FRY® in 1997, the mark and trade dress were already well-known and recognized in the industry as trade symbols indicating a single source for the product. Ventura continued use of the trademark and trade dress seamlessly from the point of view of customers. Ventura Decl. ¶ 24.

The color yellow that is part of the trade dress is non-functional. It is not the same as the color of the oil inside. It is not necessary for any competitor to use yellow packaging in this way to compete effectively in the marketplace. In fact, the other main sellers of liquid shortening use white or clear containers, and none aside from Ventura (and Supreme) uses yellow 10-quart containers. Apart from Supreme, no other competitor in the manufacturing or commercial foodservice market uses a combined trademark and trade dress for shortening resembling the Ventura MEL-FRY® "look." For example, Hunt/Wesson, Bunge, and AC Humko, all use shortening packaging distinct from the MEL-FRY® 10-quart container "look." Ventura Decl. ¶ 25 and Ex. E2 (pictures of competitors' packaging). In fact, even Supreme itself uses different white jugs for its other oils and shortenings. *See* Ventura Decl. ¶ 25 and Ex. E1 (picture of Supreme's products' packaging).

MEL-FRY® shortening is usually sold in two bulk sizes: in 10-quart jugs, three to a case; and in 35-pound containers (approximately 5 gallons by volume), sold by the unit. The 10-quart yellow jugs account for a substantial portion of Ventura's total MEL-FRY® sales, both nationally (approximately one-third) and regionally in the Northeast (approximately one-half). Ventura Decl. ¶ 14.

   4.    Ventura's MEL-FRY® Shortening.

MEL-FRY® shortening has a number of important quality specifications for superior frying for food, including the following: 1) it is extra filtered ("fractionated") for total clarity, higher stability, and maximum fry life; 2) it is formulated to resist flavor transfer and to prevent greasy aftertaste; 3) it heats quickly; and 4) it has a high smoke point. Ventura Decl. ¶ 7.

Ventura has rigorous special programs in place in its plants to ensure the food safety of its products, including MEL-FRY® shortening. Ventura treats the production of its products as a

continuous system to guarantee food safety from harvest to table. Quality Management is located in each plant and supports all phases of materials receipt, handling, processing, and finished food quality control. Customer service personnel are in place to meet Ventura customers' ongoing needs. Ventura Decl. ¶ 15.

     5.    Advertising and Sales Success.

Ventura's MEL-FRY® market is national in scope. Ventura Decl. ¶ 36.

Ventura advertises and promotes MEL-FRY® through membership in the National Restaurant Association and attendance at its national show; participation in regional and local distributor shows across the country; advertising in national publications including Nation's Restaurant News, Modern Food Service, Total Food Service and Plate Magazine; and on-site fry tests and personal sales calls. Ventura Decl. ¶ 33.

Ventura has an internal sales force of over 60 sales people and, in addition, uses salespeople employed by foodservice brokers in markets that require extra sales staff, such as New York City. Ventura Decl. ¶ 31. Ventura's annual advertising budget for trans-fat free alternatives is over $320,000, with MEL-FRY® trans-fat free products featured in all ads. Ventura Decl. ¶ 34 and Ex. F.

With current annual sales in excess of $75 million, MEL-FRY® is a very commercially successful brand. According to Ventura company records, recent annual sales are shown in pounds as follows:

| Year | Lbs. |
|------|------|
| 2004 | 57.1 million |
| 2005 | 64.0 million |
| 2006 | 69.8 million |

Ventura Decl. ¶ 27.

MEL-FRY® occupies an 14-16% share of the national market for manufacturing and commercial foodservice shortening. Ventura Decl. ¶ 28. MEL-FRY® occupies a 25-27% share of the Northeast market for manufacturing and commercial foodservice shortening. Ventura Decl. ¶ 29.

6.     Customers and Channels of Trade.

The principal MEL-FRY® users and customers are foodservice operators, including institutional cafeterias and restaurants. Ventura Decl. ¶ 35. A large majority of sales and deliveries are made through foodservice distributors. Ventura Decl. ¶ 30.

A large number of restaurants in New York City serve ethnic foods of all descriptions, such as Middle Eastern cuisine. Such small restaurants are often owned and operated by the applicable sector of the ethnic community. These owners and operators often make the supply purchases for and cook the food served at the restaurants. These customers are often recent immigrants who were not educated in the United States and who do not have a full command of English as a second language. Thus, these potential MEL-FRY® customers are relatively less sophisticated when it comes to distinguishing brands in the course of making relatively small purchases of shortening at relatively low costs. Ventura Decl. ¶ 40.

For many small ethnic restaurants, a typical purchase of MEL-FRY® shortening in the 10-quart yellow jugs would be for 1-2 cases costing about $45-$60 per case. Their purchases are small because their storage space is small. The 10-quart three-pack is the most popular size with small foodservice providers, including ethnic restaurants. Ventura Decl. ¶ 41.

7.     This Court's Prior Termination of a Very Similar MEL-FRY Infringement.

In a remarkably similar, recent case in this Court (Barbara S. Jones, J.), Ventura sued Nice Blends Corporation for trademark and trade dress infringement based on Ventura's

MEL-FRY trademark and trade dress against Nice Blends' MY-FRY trademark and trade dress,

shown side-by-side, below:



*Ventura Foods LLC v. Nice Blends Corporation*, 02 CV 4519 (BSJ). The defendant ceased using

the mark and dress, and Judge Jones awarded attorney fees to Ventura based on finding an

"exceptional case" due to Nice Blends' intentional infringement. In words fully applicable to

this case, the Court held:

> Plaintiff produces and sells vegetable based liquid shortening to restaurants and other food service providers with the MEL-FRY trademark. Defendant also produces and sells vegetable based liquid shortening, using the MY-FRY trademark. Having reviewed the side by side pictures of Plaintiff's and Defendant's products, this Court finds that Defendant willfully infringed Plaintiff's trademark and trade dress so as to warrant an award of attorneys' fees.
>
> Both products are presented in nearly identical yellow rectangular, upright jugs with front and back labels. On Defendant's labels, the MY-FRY mark appears in bold capital letters nearly identical to Plaintiff's MEL-FRY mark. Both Defendant's MY-FRY mark and Plaintiff's MEL-FRY mark appear on the label above smaller, centered phrases in yellow lettering. While Defendant asserts that two of Plaintiff's competitors also use similar yellow containers, the labels and lettering on these competitor's products are distinguishable from Plaintiff's product and do not create confusion. The same cannot be said for Defendant's labels. The substantial similarity between the combination of Defendant's MY-FRY mark and trade dress and Plaintiff's MEL-FRY mark and trade dress evidence Defendant's intent to infringe. See <u>Fun-Damental Too, Ltd v. Gemmy Industries Corp.</u>, 111 F.3d 993, 1004 (2d Cir. 1997).

*      *      *

Defendant "must create a reputation of its own and not trade on the goodwill of another product already established at considerable cost and risk." See Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 281 F.2d 755, 758 (2d Cir. 1960). The combined similarity of the word mark and the trade dress is so strong, it can only have occurred through deliberate copying to capitalize on Plaintiff's goodwill and reputation. Accordingly, the Court grants attorneys' fees to Plaintiff.

May 14, 2003, Order (Slip Op., at 2-4, Ventura Decl. Ex. H).

In this case, Supreme's MEGA-FRY infringement is no less confusing and erroneous than Nice Blends' MY-FRY infringement.

8.    Supreme's MEGA-FRY Infringement.

Supreme sells MEGA-FRY shortening in the 10-quart yellow containers illustrated above. Supreme has infringed Ventura's MEL-FRY® trademark and trade dress by confusing and attempting to confuse customers and potential customers, including those in the small restaurant community. Ventura Decl. ¶ 42.

The points of comparison between the products create an overwhelmingly similar commercial impression:



- Both products are presented in rectangular, upright, 10-quart jugs in a nearly identical bright yellow color;

- Both products have rounded edges, a twist-top opening and a rectangular handle formed in the top of the jug, and distinct bottom and top sections sandwiching a narrower middle section that bears the front and back labels (which are all in identical rounded-square shape and size;

- Supreme uses a dark-colored square shaped label, the same size and in the same location on the yellow container for MEGA-FRY as Ventura does on its MEL-FRY product;

- The Ventura MEL-FRY word logo is horizontally bisected with shading.  The MEGA-FRY logo also has shading across the letters;

- On the labels, MEGA-FRY and MEL-FRY® appear in big, bold capital letters above very similar centered phrases in yellow lettering.  The phrases are as follows:  "The Long-Lasting Liquid Frying Shortening" (MEL-FRY) and "The Longest Lasting Frying Oil" (MEGA-FRY); and

- The bottom half of both products' back labels also consists of a bright yellow rounded-rectangular area detailing the ingredients.

Ventura Decl. ¶ 17.[2]

---

[2]  Supreme applied to register its MEGA-FRY label with the U.S. Patent and Trademark Office (Serial No. 78827774).  Supreme has not filed a "statement of use" of the mark, so the application is still pending.

MEGA-FRY and MEL-FRY® shortening are directly competitive products as they have the same composition, function, use, and purpose; are sold in the same quantity packaging; and are sold to the same classes of buyers and users. Ventura Decl. ¶ 37.

While Supreme's MEGA-FRY infringement confuses buyers and users of MEL-FRY® shortening in all categories, the New York City metropolitan area restaurant market is especially vulnerable for the following reasons: first, there is a heavy concentration of restaurants in this territory; second, many of the restaurants are relatively small and do not have elaborate supply requisition or purchase systems; and third, shortening sales to such small foodservice providers tend to be of a relatively small number of units for a relatively low purchase price. For example, a typical purchase for a foodservice operator is 1-2 cases per week at $45-$60 per case. Ventura Decl. ¶ 38.

Many foodservice operators receive automatic shipments every week. Therefore, once a purchase order is set, the order is unlikely to be noticed or changed. Ventura Decl. ¶ 39.

Supreme also uses its MEL-FRY® look-alike MEGA-FRY to get a "foot in the door" to make sales. Due to the long history of MEL-FRY® and its recognition in the trade, Supreme is able to use its MEL-FRY® look-alike MEGA-FRY to attract initial interest of potential customers. Even if by the time of actual purchase the customer realizes that MEGA-FRY is not MEL-FRY®, the damage to Ventura has been done. Ventura Decl. ¶ 43.

Apart from confusing customers and diverting sales, Supreme also threatens the reputation of MEL-FRY® as a symbol of high-quality shortening. The elaborate food safety and quality control procedures used by Ventura were outlined above. Ventura Decl. ¶¶ 15, 44.

If customers who buy MEGA-FRY are dissatisfied with the product, they are likely to turn elsewhere for their shortening needs, and certainly not to Ventura. Ventura Decl. ¶ 45.

9.    Ventura's Enforcement Efforts Against Supreme.

Ventura learned of the MEGA-FRY infringement on or about March 2007.  Ventura

Decl. ¶ 47.  Through its counsel, Ventura sent a cease and desist demand to Supreme's counsel,

Frederick W. Meyers of Ladas & Parry LLP, on May 22, 2007.  Ventura Decl. Ex.I.

On or about June 28, 2007, Ventura received a letter in which Supreme, by its counsel,

rejected Ventura's demand.  Ventura Decl. Ex. J.  Subsequent contacts between the parties'

respective principals did not lead to a resolution of this matter, Ventura Decl. ¶ 48, and

consequently Ventura proceeded to file its Complaint and Preliminary Injunction Motion with

this Court.

## ARGUMENT

## VENTURA IS ENTITLED TO A PRELIMINARY INJUNCTION

Ventura is entitled to a preliminary injunction because 1) Supreme's actions are causing

irreparable harm; and 2) Ventura is likely to succeed on the merits of proving trademark and

trade dress infringement by Supreme.  *LeSportsac v. K Mart*, 754 F.2d 71, 74 (2d Cir. 1985)

(affirming preliminary injunction against trademark and trade dress infringement).  The Second

Circuit follows the majority rule that irreparable injury flows from likelihood of confusion.

5 *McCarthy on Trademarks* § 30:47 citing *inter alia, LeSportsac*, 754 F.2d at 79 ("Likelihood of

confusion is itself strong evidence that, in the absence of an injunction, [plaintiff] might face

irreparable harm.").

### A.  Ventura's MEL-FRY® Word Mark and Trade Dress Are Valid and Enforceable

Ventura's trademark and trade dress rights are superior to Supreme's due to Ventura's

prior use and registration of MEL-FRY® and its prior use and prior-acquired distinctiveness of

the MEL-FRY® trade dress as against the MEGA-FRY mark and dress.

1.    <u>Word Mark</u>.  Ventura's word mark MEL-FRY® is inherently distinctive.  The MEL prefix is "arbitrary" with respect to shortening and has no meaning or significance in the food or foodservice industry except as Ventura's trademark.  *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210-11 (2000) (applying Judge Friendly's "now classic" test); Ventura Decl. ¶¶ 18-20.  The mark was registered on the Principal Register, without a showing of acquired distinctiveness, as U.S. Trademark Reg. No. 774,679.  The registration is "incontestable" under 15 U.S.C. 1115(b), thus conclusively establishing the mark MEL-FRY® as valid and enforceable.  Ventura Decl. ¶ 9 and Ex. A.

2.    <u>Packaging</u>.  Ventura's MEL-FRY® packaging, illustrated above, is unregistered trade dress.  Ventura Decl. ¶¶ 16-17, 22-23.  The trade dress is valid and enforceable because it is inherently distinctive, i.e., an automatic indication of source perceived as such by consumers.  *See Wal-Mart*, 529 U.S. at 212-13 (explaining that TIDE detergent's orange jug trade dress functions as a source identifier); Ventura Decl. ¶ 24.  There is nothing descriptive or functional about the MEL-FRY® package collocation of color, logotype, and design that has been confusingly imitated by Supreme.  Industry custom and practice point to this conclusion, since the other sources in the industry besides Ventura (and Supreme) use very different trade dress for the 10-quart size.  *See Paddington v. Attiki Importers*, 996 F.2d 577, 583-84 (2d Cir. 1993) (finding a bottle label color and design inherently distinctive based in part on industry practice).  The MEL-FRY® and MEGA-FRY 10-quart products look far more similar to each other than either does to other leading commercial shortening products.  Ventura Decl. ¶ 25 and Ex. E2.

Even if the MEL-FRY® packaging is not inherently distinctive, it has acquired distinctiveness or "secondary meaning" in the minds of the relevant purchasing public, i.e.,

commercial foodservice providers.[3] *Id.* The demonstrated length and exclusivity of use;

advertising; advertising expense; market share; and sales success all establish that the MEL-

FRY® trade dress is recognized by customers as an indication of product source. *Bristol-Myers*

*Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1041 (2d Cir. 1992) (citing factors

establishing secondary meaning). With current annual sales in excess of $75 million for

70 million pounds of MEL-FRY® shortening; trade industry advertising; annual advertising

expenses of over $320,000 for trans-fat free alternatives; a large sales force; participation in

national, regional, and local trade shows; and participation in regional and local distributor

shows, the MEL-FRY® brand is highly promoted and recognized throughout the industry as a

leader of reliably consistent high-quality shortening, backed by Ventura's rigorous food safety

and quality control procedures, as well as its customer service. Ventura Decl. ¶¶ 8-10, 21, 23-24,

27, 31-33. Ventura's success with MEL-FRY® has been an attraction to other pirates. Ventura

Decl. ¶ 46.

   Supreme's obvious intentional copying of the trade dress is further "most persuasive"

evidence of acquired distinctiveness. *Centaur Communications*, 830 F.2d at 1224 (affirming

permanent injunction in trademark case). "There is no logical reason for the precise copying

save an attempt to realize upon a secondary meaning that is in existence." *Audio Fidelity, Inc. v.*

*High Fidelity Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir. 1960).

---

[3]  Secondary meaning need not be proved for the *general* public, but only for a "substantial segment" of the
"relevant consuming public (i.e., market)," which may be "relatively small." *Centaur Comm. v A/S/M Comm*,
830 F.2d 1217, 1221-22, 1225 (2d Cir. 1987) (finding secondary meaning in mark for trade publication directed
to "executives in the international marketing and advertising community in the United States").

**B. Supreme's MEGA-FRY Word Mark and Trade Dress Are Likely to Cause Confusion.**

As Judge Jones quoted the Second Circuit in the *Nice Blends* case, a competitor "must create a reputation of its own and not trade on the goodwill of another product already established at considerable cost and risk" (see discussion *supra* at 9). The confusing similarity of the MEL-FRY and MEGA-FRY trademarks and trade dress is at least as great as the similarity of the MEL-FRY and MY-FRY trademarks and trade dress, which Judge Jones found to be confusingly similar.

Likelihood of confusion is the test for infringement of both the registered MEL-FRY® mark, 15 U.S.C. 1114(1), and the unregistered MEL-FRY® trade dress, 15 U.S.C. 1125(a). The multi-factor test laid out in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961) is applied as follows:

1.    The Marks and Dress Are Confusingly Similar. The MEL-FRY® and MEGA-FRY marks and dress are very similar. "Of course, the imitation is not exact; it never is in such cases. The details ... have been varied in trifling regards .... All that is almost a convention when you appropriate another man's mark; for there must be some color of good faith, some defense to put forward .... It is impossible to mistake the defendant's purpose, the very ancient desire to trade on another man's name and reputation." *Stamford Foundry Co. v. Thatcher Furnace Co.*, 200 F. 324 (S.D.N.Y. 1912) (Learned Hand, J.).

As likely to be viewed and remembered by ordinary customers, the overall commercial impressions of the MEL-FRY® and MEGA-FRY marks[4] and trade dress are confusingly similar. Basic similarities outweigh peripheral differences. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d

---

[4]    Although FRY is descriptive, "the common endings do add to the marks' similarity." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 351 (9th Cir. 1979) (SLICKCRAFT v. SLEEKCRAFT, both for boats, held confusingly similar). *See also Block Drug Co. Inc. v. Den-Mat Inc.*, 17 U.S.P.Q.2d 1315, 1317 (TTAB 1989), *aff'd*, 895 F.2d 1421, 17 U.S.P.Q.2d 1318 (Fed. Cir. 1990) (POLIDENT v. POWERDENT both for denture cleanser—confusing similarity due to same initial letter; same suffix; same number of syllables).

1199, 1206 (9th Cir. 2000) (affirming preliminary injunction due to similar color combination

and design of two logos). Ordinary customers do not study marks and dress; do not remember

them point for point; and do not scrutinize them side by side. *Spring Mills v. Ultracashmere*

*House*, 689 F.2d 1127, 1133 (2d Cir. 1982) (marks held confusingly similar when singly

presented; side by side comparison is inappropriate). "Even if close examination would

differentiate the products, that is not sufficient to dispel the initial confusing similarity."

*Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 704 (5th Cir. 1981)

(overall appearance of color combination trade dress held confusingly similar).[5]

  Indeed, **initial interest confusion** is one of Supreme's principal goals. As a new entrant

in the market poaching on Ventura's established brand identity, Supreme uses the confusing

similarity to attract potential customers' initial interest; get its "foot in the door" for a sale; and

divert trade from Ventura. Whether customers figure out the truth by the time of making an

actual purchase is immaterial – in either case the damage to Ventura has already been done.

*Mobil Oil*, 818 F.2d at 260 ("initial interest"); *Grotrian, Helfferich, Schulz, Th. Steinweg*

*Nachf v. Steinway and Sons*, 523 F.2d 1331, 1342 (2d Cir. 1975) ("attract potential customers");

---

[5] As noted previously, Supreme filed an application (Serial No. 78827774) to register its MEGA-FRY label with
the United States Patent and Trademark Office ("USPTO"). Ventura Decl. Ex.D. The allowance of the MEGA-
FRY label application by a USPTO examiner has no bearing on this preliminary injunction motion. This Court
has plenary power over both the registration and use of trademarks. 15 U.S.C. §§ 1116-19. This Court and the
Second Circuit have often found infringement even though the USPTO had found no likelihood of confusion
based on limited record. *Sterling Drug v. Bayer*, 14 F.3d 733, 744 (2d Cir. 1994) (finding infringement and
rejecting deference to USPTO approval of applications over adverse marks); *Kraft v. Allied*, 831 F. Supp. 123 at
n.11 (S.D.N.Y. 1993) (finding infringement, Court gave no weight to USPTO examiner's allowance of
defendant's application over plaintiff's registration); *American Home Prods. v. Morton-Norwich*, 202 U.S.P.Q.
824, 826 n.1 (S.D.N.Y. 1978). In this case, the examiner did not have Ventura's MEL-FRY label to compare to
the MEGA-FRY label that Supreme applied to register; the MEL-FRY mark is registered in block letters.
Ventura Decl. Ex. A. Furthermore, there is no evidence that the examiner considered the MEL-FRY mark, and
may have overlooked it. *Mktg. Displays v. TrafFix*, 200 F.3d 929, 934 (6th Cir. 1999) *rev'd on other grounds*,
532 U.S. 23 (2001). In any event, an examiner's action, not reviewed by the Trademark Trial and Appeal Board,
is a "low-level, preliminary determination . . . [and] was conclusory, not searching or analytical." *A&H
Sportswear v. Victoria's Secret*, 237 F.3d 198, 220-12 (3d Cir. 2000).

*see Inc. Pub. Corp. v. Manhattan Magazine, Inc.*, 616 F. Supp. 370, 387 (S.D.N.Y. 1985) ("foot in the door"), *aff'd*, 788 F.2d 3 (2d Cir. 1986).  Ventura Decl. ¶¶ 39, 43, 47.

The confusing similarity of the trade symbols in this case is at least as great as that in other cases finding infringement for directly competitive food and beverage products:



*Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577 (2d Cir. 1993) (ouzo).



*RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058 (2d Cir. 1979) (fruit punch).



*Osem Food Industries Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161 (4th Cir. 1990) (dried soup).

2.    The Products Are Identical.  The parties' products are directly competitive, low

price shortening sold (like no other brand) in virtually identical 10-quart yellow jugs to the

identical classes of customers. Ventura Decl. ¶ 37.  This fact is one of the most salient in this

case, and it affects the evaluation of the other factors, which are all interrelated.[6]  Where the

products are thus identical, less similarity of marks and dress is required, and less proof generally

on the other factors, in order to establish likelihood of confusion.[7]

3.    The MEL-FRY® Mark and Dress Are Very Strong.  The MEL-FRY® mark and

dress are very strong indicators of source in the minds of commercial foodservice providers.

Ventura Decl. ¶¶ 21, 23-24, 32.  The MEL-FRY® word mark, being arbitrary and incontestably

---

[6]  The factors are "variable and relative," *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.*, 411 F.2d 1097, 1099 (2d Cir. 1969) (reversing district court with directions that defendant be enjoined from further use of plaintiff's trademark).  "Each factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir. 1986) (affirming summary judgment and permanent injunction against defendants' confusingly similar pocket stitching patterns on competing jeans).

[7]  *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 492 (2d Cir. 1988). ("To establish likelihood of confusion, competing goods require less proof under the *Polaroid* factors than noncompetitive items"); *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980) ("Where the products are closely related, less similarity in the trademarks is necessary to support a finding of infringement."); *Beer Nuts, Inc. v. Clover Foods Co.*, 805 F.2d 920, 925 (10th Cir. 1986) ("It must be stressed that these factors are interrelated and must be considered as such when assessing likelihood of confusion.  For example, a small degree of similarity between two marks may lead to a finding that confusion is likely when the products are identical, inexpensive items.").

registered, is strong and entitled to the utmost protection. *The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 961-62 (2d Cir. 1996) (affirming district court's decision that THE SPORTS AUTHORITY is a strong mark); *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 257 (2d Cir. 1987) (affirming district court's finding of infringement of plaintiff's strong flying horse design mark). "The more distinctive a plaintiff's ... mark, the greater the likelihood that consumers will associate the registered mark and all similar marks with the registered owner." *Freedom Sav. and Loan Ass'n v. Way*, 757 F.2d 1176, 1182 (11th Cir. 1985).

The same points discussed above that establish the validity of the MEL-FRY® trade dress (Supreme's copying; the Nice Blends copying; Ventura's length and exclusivity of use; advertising; advertising expense; sales success) also demonstrate the strength of the trade dress for enforcement purposes. *See Time, Inc. v. Petersen Pub. Co. L.L.C.*, 173 F.3d 113, 117 (2d Cir. 1999). Proof of intentional copying is "persuasive, if not conclusive evidence of secondary meaning." *20th Century Wear, Inc. v. Sanmark-Stardust, Inc.*, 815 F.2d 8, 10 (2d Cir. 1987). The MEL-FRY® trade dress strongly points to Ventura, its strong reputation, and its longevity as a symbol of superior product quality – that is exactly why Supreme has copied it. Ventura Decl. ¶ 32.

4.    <u>Supreme Intends to Confuse</u>. Supreme knowingly imitated Ventura's mark and trade dress with the intent to confuse customers. Such intent creates a presumption of infringement. *Paddington*, 966 F.2d at 586-87. At the very least, Supreme knowingly took a calculated risk "at [its] own peril." *Playboy Enterprises, Inc. v. Chuckleberry Pub., Inc.*, 687 F.2d 563, 567 (2d Cir. 1982) (affirming finding of likely confusion), and should not be heard to claim any benefit of equity. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) (affirming preliminary injunction).

Supreme's knowledge of MEL-FRY may be readily inferred from the long time use, advertising, and success of MEL-FRY® in the same market. *Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 96 (2d Cir. 1993) (affirming order for permanent injunction and finding of trademark infringement and dilution); Ventura Decl. ¶¶ 27-29, 32-34. Supreme's bad faith is shown by the glaring fact that its MEGA-FRY packaging is the only competitive brand that is presented in the 10-quart size and that is similar to Ventura's MEL-FRY®, and the similarity is great. *LeSportsac, Inc. v. K Mart Corp.*, 607 F. Supp. 183, 185-86 (E.D.N.Y. 1984), *aff'd*, 754 F.2d 71 (2d Cir. 1985) (granting preliminary injunction). All other competitors use different size packaging with a very different "look." Ventura Decl. ¶ 25 and Ex. E2. The combined similarity of the word mark and the trade dress further evidences Supreme's intent to confuse. *Fun-Damental Too, Ltd. v. Gemmy Industries Corp.*, 111 F.3d 993, 1004 (2d Cir. 1997) ("combined effect of placing an identical product in copied packaging") (affirming preliminary injunction); *Lon Tai Shing Co. v. Koch + Lowy*, 19 U.S.P.Q.2d 1081, 1098-99 (S.D.N.Y. 1990) (granting preliminary injunction; inference of intentional infringement reinforced by combined use of name and design feature).

The use of the very similar slogans[8] further contributes to Supreme's creation of a confusingly similar label. *See Spring Mills*, 689 F.2d at 1130-31 (reversing judgment of non-infringement; noting use of "virtually identical" promotional language on hang tag).

Another classic fingerprint of Supreme's bad faith is that the yellow bottle that Supreme uses for MEGA-FRY looks uniquely different from the white bottles Supreme uses for its other oils and shortenings:

---

[8] "The Longest-Lasting Liquid Frying Shortening" (MEL-FRY) and "The Longest Lasting Frying Oil" (MEGA-FRY).



Ventura Decl. ¶ 25 and Ex. E2.  A defendant's "departure from the pattern" of trade dress it

previously used strongly indicates intentional infringement.  *Fun-Damental Too v. Gemmy*, 111

F.3d 993 (2d Cir. 1997) (affirming preliminary injunction); *see also CPC Int'l, Inc. v. Balzola*

*Foods Corp.*, 1984 U.S. Dist. LEXIS 15764, 224 USPQ 85, 88 (S.D. Fl. 1984) (granting

preliminary injunction) (MAZOLA v. BALZOLA, both for corn oil; defendant "offers for sale

approximately one hundred different packaged foods and household items including corn oil,

vegetable oil, and olive oil.  *Significantly*, of these 100 items, only the corn oil product bears the

trademark BALZOLA.") (emphasis added).

The Court is "content to accept [the intentional infringer's implicit] forecast that he is

'likely' to succeed" in causing confusion.  *American Chicle Co. v. Topps Chewing Gum*,

208 F.2d 560, 562-63 (2d Cir. 1953) (Learned Hand, J.) (permanent injunction affirmed because

defendant's apparent purpose was to copy plaintiff's successful design); *Little Caesar*

*Enterprises, Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 572 (6th Cir. 1987) ("the defendant ought

to know at least as much about the likelihood of confusion as the trier of fact").

5.    <u>Low Buyer Care Exacerbates Confusion</u>. Even though the buyers of the parties' goods are businesspeople, they cannot be considered so "sophisticated" as to avoid confusion in view of the strength of the Ventura mark and dress; the identity of the products; and the overall similarity of the marks and dresses, especially when a poacher like Supreme is attempting to deceive them. *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 481 (2d Cir. 1996) (beverage purchasing agents at the wholesale level could be confused). "Human memories even of discriminating purchasers … are not infallible." *In re Research and Trading Corp.*, 793 F.2d 1276, 1279 (Fed. Cir. 1986) (affirming a finding of likelihood of confusion).

A large number of restaurants in New York City—Ventura's primary Northeastern market—serve ethnic foods of all descriptions, such as Middle Eastern cuisine. Such small restaurants are often owned and operated by the applicable sector of the ethnic community. These owners and operators often make the supply purchases for and cook the food served at the restaurants. These customers are often recent immigrants who were not educated in the United States and who do not have a full command of English as a second language. Thus, these potential MEL-FRY® customers and primary Supreme's targets are relatively less sophisticated when it comes to distinguishing brands in the course of making relatively small purchases of shortening at relatively low costs. Ventura Decl. ¶¶ 40, 42.

Even if some classes of buyers of commercial shortening are considered to be sophisticated, that is certainly not true of all, and "confusion within the lowest stratum of 'reasonably prudent buyers' may give rise to liability even if professional buyers in the market are not confused." *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 293 (3d Cir. 1991). Thus, when a class of purchasers is mixed, the standard of care to be applied is that of the least sophisticated. *Id.*

Less care and greater risk of confusion is expected for items that are inexpensive, disposable, and subject to frequent or routine replacement—like shortening selling for $15-22 per container. For the many small ethnic restaurants that Ventura serves and Supreme targets, a typical purchase of MEL-FRY® shortening would be for 1-2 cases costing about $45-$60 per case. Ventura Decl. ¶ 41. Once the purchase order is set, orders often are automatically renewed and thus less likely to be scrutinized. Ventura Decl. ¶¶ 39-41. The purchaser of such low cost, low involvement purchases is unlikely to retain more than a general recollection of the mark and dress and therefore is more likely to be confused when later encountering the same product sold under a confusingly similar color scheme. *Goya Foods, Inc. v. Condal Distributors, Inc.*, 732 F. Supp. 453, 457-58 (S.D.N.Y. 1990) (granting preliminary injunction where the products were low-cost, staple foods).

6.    <u>Actual Confusion Is Not Required</u>.  While there is no known actual confusion evidence so far in this case, evidence of actual confusion is not required. *Lois Sportswear,* 799 F.2d at 875 (affirming summary judgment and permanent injunction).  There has been insufficient opportunity for actual confusion to be manifested because defendant's business so far is small. *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir. 1999) (affirming preliminary injunction).

7.    <u>Supreme Threatens Ventura's Reputation for Quality</u>.  Controlled quality of food ingredients used by commercial foodservice providers is obviously a strong interest of consumers.  The quality of Ventura's  MEL-FRY® shortening has been established with an earned reputation for excellence over many years. Ventura Decl. ¶¶ 21, 23, 32. MEL-FRY® shortening has a number of important quality specifications for superior frying for food, including the following: 1) it is extra filtered ("fractionated") for total clarity, higher stability,

and maximum fry life; 2) it is formulated to resist flavor transfer and to prevent greasy aftertaste; 3) it heats quickly; and 4) it has a high smoke point. Ventura Decl. ¶ 7.

Ventura has a fundamental right to exclusive control of the quality of the product under the mark. *El Greco Leather Products Co., Inc. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986) ("One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of goods...."). In furtherance of this right and responsibility, Ventura has rigorous special programs in place in its plants to ensure the food safety of its products, including MEL-FRY® shortening. Quality Management is located in each plant and supports all phases of materials receipt, handling, processing, and finished food quality control. Customer service personnel are in place to meet Ventura customers' ongoing needs. Ventura Decl. ¶15.

Supreme has infringed and continues to infringe Ventura's MEL-FRY® by applying the confusingly similar MEGA-FRY mark and trade dress to a shortening product "whose quality no longer lies within [Ventura's] control." *See Yale Elec. Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir. 1928) (Learned Hand, J.).

Whatever the present quality of Supreme's MEGA-FRY product, there is no assurance of what the future quality might be. *AMF*, 599 F.2d at 353 (reversing denial of injunctive relief); Ventura's mark and guarantee is "imperiled" because Supreme's product is out of Ventura's control. *Mobil Oil,* 818 F.2d at 260. "[I]t is always troublesome, and generally impossible, to follow the business practices of such a competitor closely enough to be sure that they are not damaging, and the harm is frequently done before it can be prevented." *S.C. Johnson & Sons v. Johnson*, 116 F.2d 427, 429 (2d Cir. 1940) (Learned Hand, J.).

## CONCLUSION

The factors combine overwhelmingly in this case to demonstrate likelihood of confusion. If any doubt remains, it must be resolved against Supreme. When entering a market occupied by an established brand like MEL-FRY®, Supreme failed in its duty as a "second comer … to so name and dress its product as to avoid all likelihood of consumers confusing it with the product of the first comer." *Perfect Fit Industries v. Acme Quilting Co.*, 618 F.2d 950, 953 (2d Cir. 1980) (reversing district court's denial of injunctive relief). "[O]ne who adopts the mark of another for similar goods acts at his own peril and any doubt concerning the similarity of the mark must be resolved against him." *Playboy*, 687 F.2d at 567.

For the foregoing reasons, the court should preliminarily enjoin Supreme from the use of the infringing MEGA-FRY trademark and trade dress.

Dated:   August 16, 2007

PILLSBURY WINTHROP SHAW PITTMAN LLP

By: *Kerry A. Brennan*

Kerry A. Brennan  (KB-2400)
1540 Broadway
New York, NY 10036-4039
(212) 858-1000

Attorneys for Plaintiff
Ventura Foods, LLC