PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 Broadway
New York, NY 10036-4039
(212) 858-1723
Kerry A. Brennan (KB-2400)

Attorneys for Plaintiff
VENTURA FOODS, LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VENTURA FOODS, LLC,<br><br>        Plaintiff,<br><br>v.<br><br>SUPREME OIL COMPANY,<br>INCORPORATED a.k.a. ADMIRATION<br>FOODS,<br><br>        Defendant. | 07 CV 7338 (PKC) (MHD)<br><br><br>**DECLARATION OF<br>ANGIE YOUNG KIM** |

I, ANGIE YOUNG KIM, declare under penalty of perjury:

1.     I am an attorney duly admitted to this Court. I am associated with the firm Pillsbury

Winthrop Shaw Pittman LLP, attorneys for plaintiff Ventura Foods, LLC in the above

matter. I affirm that the following is true.

2.     Attached hereto as Exhibit A is a true and correct copy of the transcript of the

10/11/07 deposition of Terry Splane, excluding pages 28-34 which have been

redacted based on Ventura's designation of those pages as "Confidential – Attorneys'

Eyes Only" pursuant to the 9/28/07 Stipulation and Order for the Production and

Exchange of Confidential Information.

3.    Attached hereto as Exhibit B is a true and correct copy of an email from Thomson

CompuMark to Pillsbury Winthrop Shaw Pittman LLP dated May 21, 2007.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 24, 2007

_____

Angie Young Kim

2

700849725v2

# EXHIBIT A

Condensed Transcript and Word Index of
TERRY SPLANE

Case: VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.

Date: October 11, 2007

Reported by Steven W. Cornwell, CSR No. 7193

Bob Diehl & Associates
Certified Court Reporters
Phone: (805) 495-8919
Fax:    (805) 495-6001

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                    TERRY SPLANE

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


VENTURA FOODS, LLC,                    )
                                       )
                    Plaintiff,         )
                                       )
        vs.                            )  No. 07 CV 7338
                                       )
SUPREME OIL COMPANY,                   )     (PKC) (MHD)
INCORPORATED a.k.a.                    )
ADMIRATION FOODS,                      )
                                       )
                    Defendants.        )
_____)


            Deposition of TERRY SPLANE, taken on behalf of

        the Defendant, at 5670 Wilshire Boulevard,

        21st Floor, Los Angeles, California,

        commencing at 9:04 a.m., on Thursday, October


        11, 2007, before Steven W. Cornwell, CSR 7193,


        RPR, a Certified Shorthand Reporter in and for


        the County of Los Angeles, State of


        California, pursuant to Notice.

Case 1:07-cv-07338-PKC    Document 33    Filed 10/25/2007    Page 6 of 33

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                    TERRY SPLANE

APPEARANCES:

FOR THE PLAINTIFF:

PILLSBURY WINTHROP SHAW PITMAN, LLP
BY: JAMES A. GARRETT, Attorney at Law
501 West Broadway, Suite 1100
San Diego, California 92101
(619) 234-5000

FOR THE DEFENDANT:
LADAS & PARRY, LLP
BY: JOHN P. LUTHER, Attorney at Law
224 South Michigan Avenue, Suite 1600
Chicago, Illinois 60604
(312) 427-1300

Bob Diehl & Associates (805) 495-8919          2

---

## EXHIBITS

| DEFENDANTS | PAGE |
| --- | --- |
| 5   Webpage printout from BestContainers.com. (3 pages) | 49 |
| 6   Webpage printout from containerandpackaging.com. (4 pages) | 49 |
| 7   Webpage printout from thecarycompany.com. (7 pages) | 52 |
| 8   Webpage printout from illingcompany.com. (1 page) | 52 |
| 9   Webpage printout from foodprocessing.com. (3 pages) | 58 |
| 10   Webpage printout from gourmetsleuth.com. (1 page) | 59 |
| 11   Webpage printout from intiboga.com. (1 page) | 60 |
| 12   Webpage printout from yeelee.com. (1 page) | 60 |
| 13   Webpage printout from yeelee.com. (1 page) | 61 |
| 14   Webpage printout from aaj-id.com. (1 page) | 62 |
| 15   Webpage printout from istockphoto.com. (1 page) | 64 |
| 16   Webpage printout from wocm.com. (1 page) | 65 |
| 17   Webpage printout from realestate.net. (1 page) | 66 |
| 18   Webpage printout from saporitofoods.com. (8 pages) | 66 |
| 19   Webpage printout from Shetakis Wholesalers. (8 pages) | 70 |
| 20   Webpage printout from Spectra Foods. (17 pages) | 72 |

Bob Diehl & Associates (805) 495-8919          4

---

## INDEX

| EXAMINATION BY: | PAGE |
| --- | --- |
| MR. LUTHER | 7 |
| [P.M. SESSION.] | |
| MR. LUTHER | 112 |
| MR. GARRETT | 243 |
| MR. LUTHER | 246 |

QUESTIONS MARKED
(None)

INFORMATION REQUESTED
(None)

## EXHIBITS

| DEFENDANT'S | PAGE |
| --- | --- |
| 1   Notice of the instant deposition. (6 pages) | 9 |
| 2   Defendant Supreme Oil Company, Inc.'s Request for Production of Documents and Things to Plaintiff. (9 pages) | 15 |
| 3   Notice of Electronic Filing. (1 page) | 17 |
| 4   [Confidential: bound in separate volume.] | |

Bob Diehl & Associates (805) 495-8919          3

---

## EXHIBITS

| DEFENDANT'S | PAGE |
| --- | --- |
| 21   Webpage printout from Goodman Fielder Food Services. (2 pages) | 74 |
| 22   Webpage printout from ADM. (4 pages) | 75 |
| 23   Webpage printout from cwlservices.com. (2 pages) | 77 |
| 24   Webpage printout from jupiterimages.com. (1 page) | 77 |
| 25   Webpage printout from dreamstime.com. (1 page) | 78 |
| 26   Webpage printout from dreamstime.com. (2 pages) | 78 |
| 27   Webpage printout from qvc.com. (5 pages) | 79 |
| 28   Webpage printout from cookathomeappliances.com. (2 pages) | 80 |
| 29   Webpage printout from inmagine.com. (3 pages) | 80 |
| 30   Webpage printout from cwlservices.com (1 page) | 81 |
| 31   Webpage printout from stridegum.com. (2 pages) | 82 |
| 32   Webpage printout from sephora.com. (1 page) | 82 |
| 33   Webpage printout from buildersmerchantsjournal.net. (2 pages) | 83 |
| 34   Document Bates numbered VF 00016. (1 page) | 85 |
| 35   Document Bates numbered VF 00025. (1 page) | 95 |
| 36   Document Bates numbered VF 00034. (1 page) | 109 |

Bob Diehl & Associates (805) 495-8919          5

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                    TERRY SPLANE

Page 8

E X H I B I T S

DEFENDANT'S                                          PAGE
37  Consent Order for Permanent Injunction,      109
    in the instant litigation. (3 pages)

38  Declaration of Terry Splane, dated           114
    October 9, 2007. (9 pages)

39  Declaration of Terry Splane, dated           147
    August 16, 2007. (76 pages)

40  Letter from Edward P. Kelly to Hon. Judge     224
    P. Kevin Castel, dated October 9, 2007.
    (5 pages)

41  Jury Trial Demand, in the instant            226
    litigation. (13 pages)

42  Webpage printout from illingcompany.com.     233
    (7 pages)

43  Webpage printout from                        234
    postbulletin.typepad.com. (3 pages)

44  Webpage printout from                        235
    argos.co.uk/wcsstore/argos/images.
    (2 pages)

45  Webpage printout from                        235
    bbcmotiongallery.com. (3 pages)

46  Webpage printout from                        236
    foodservicerumors.com. (1 page)

47  Webpage printout from aaj-id.com.            239
    (7 pages)

48  Webpage printout from costo.com.             240
    (5 pages)

Bob Diehl & Associates (805) 495-8919       6

---

Page 8

```
 1     Q  You were a business major?
 2     A  Business, economics, yes.
 3     Q  Did you go to graduate school?
 4     A  Did not.
 5     Q  Is that your last degree?
 6     A  Yes.
 7     Q  Okay.
 8        And your first job after college?
 9     A  Selling biomedical lab supplies for Curtin
10  Matheson & Associates.
11     Q  So up until the present you have been involved
12  in business?
13     A  Yes, sir.
14     Q  How long in the food business?
15     A  Since '86, '87.
16     Q  And how long at Ventura?
17     A  Just over two years.
18     Q  And did you start there as a vice president?
19     A  Correct.
20     Q  And your duties when you started are your
21  current duties now?
22     A  Correct.
23     Q  And what are those duties?
24     A  Overseeing the entire marketing department,
25  from category management, product management, training,
```

---

Page 7

```
 1     LOS ANGELES, CALIFORNIA; THURSDAY, OCTOBER 11, 2007
 2             9:04 a.m.
 3
 4        TERRY SPLANE,
 5     having declared under penalty of perjury to tell
 6     the truth, was examined and testified as follows:
 7
 8        EXAMINATION
 9  BY MR. LUTHER:
10     Q  Will you state your full name, please, and
11  spell it out for the court reporter.
12     A  Sure.  Full legal name is William Terence
13  Splane.  W-i-l-l-i-a-m, T-e-r-e-n-c-e, S-p-l-a-n-e.
14     Q  And your business address is?
15     A  40 Pointe, P-o-i-n-t-e, Drive, Brea,
16  California 92821.
17     Q  And could you just give me your educational
18  background.  College?
19     A  Washington State University.
20     Q  Graduated?
21     A  Yes.
22     Q  Year?
23     A  '84.
24     Q  Business major?
25     A  Yes.
```

---

Page 9

```
 1  new product development, media communications.
 2     Q  What did you do preceding Ventura?
 3     A  Similar job responsibilities for McCormick &
 4  Company in Baltimore -- or Hunt Valley, Maryland.
 5        (Discussion held off the record.)
 6        MR. LUTHER:  Exhibit -- deposition Exhibit 1,
 7  notice of deposition, 30(b)(6).  I just have one copy.
 8  Maybe I have two.  I do.
 9        (Defendant's Exhibit 1 was marked
10        for identification by the Certified
11        Shorthand Reporter.)
12  BY MR. LUTHER:
13     Q  May I direct your attention to Schedule A, the
14  last page -- or second to the last page, topics of
15  deposition.
16        Do you see this?
17     A  Yes.
18     Q  Have you seen this before?
19     A  I believe so, yes.
20     Q  Are you prepared to testify to each of the 15
21  topics with knowledge as a spokesman for Ventura?
22        MR. GARRETT:  To the extent that we are here
23  for a 30(b)(6) and Mr. Splane has been designated as
24  the representative of Ventura on these topics, we will
25  represent that, yes, he is.
```

Case 1:07-cv-07338-PKC    Document 33    Filed 10/25/2007    Page 8 of 33

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                    TERRY SPLANE

Page 10

1      MR. LUTHER: Okay.
2      Now I'm going to ask the deponent, and not the
3   attorney, for a "Yes" or "No."
4   Q   Are you prepared to testify with knowledge as
5   to each the topics listed in schedule A? "Yes" or
6   "No."
7      MR. GARRETT: You can answer the question to
8   the extent you can.
9      THE WITNESS: I will -- yeah, I will testify
10  to the extent I can. There are areas on here where I
11  have no knowledge.
12  BY MR. LUTHER:
13  Q   Let's go down one by one. Which areas do you
14  not have knowledge as to number one?
15     MR. GARRETT: Well, is there a question
16  regarding the topic? You've designated the topics.
17  And we are representing that --
18     MR. LUTHER: Okay. The deponent just stated
19  that he cannot testify to certain areas. We are going
20  to find out what those areas are, start with number
21  one, go to number two, go down the list.
22  Q   We will start with number one. Which areas
23  can you not testify to here?
24     MR. GARRETT: Objection to the extent it
25  misstates the prior testimony.

Page 11

1      MR. LUTHER: You can answer.
2      MR. GARRETT: If you understand the question,
3   go ahead and answer.
4      Can I rephrase? I think it's still a vague
5   question.
6      Can you answer -- are you asking can he answer
7   questions regarding topic one?
8      MR. LUTHER: I'll tell you what. I will hold
9   this question for later. Let's go on to the next
10  question.
11     MR. GARRETT: Okay.
12  BY MR. LUTHER:
13  Q   What did you do to prepare for this
14  deposition?
15  A   Spent some time on the phone yesterday with
16  Jim and other counsel, primarily going over these
17  topics and --
18     MR. GARRETT: You can answer to the extent you
19  are not --
20     MR. LUTHER: Wait a second. There is no --
21  for the record, there is no coaching the witness ever.
22  Okay? Ever. And that is solid in the rules.
23     MR. GARRETT: Counsel --
24     MR. LUTHER: Now, let's start again.
25  Q   What have you done to prepare for this

Page 12

1   deposition?
2      MR. GARRETT: Counselor?
3      MR. LUTHER: Yes.
4      MR. LUTHER: Do not raise your voice to me,
5   first of all. Second of all, I am well aware of the
6   rules. Third of all, I am not counseling the witness.
7   What I'm saying is I was making an objection which is a
8   totally valid objection based on the attorney/client
9   privilege.
10     The witness started to testify as to what he
11  may or may not have said to me yesterday on the
12  telephone. I was advising him, as I am entitled to do,
13  not to reference any comments he may have had with me
14  or other with counsel in this case.
15     Are we clear?
16     MR. LUTHER: Noted.
17  Q   Were you asked to look for any documents to
18  prepare for this deposition?
19  A   To look for any documents, no.
20  Q   When were you told about today's deposition?
21  A   Tuesday afternoon.
22  Q   When were you first told to prepare for
23  today's deposition?
24  A   I don't recall.
25  Q   Who told you to prepare for this deposition?

Page 13

1      MR. GARRETT: Objection to the extent it calls
2   for the disclosure of attorney/client communication.
3      MR. LUTHER: You can answer.
4      MR. GARRETT: If you can answer to the extent
5   it does not call for disclosure of attorney/client
6   communication.
7      MR. LUTHER: So answer.
8   Q   Who told you? Who is not legal content. Who
9   told you? You can answer that.
10     MR. GARRETT: You can answer the question.
11     THE WITNESS: Would have been legal counsel
12  internally at Ventura Foods.
13  BY MR. LUTHER:
14  Q   And what's their name?
15  A   Would have been Kathy Riley.
16  Q   Kathy Riley?
17  A   Correct.
18  Q   Is she a trademark attorney?
19  A   She is not.
20  Q   What kind of attorney is she?
21  A   I believe she's a paralegal.
22  Q   So there wasn't attorney/client privilege. A
23  paralegal told you. A paralegal prepared you for this
24  deposition; is that correct?
25     MR. GARRETT: Objection. That's

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                              TERRY SPLANE

Page 14

1  argumentative. And there is an attorney/client
2  communication between representatives of the legal
3  department of Ventura Foods.
4  BY MR. LUTHER:
5     Q  Do you know what a trademark is?
6     A  Sure.
7     Q  What's a trademark?
8     A  Protects --
9     MR. GARRETT:  Objection to the extent it calls
10 for a legal conclusion and/or expert testimony.
11    To the extent you can answer, you may answer.
12 BY MR. LUTHER:
13    Q  What's a trademark?
14    A  In my opinion, not legal or professional, is
15 protection of an owned property of an organization.
16    Q  What's trade dress?
17    MR. GARRETT:  Same objection.
18    MR. LUTHER:  You can answer.
19    MR. GARRETT:  To the extent you can answer.
20    THE WITNESS:  The overall field equity essence
21 of a brand.
22    MR. LUTHER:  Okay.
23    So you will testify you didn't look for any
24 documents for today's deposition, and so we have not
25 been -- for the record, we have not been provided any

Page 15

1  documents which, you know, is in default of the judge's
2  order of the other day. You were to provide documents
3  by 5:00 o'clock yesterday, which you failed to do. I
4  just want to put that on the record.
5     MR. GARRETT:  Objection to the extent it
6  misstates the prior testimony. And, again, for the
7  record, are there any document requests attached to
8  this deposition subpoena? I don't see any.
9     MR. LUTHER:  Okay. Exhibit 2 to the
10 deposition.
11    (Defendant's Exhibit 2 was marked
12    for identification by the Certified
13    Shorthand Reporter.)
14    MR. GARRETT:  Is this a copy for me?
15    MR. LUTHER:  Yes.
16    Q  Have you seen this request for documents
17 before?
18    MR. GARRETT:  For the record, this is an
19 unsigned copy. Is this a copy that was served?
20    MR. LUTHER:  Yes.
21    MR. GARRETT:  And in that it's not signed,
22 what date was this served?
23 BY MR. LUTHER:
24    Q  Have you seen this copy -- have you seen this
25 request for documents before?

Page 16

1     MR. GARRETT:  Can we go off the record,
2  please. Are we off the record?
3     THE REPORTER:  Are we off the record?
4     MR. LUTHER:  We can go off the record.
5     (Discussion held off the record.)
6     MR. LUTHER:  Go back on the record.
7     We are going to make this -- I am going back
8  on. You are refusing to answer the question? We are
9  going to the next one. Okay.
10    I want to make this Exhibit 3. This is the
11 judge's order.
12    MR. GARRETT:  Counselor, for the record --
13    MR. LUTHER:  I withdraw the question.
14    MR. GARRETT:  Off the record.
15    MR. LUTHER:  Yeah.
16    (Discussion held off the record.)
17    MR. LUTHER:  I withdraw the question.
18    Back on the record.
19    MR. GARRETT:  No.
20    MR. LUTHER:  Per the court's order --
21    MR. GARRETT:  Off the record.
22    If you want to have this on the record, I will
23 gladly --
24    MR. LUTHER:  Put it on the record.
25    MR. GARRETT:  Fine. On the record.

Page 17

1     Mr. Luther, you and I have never met before.
2  However, this deposition is starting off quite
3  aggressively for no reason. I've asked you a couple of
4  questions off the record regarding this document, which
5  you just marked as Exhibit 2 to this deposition. It is
6  an unsigned document. It is also blank dated.
7     MR. LUTHER:  Okay.
8     MR. GARRETT:  I simple asked you a question as
9  to --
10    MR. LUTHER:  I don't recall. I told you I
11 don't recall.
12    MR. GARRETT:  Okay. Fine.
13    Are you withdrawing and taking Exhibit 2 off
14 the record? Or is this simply a document you are going
15 to introduce into the record and --
16    MR. LUTHER:  I am going to withdraw the
17 question.
18    MR. GARRETT:  Okay.
19    MR. LUTHER:  I'm going to go to the next one.
20 Here is -- we will leave two blank. Here is Exhibit 3.
21    We are back on the record; right?
22    (Defendant's Exhibit 3 was marked
23    for identification by the Certified
24    Shorthand Reporter.)
25 BY MR. LUTHER:

Case 1:07-cv-07338-PKC    Document 33    Filed 10/25/2007    Page 10 of 33

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                    TERRY SPLANE

## Page 18

1  Q  Here is the judge's order. Plaintiff shall
2  respond to defendant's document request, so and so and
3  so and so. Have you seen this order before?
4      MR. GARRETT: Do you have a copy for me?
5      MR. LUTHER: We will make some copies.
6      MR. GARRETT: Okay. Hold on one second.
7      MR. LUTHER: Or you can keep that, we will
8  just get another copy.
9      MR. GARRETT: Hold on one second, please.
10     THE REPORTER: That's the marked copy. So
11 that's attached to the record.
12     MR. GARRETT: That's fine.
13     MR. LUTHER: So you haven't seen this order
14 before?
15     MR. GARRETT: Counselor, you just handed me
16 what's marked as Exhibit 3, and I'm reading it. If I
17 could please have time to read it. Thank you.
18     MR. LUTHER: Where are the documents? You
19 haven't produced documents.
20     MR. GARRETT: Counselor, --
21     MR. LUTHER: There is a court order.
22     MR. GARRETT: Counselor, first of all, I told
23 you a few moments ago, do not raise your voice to me.
24     Second of all, I am reading this document, as
25 I'm entitled to do.

## Page 19

1      MR. LUTHER: So it's apparent you are in
2  default.
3      MR. GARRETT: I am not going to show this
4  document to my client until I have an opportunity to
5  read it, being that you just handed me a multiple --
6  it's an email that's was faxed twice apparently. And
7  the last document you showed me is blank, et cetera.
8  And you are being badgering --
9      MR. LUTHER: Okay.
10     MR. GARRETT: -- to the extent -- it's
11 unbelievable --
12     MR. LUTHER: All right.
13     MR. GARRETT: -- at this point.
14     MR. LUTHER: Are you refusing to answer?
15     MR. GARRETT: I don't need to answer anything
16 today.
17     MR. LUTHER: Okay. We are going on to the
18 next question.
19  Q  Have you been in a trademark lawsuit before?
20  A  No.
21     MR. GARRETT: Excuse me.
22 BY MR. LUTHER:
23  Q  Have you testified --
24     MR. GARRETT: Mr. Reporter, we are going off
25 the record.

## Page 20

1      MR. LUTHER: No, no. We are on the record.
2  We are on to the next question.
3      MR. GARRETT: Then mark for the record that my
4  client and I are getting up from the table and going
5  outside for a brief moment. And I am going to take
6  Exhibit 3 with me so I can read it in peace, please.
7  Thank you.
8      MR. LUTHER: We may have to go to a second day
9  of depositions.
10     MR. GARRETT: Fine. You want to try to get a
11 judge to order a second day of deposition because you
12 won't let me read a document you introduced as
13 evidence?
14     MR. LUTHER: That's a court order. You are
15 supposed to have read it before you come in here.
16     MR. GARRETT: I am not supposed to have read
17 anything before I came --
18     MR. LUTHER: You didn't read the court's
19 order?
20     MR. GARRETT: Counselor, I am going out of the
21 room now. Thank you.
22     (Brief recess.)
23     MR. LUTHER: Where are we?
24     MR. GARRETT: For the record, I have reviewed
25 Exhibit 3 if you have any questions about it.

## Page 21

1      MR. LUTHER: Okay.
2  Q  Where are the documents? Where are the
3  documents that Ventura was supposed to produce
4  according to the court order?
5      MR. GARRETT: To the extent you can answer the
6  question, feel free.
7      THE WITNESS: I have no knowledge of this
8  document.
9      MR. LUTHER: Okay. Let's go back to what was
10 marked Exhibit 2, the -- I believe the defendant's
11 request for production of documents and things.
12  Q  Do you have any knowledge of that document?
13     MR. GARRETT: We are referring back to the
14 Exhibit 2 --
15     MR. LUTHER: Yes.
16     MR. GARRETT: -- that's the blank?
17     MR. LUTHER: Yes.
18     MR. GARRETT: Okay.
19 BY MR. LUTHER:
20  Q  Do you have any knowledge of that document?
21  A  I have never seen this document before.
22  Q  Okay.
23     And how does your company police their
24 trademarks?
25     MR. GARRETT: Objection. Calls for

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                    TERRY SPLANE

---

**Page 22**

1  speculation. And to the extent it calls for
2  attorney/client and/or work product, I would object on
3  those grounds.
4       To the extent you can answer without
5  disclosing attorney/client communications and/or work
6  product, being attorney/client or attorney work
7  product, you may answer.
8       THE WITNESS: I have no idea what our
9  official policies are associated with that.
10  BY MR. LUTHER:
11     Q  How does your company learn of potential
12  infringers?
13       MR. GARRETT: Same objection. Calls for
14  speculation and to the extent it calls for the
15  disclosure of attorney work product or attorney/client
16  communication.
17       you can answer to the extent you can.
18       THE WITNESS: From what I've seen, it's just a
19  -- it's a reaction to information coming in from the
20  field organization, as in this case.
21  BY MR. LUTHER:
22     Q  And have you personally worked with your legal
23  department in trademark matters before?
24     A  In trademark searches for potential new
25  products or categories, yes.

---

**Page 23**

1     Q  Okay.
2       Do you work with a paralegal or a lawyer?
3     A  Both.
4     Q  You have an in-house legal team?
5     A  Yes.
6     Q  How many attorneys?
7     A  Two.
8     Q  Are they intellectual property attorneys?
9     A  I have no idea.
10     Q  Well, are they trademark attorneys?
11     A  I do not believe so.
12     Q  Okay.
13       And I may have asked you this before. Have
14  you testified in a lawsuit before?
15     A  I have not.
16     Q  How many had trademarks does Ventura own?
17       MR. GARRETT: Objection to the extent -- calls
18  for speculation. And the extent it calls for a legal
19  conclusion.
20       THE WITNESS: Couldn't wager a guess.
21       MR. LUTHER: Okay. I will refine the
22  question somewhat.
23     Q  How may trademarks does your company own for
24  use with liquid shortening?
25       MR. GARRETT: Same objection. Calls for

---

**Page 24**

1  speculation and calls for a legal conclusion.
2       THE WITNESS: Don't know the exact number.
3       MR. LUTHER: Okay.
4     Q  Now, what are the names of the different
5  liquid shortening products made and distributed by
6  Ventura?
7       MR. GARRETT: It's a compound question. Calls
8  for speculation.
9       MR. LUTHER: Let me refine it.
10     Q  What are the names of the different liquid
11  shortening products manufactured by Ventura?
12     A  Extend. Triumph. Chef's Pride.
13     Q  Which ones are clear?
14       MR. GARRETT: Calls for speculation. It's
15  also vague.
16       MR. LUTHER: You can answer.
17       MR. GARRETT: To the extent you can.
18       THE WITNESS: In a number of the brands I
19  mentioned there is an option of clear and creamy.
20  BY MR. LUTHER:
21     Q  You mean a customer may order it either --
22     A  We have --
23     Q  -- clear --
24     A  We do have multiple choices under multiple
25  brands, correct.

---

**Page 25**

1     Q  Okay.
2       Is Mel-Fry offered clear and in color?
3     A  It is not.
4     Q  Mel-Fry is only offered in clear?
5     A  Correct.
6     Q  And all those products that are manufactured
7  are also distributed by your company; is that correct?
8     A  Sold to distributors, correct.
9     Q  Okay.
10       Do you know of documents showing this?
11       MR. GARRETT: Calls for speculation.
12       MR. LUTHER: You can answer.
13       MR. GARRETT: It's also vague.
14  BY MR. LUTHER:
15     Q  Are there documents showing what products are
16  made and distributed by your company?
17     A  Can you restate that question, please.
18     Q  Let's go to the next one.
19       Who does Ventura sell liquid shortening
20  products to?
21       MR. GARRETT: Calls for -- objection. To the
22  extent that it calls for the -- it's vague.
23       Go ahead and answer it to the extent you can.
24       THE WITNESS: Across multiple channels --
25  retail, industrial, and food service.

---

7 (Pages 22 to 25)

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                                      TERRY SPLANE

Page 26

1  BY MR. LUTHER:
2      Q  Who in retail?
3      A  That's not a part of my sphere of
4  responsibility.  So I can't specifically tell you the
5  customers.
6      Q  By retail, what do you mean?  Do you mean
7  restaurants?
8      A  No.  Retail would be consumers.
9      Q  Oh.  Individual consumers?
10     A  Not to individual consumers.  To retail stores.
11     Q  Like a distributor that would sell to
12  individual consumers?
13     A  A retail store.
14     Q  Can you give me an example.
15     A  Safeway.
16     Q  Safeway.  So somebody would go into Safeway
17  and buy your product?
18     A  (No audible response.)
19     THE REPORTER:  Excuse me?
20     MR. GARRETT:  You need to have an audible
21  answer.
22     THE WITNESS:  Oh.  "Yes."
23         Not knowing if Safeway is a customer of ours
24  or not.  Again, it's not my sphere of responsibility.
25  BY MR. LUTHER:

Page 27

1      Q  So you wouldn't know if Costco is a customer?
2      A  No.
3      Q  What is your sphere of responsibility?
4      A  Food service channel.
5      Q  To commercial customers?
6      A  To restaurants.  Yes.
7      Q  Okay.
8         And are there documents showing the
9  distribution of products from your company?
10     MR. GARRETT:  Calls for speculation.  It's
11  vague.
12     MR. LUTHER:  You can answer.
13     MR. GARRETT:  To the extent you know whether
14  or not there's documents in your company, go ahead.
15     THE WITNESS:  Sure.  We can go in the system
16  and pull the customer list.
17     MR. LUTHER:  Okay.
18     Q  And have these documents been provided?
19     MR. GARRETT:  Objection.  The witness does not
20  know what counsel has provided to you, as he has
21  already testified.
22         (The following portion of the deposition of
23         TERRY SPLANE is confidential pursuant to
24         stipulated protective order, Page 28 through
25         Page 34.)

Page 35

1
2         EXAMINATION (Continued)
3  BY MR. LUTHER:
4      Q  What is the percentage of Ventura's business
5  pertaining to its Mel-Fry product?
6      MR. GARRETT:  It's vague.
7      You can answer.
8      THE WITNESS:  I'm sorry.  The question again?
9  BY MR. LUTHER:
10     Q  What is the percentage of Ventura's business
11  pertaining to its Mel-Fry product?
12     MR. GARRETT:  Same objection.  You can answer
13  to the extent you can.
14     MR. LUTHER:  That's Mel, M-e-l, hyphen, F-r-y.
15  Mel-Fry.
16     MR. GARRETT:  Also calls for speculation.
17     THE WITNESS:  Don't know off the top of my
18  head.
19  BY MR. LUTHER:
20     Q  Can you tell me what Mel-Fry sales percentage
21  of Ventura were last year?
22     MR. GARRETT:  Still a vague question.
23     Go ahead.
24     THE WITNESS:  I cannot.
25  BY MR. LUTHER:

Page 36

1      Q  Can you tell me for any year?
2      A  No.
3      Q  Why can't you?
4      MR. GARRETT:  It's argumentative.
5      MR. LUTHER:  You can answer.
6      MR. GARRETT:  To the extent you can answer the
7  question, feel free.  Why can't you testify as to
8  something.
9  BY MR. LUTHER:
10     Q  Why don't you know?
11     A  I don't have that specific knowledge.  It's --
12  it's a vast business, with a multitude of brands and
13  categories beyond shortening.
14     Q  Weren't you designated as the official
15  spokesman for Ventura to testify today?
16     MR. GARRETT:  Objection.
17  BY MR. LUTHER:
18     Q  "Yes" or "No."
19     MR. GARRETT:  Objection.
20  BY MR. LUTHER:
21     Q  "Yes" or "No."
22     MR. GARRETT:  I need my objection on the
23  record, please, --
24  BY MR. LUTHER:
25     Q  "Yes" or "No."

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.

TERRY SPLANE

## Page 37

1    MR. GARRETT: -- before you answer the
2  question.
3    MR. LUTHER: Okay.
4    MR. GARRETT: You are asking the witness
5  specific financial questions. He has been so
6  designated. However, if you would like to show him a
7  specific document, perhaps to refresh his recollection.
8    I believe those documents have been produced
9  in this litigation.
10    MR. LUTHER: We don't have the documents, and
11  you haven't produced them. Do you refuse to produce
12  them? "Yes" or "No."
13    MR. GARRETT: I'm not refusing to produce
14  anything, Counselor.
15    MR. LUTHER: Okay.
16    Q  What were Mel-Fry's sales last year in
17  dollars?
18    MR. GARRETT: Gross sales? Net sales?
19  BY MR. LUTHER:
20    Q  Gross sales.
21    A  75 million.
22    Q  What percentage of sales is that of Ventura?
23    MR. GARRETT: It's -- it's still a vague
24  question.
25    You can answer to the extent you can.

## Page 38

1    THE WITNESS: In dollars?
2    MR. LUTHER: In dollars.
3    THE WITNESS: I'm not aware.
4  BY MR. LUTHER:
5    Q  You don't know?
6    A  (No audible response.)
7    Q  Okay.
8    Is Mel-Fry a big part of Ventura's business?
9    A  Yes.
10    Q  Am I pronouncing it right -- Ventura?
11    A  Yes, sir.
12    Q  How big a part is Mel-Fry of Ventura's
13  business?
14    MR. GARRETT: Asked and answered.
15    MR. LUTHER: You can answer.
16    THE WITNESS: Similar to the last question.
17  It's stated a different way.
18  BY MR. LUTHER:
19    Q  What are the names of your largest
20  competitors?
21    MR. GARRETT: Have you finished your previous
22  answer? Were you finished?
23    THE WITNESS: (No audible response.)
24  BY MR. LUTHER:
25    Q  What are the names of your largest

## Page 39

1  competitors?
2    MR. GARRETT: "Yours" being Ventura's?
3    MR. LUTHER: Let me rephrase it.
4    Q  What are the names of Ventura's largest
5  competitors?
6    A  Cargill. ADM. ConAgra.
7    Q  Is Supreme?
8    A  Not one of our largest, no.
9    Q  Okay.
10    Is -- would you say Supreme is a significant
11  competitor?
12    MR. GARRETT: Vague as to the term
13  "significant."
14    MR. LUTHER: You can answer.
15    THE WITNESS: The manufactures of competitors
16  that I stated before are national in scope. As it
17  relates to a specific region and territory, yes,
18  Supreme is in the northeast. New York specifically.
19  BY MR. LUTHER:
20    Q  So Supreme is a significant competitor in the
21  northeast region of the country?
22    A  (No audible response.)
23    Q  "Yes"?
24    A  Yes, that's where the name --
25    Q  Okay.

## Page 40

1    A  -- comes up.
2    Q  Do you have any documents at Ventura to show
3  this answer?
4    MR. GARRETT: Calls for speculation. It's
5  also vague.
6    MR. LUTHER: "Yes" or "No."
7    Well, you can answer the question.
8    THE WITNESS: "No."
9  BY MR. LUTHER:
10    Q  You don't have any documents at Ventura that
11  show who the largest competitors are. Is that correct?
12    MR. GARRETT: That's -- it's vague. Also
13  misstates the prior testimony.
14  BY MR. LUTHER:
15    Q  Do you have any -- do you have documents at
16  Ventura?
17    A  Yes.
18    Q  Do you have documents showing who your
19  competitors are?
20    A  We keep competitive intelligence, yes.
21    Q  Okay.
22    Why haven't you produced those documents?
23    MR. GARRETT: Objection to the extent you are
24  asking the witness what has or has not been produced by
25  counsel, he may or may not be aware of that

Case 1:07-cv-07338-PKC   Document 33   Filed 10/25/2007   Page 14 of 33

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                    TERRY SPLANE

Page 41

1  information.
2  BY MR. LUTHER:
3     Q  Did you provide those documents to your
4  attorney?
5        MR. GARRETT:  Again, objection to the extent
6  it calls for disclosure of attorney/client
7  communication.
8        MR. LUTHER:  You are asking him not to -- you
9  are instructing him not to answer that one?
10       MR. GARRETT:  I haven't said that.
11       Can you read back the question.
12       (Record read as follows:
13          "Question: Did you provide those
14       documents to your attorney?")
15       MR. GARRETT:  Those documents being documents
16  showing competitive data?
17       MR. LUTHER:  Yes.
18       MR. GARRETT:  You can answer the question.
19       THE WITNESS:  I did not personally, no.
20  BY MR. LUTHER:
21     Q  When Ventura sells liquid shortening to a
22  customer, does the customer know who it's buying from?
23     A  Yes.
24       Can I ask for your definition of a customer.
25       MR. GARRETT:  I'd like to interject a belated

Page 42

1  objection as calls for speculation.
2  BY MR. LUTHER:
3     Q  How long has Mel-Fry been used, the mark?
4     A  I believe since the '60s, early '60s.
5     Q  Was that when it was owned by Durkee?
6        MR. GARRETT:  Calls for speculation.
7        THE WITNESS:  I'm not sure who owned the
8  trademark at that point.
9  BY MR. LUTHER:
10     Q  Now, are you familiar with the Mel-Fry design
11  which is at issue in this lawsuit?
12     A  Yes.
13     Q  How long has that design been in use?
14       MR. GARRETT:  Again, calls for speculation.
15       THE WITNESS:  Do not know.
16  BY MR. LUTHER:
17     Q  So you can't tell me when it was first used?
18     A  I'm not aware of any design modifications over
19  the continuum life of Mel-Fry.
20     Q  So it's your impression or to your personal
21  knowledge the design in use today was the design first
22  used?
23       MR. GARRETT:  Objection.  Misstates the prior
24  testimony.  In addition --
25       MR. LUTHER:  We have a new question here.

Page 43

1        MR. GARRETT:  No, let me finish my objection.
2        MR. LUTHER:  Finish.
3        MR. GARRETT:  To the extent you are asking the
4  witness multiple questions that are outlined in his
5  declaration, I would ask that you show him the
6  declaration.  Perhaps it will refresh his recollection.
7  You are asking him identical questions he's already
8  testified to in his declaration, multiple declarations.
9        You may ask your next question.
10  BY MR. LUTHER:
11     Q  So how many versions of the Mel-Fry label have
12  there been?
13       MR. GARRETT:  Calls for speculation.
14       MR. LUTHER:  You can answer.
15       THE WITNESS:  Since I've been involved in the
16  business, one.  I have no idea prior to that.
17  BY MR. LUTHER:
18     Q  And that one is the one at issue in the
19  lawsuit?
20     A  (No audible response.)
21       THE REPORTER:  Excuse me?
22       THE WITNESS:  "Yes."
23       MR. GARRETT:  Let me back up since Mr. Luther
24  did not provide you with this information in the
25  beginning.  The court reporter is taking down all of

Page 44

1  the information, everything that is said in the room
2  today.  And you need to give Mr. Luther the courtesy of
3  finishing his question before you give an answer.  And,
4  likewise, he will of course do the same.
5        If you don't understand a question, you should
6  ask that he rephrase the question.  Otherwise the court
7  reporter and Mr. Luther will assume you understood the
8  question.
9        THE WITNESS:  Understood.
10       MR. GARRETT:  So he can only take down verbal
11  responses.  So to the extent you have your hand over
12  your mouth or you nod your head, he can't take that
13  down.  So you need to say it audibly.
14       Understood?
15       THE WITNESS:  Yes, sir.
16       MR. GARRETT:  And we will all try to talk
17  slowly and not talk over each other.
18       MR. GARRETT:  Are we back on the record?  Are
19  we on the record?
20       MR. GARRETT:  We are on the record.
21  BY MR. LUTHER:
22     Q  How long has the term "fry" been used by
23  Ventura?
24       MR. GARRETT:  Objection.  Calls for
25  speculation.  It's also vague.

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.

TERRY SPLANE

---

Page 45

1     MR. LUTHER: You can answer.
2     MR. GARRETT: Are you referring to in the
3 Mel-Fry term or in Ventura in any context?
4     MR. LUTHER: Any context.
5     MR. GARRETT: You can answer.
6     THE WITNESS: I can only answer to the extent
7 on the Mel-Fry that would have been since the
8 acquisition in the late '90s.
9 BY MR. LUTHER:
10    Q To your knowledge who else besides Ventura
11 uses the term "fry" in the trademark?
12    MR. GARRETT: Calls for speculation. It's
13 vague.
14    MR. LUTHER: You can answer.
15    MR. GARRETT: Talking about any other
16 retailer? Wholesaler? Manufacturer? Of any kind?
17    MR. LUTHER: Any use whatsoever.
18    MR. GARRETT: Like Kentucky Fried Chicken?
19    MR. LUTHER: Any use whatsoever to your
20 knowledge.
21    MR. GARRETT: To the extent you can answer, go
22 ahead.
23    THE WITNESS: No idea.
24    MR. LUTHER: Okay.
25    Q Now, pertaining to the Mel-Fry mark, what does

---

Page 46

1 "Mel" mean or describe?
2    A I believe it's an arbitrary term, does not tie
3 to anything with the actual shortening.
4    Q Is it an acronym for something?
5    A Not to my knowledge.
6    Q Do you know what the term "fry" means or
7 describes?
8    MR. GARRETT: Again, vague to the extent it's
9 -- you are talking in the Mel-Fry context; correct?
10    MR. LUTHER: Any context.
11    Q What does fry -- let me finish my question,
12 please.
13    What does "fry" mean or describe to your
14 knowledge?
15    A It's a preparation method of food.
16    Q Okay.
17    To your knowledge what does the term "pig fry"
18 mean or describe?
19    MR. GARRETT: For the record, p-i-g, second
20 word, f-r-y?
21    MR. LUTHER: Correct.
22    THE WITNESS: My interpretation would be
23 frying a pig.
24 BY MR. LUTHER:
25    Q To your knowledge what does the term French

---

Page 47

1 fry mean or describe?
2    A Fried potatoes.
3    Q To your knowledge what does the term "chicken
4 fry" mean or describe?
5    MR. GARRETT: You can answer.
6    THE WITNESS: It's a preparation method.
7 BY MR. LUTHER:
8    Q Fried chicken? Is that what you mean?
9    A Chicken fried steak. Doesn't have to be
10 chicken.
11    Q To your -- that was my next question.
12    To your knowledge what does the term "French
13 fried potatoes" mean or describe?
14    A Fried potatoes.
15    Q Okay.
16    And you testified to the chicken fried steak.
17 Okay.
18    Pertaining to the Mel-Fry design which you
19 are familiar with you testified to, why did Ventura
20 choose common descriptive elements for use in the
21 label?
22    MR. GARRETT: It's compound. It's
23 argumentative and calls for a legal conclusion. Also
24 calls for speculation.
25    To the extent you can answer the question, you

---

Page 48

1 may do so.
2    THE WITNESS: Wasn't a part of the
3 organization when the decision was made.
4    MR. LUTHER: Okay.
5    Q So you have no idea -- you testified -- strike
6 that question. Okay.
7    Pertaining to the Mel-Fry --
8    MR. GARRETT: Before a question is pending,
9 I'd like to take a short break real quickly if I could.
10    MR. LUTHER: Off the record.
11    MR. GARRETT: Thanks.
12    (Brief recess.)
13 BY MR. LUTHER:
14    Q Mr. Splane -- am I pronouncing that right?
15    A Yes, sir.
16    Q Pertaining to the Mel-Fry product, can you
17 tell me what kind of containers that product is put
18 into, please.
19    A Yes. 35 pound jug. Three 10-quart pack. And
20 a twin pack, two 17-and-a-half pound.
21    Q Is that jug referred to as an F-style jug?
22    A Which jug?
23    Q That Mel-Fry is put into.
24    A There's three that it's put into.
25    Q Is Mel-Fry put into a 10-quart jug?

---

11 (Pages 45 to 48)

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                                    TERRY SPLANE

Page 49

1     A   Yes.
2     Q   Is that an F-style jug?
3     A   I have never heard it referred to as that.
4         MR. LUTHER: I want to introduce Exhibit 5.
5     (Defendant's Exhibit 5 was marked
6         for identification by the Certified
7         Shorthand Reporter.)
8   BY MR. LUTHER:
9     Q   Do you see the front page, Mr. Splane?
10        MR. GARRETT: Go ahead and take a look at it.
11        MR. LUTHER: Right now I'm just referring to
12   the front page of document SU 100149.
13        MR. GARRETT: For the record this is a --
14   looks like a document printed from the Internet at
15   www.containerandpackaging.com. Actually correction.
16   It looks like two different websites.
17        Did you intend to mark both of these? Looks
18   like one is -- the first three pages are from
19   bestcontainers.com. And the last three pages are from
20   containerandpackaging.com.
21        MR. LUTHER: Well, looks like they got stapled
22   together. Let's make Exhibit 5 SU 100149 to SU 100151.
23        Okay. And we will make Exhibit 6 the next
24   one.
25        (Defendant's Exhibit 6 was marked

Page 50

1         for identification by the Certified
2         Shorthand Reporter.)
3   BY MR. LUTHER:
4     Q   Can we have -- we are looking at Exhibit 5.
5   Do you see the first -- do you see the container on the
6   first page of Exhibit 5, Mr. Splane?
7     A   Yes.
8     Q   Is that the type of container used for
9   Mel-Fry?
10    A   With the small picture, yes, it looks very
11   similar.
12    Q   Okay.
13        Now let's to Exhibit 6. And this would be
14   document SU 100152.
15        MR. GARRETT: If I could interject a belated
16   objection to the extent it calls for speculation, the
17   prior question and answer.
18        Go ahead.
19   BY MR. LUTHER:
20    Q   We are now on Exhibit 6, SU 100152, first
21   page. Do you see several bottles there exhibited,
22   Mr. Splane?
23        MR. GARRETT: You can answer the question.
24        THE WITNESS: Yes.
25   BY MR. LUTHER:

Page 51

1     Q   Is -- the first bottle is referred to as 2.5
2   gallon white F-style. Is that similar to the bottle
3   used for the -- is that similar to the jug used for the
4   Mel-Fry product?
5     A   It's not discernible --
6         MR. GARRETT: Calls for speculation.
7         THE WITNESS: And it's not discernible in the
8   shot. I -- there's no boundaries around the bottle. I
9   can't tell.
10  BY MR. LUTHER:
11    Q   You can't tell?
12    A   I can't tell.
13    Q   And you can't tell from the last one either?
14    A   I didn't state that.
15    Q   Can you tell from the last one? On that page.
16        MR. GARRETT: Referring to B140 on --
17        MR. LUTHER: I am referring to exhibit --
18        THE REPORTER: Wait, wait, wait, wait.
19        (Discussion held off the record.)
20        MR. LUTHER: I am referring to Exhibit 6, the
21   designation B140, 32 ounce.
22        THE WITNESS: There is not enough definition
23   in the shot.
24        MR. LUTHER: So you can't tell from -- okay.
25   We will go on to the next one.

Page 52

1         There is Exhibit 7.
2         (Defendant's Exhibit 7 was marked
3         for identification by the Certified
4         Shorthand Reporter.)
5   BY MR. LUTHER:
6     Q   We have Exhibit 7. This starts with SU 100156
7   through -- sequentially through to SU 100163.
8         MR. GARRETT: Again, if I could, Counselor, it
9   appears as though the last page, which is 100163 is
10   from a separate website. Do you want to mark it as
11   eight?
12        MR. LUTHER: Eight it is.
13        (Defendant's Exhibit 8 was marked
14        for identification by the Certified
15        Shorthand Reporter.)
16        MR. GARRETT: For the record, Exhibit 7 is
17   a -- appears to be a five-page -- excuse me -- a
18   six-page printout from www.thecarycompany -- spelled
19   with a "C" -- dot com. And Exhibit 8 is a one-page
20   printout from the website w-w-w dot i-l-l-i-n-g,
21   company, dot com.
22        MR. LUTHER: Okay.
23    Q   Mr. Splane, let's go to Exhibit 7. Do you see
24   the first page of Exhibit 7?
25    A   Yes.

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.

TERRY SPLANE

---

**Page 53**

1  Q  And you see a series of containers there?
2  A  Yes.
3  Q  Do you see the jug in the middle?
4  A  Yes.
5  Q  Is that similar to the product that Mel-Fry is
6  used with?
7  MR. GARRETT:  Is it similar?  You are
8  referring to the one, two, three -- sixth jug in?
9  MR. LUTHER:  Yes.
10  MR. GARRETT:  From the left?
11  MR. LUTHER:  Yes.
12  THE WITNESS:  It appears to be, yes.
13  MR. LUTHER:  Okay.
14  Q  Can we go to page three of seven.  That is
15  document SU 100158.  Do you see the last two jugs
16  illustrated on this document, Mr. Splane?
17  A  Yes.
18  Q  Okay.
19  Is the first one similar to the one used -- to
20  the jug used with the Mel-Fry product?
21  MR. GARRETT:  The -- which size Mel-Fry
22  product, just to be clear?
23  MR. LUTHER:  The jug illustrated in the
24  middle.
25  MR. GARRETT:  The 10-quart?

---

**Page 54**

1  THE WITNESS:  (No audible response.)
2  MR. GARRETT:  Just so we are referring to the
3  10-quart.  He referred to three of them.
4  Go ahead.
5  THE WITNESS:  Looks similar, yes.
6  BY MR. LUTHER:
7  Q  Now let's go back to question I just asked, SU
8  100158, and which shows three jugs.  You see these
9  three jugs?
10  A  Yes.
11  Q  Okay.
12  Now, do you see a jug that's second down from
13  the first jug?
14  A  Yes.
15  Q  Is that jug similar to the one used with the
16  Mel-Fry product?
17  MR. GARRETT:  Again, it's vague.
18  Go ahead.
19  MR. LUTHER:  You can answer.
20  THE WITNESS:  As previously stated, yes,
21  similar.
22  MR. LUTHER:  Okay.
23  Q  Let's go to up document eight.  Do you see in
24  the first -- document eight is SU 100163.
25  Do you see any jugs depicted in this exhibit

---

**Page 55**

1  which is similar to the jug used with the Mel-Fry
2  product?
3  MR. GARRETT:  Again, it's vague to the extent
4  the Mel-Fry product is packaged in three different
5  jugs.
6  Go ahead.
7  THE WITNESS:  Yes.
8  BY MR. LUTHER:
9  Q  And which ones?
10  A  The ones in this scale that look most similar
11  to the Mel-Fry three 10-quart are number three and
12  number four.
13  Q  Okay.  Let's go on.
14  Now, the Mel-Fry design which is at issue in
15  this lawsuit shows a basket of fried foods.  Is that
16  correct?
17  A  Correct.
18  MR. GARRETT:  It's vague.  You are referring
19  to the label?
20  MR. LUTHER:  I said "design."
21  Q  Now, are you aware of any other designs or
22  labels which use a basket with fried foods?
23  MR. GARRETT:  Calls for speculation.  It's
24  also vague.
25  MR. LUTHER:  You can answer.

---

**Page 56**

1  THE WITNESS:  Yes.
2  BY MR. LUTHER:
3  Q  How many?
4  A  One.
5  Q  Just one?  You answered.  Which one?  Who
6  makes it?  Strike that.
7  Who makes it?
8  For the record, if we have any more
9  interference, we are going to go ask the judge to
10  reschedule this deposition and have plaintiff pay for
11  it again.  If the plaintiff's counsel keeps giving hand
12  signals and chuckling after each question.
13  MR. GARRETT:  For the record --
14  MR. LUTHER:  You can shut your mouth.  Now we
15  are going to go on the next question.
16  MR. GARRETT:  Counselor.
17  MR. LUTHER:  Who --
18  MR. GARRETT:  Counselor, for the record, I did
19  nothing more than chuckle because you asked the same
20  question three different times.
21  MR. LUTHER:  I will ask it a hundred different
22  times.
23  MR. GARRETT:  For the record --
24  MR. LUTHER:  Now, who --
25  MR. GARRETT:  For the record, if you continue

---

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                              TERRY SPLANE

Page 57

1  to badger the witness, be argumentative, and be this
2  aggressive in this deposition, all unnecessarily, we
3  will get up and walk away and you can feel free to call
4  the judge.
5       You are here to ask your questions; we are
6  here to answer them. However, we do not have
7  to take your abuse, nor do we have to take this
8  attitude. It may be appropriate in Chicago, but it is
9  not here. So please --
10      MR. LUTHER: Don't chuckle anymore. Okay? Do
11  me a favor --
12      MR. GARRETT: -- take a deep breath.
13      MR. LUTHER: -- and keep your chuckling to
14  yourself. No, next question.
15      MR. GARRETT: Take a deep breath.
16  BY MR. LUTHER:
17      Q  Who to your knowledge also uses a basket of
18  fried foods in their advertising?
19      MR. GARRETT: Calls for speculation.
20      MR. LUTHER: You can answer.
21      MR. GARRETT: It's vague.
22      You may answer the question.
23      THE WITNESS: Yeah, two-part question, Supreme
24  with their Mega-Fry. Don't know that they advertise.
25      This will be Exhibit No. 9, I believe.

Page 58

1       (Defendant's Exhibit 9 was marked
2       for identification by the Certified
3       Shorthand Reporter.)
4       MR. LUTHER: Exhibit 9 is SU 100118 through
5  SU 100120.
6       Q  Do you see the first page, Mr. Splane?
7       MR. GARRETT: Feel free to take a look at the
8  document. Take your time.
9       For the record, this is a three-page document
10  printed from the Internet from www.foodprocessing.com.
11      MR. LUTHER: Okay.
12      Q  Do you see the first page, Mr. Splane?
13      MR. GARRETT: Are you finished reading the
14  document?
15      THE WITNESS: No, I'm not yet.
16  BY MR. LUTHER:
17      Q  I am going to direct your attention to the
18  picture on the first page. Do you see that?
19      A  Yes.
20      Q  Does it show fried foods?
21      A  Yes.
22      Q  Let's go to the next document.
23      By the way, to your knowledge is Ventura the
24  only distributor of liquid shortening that uses a
25  yellow container?

Page 59

1       A  No.
2       Q  Can you tell me who else does?
3       A  The reason we are sitting here, Supreme and
4  Mega-Fry.
5       MR. LUTHER: And you know of -- okay.
6  I will make this document number ten.
7       (Defendant's Exhibit 10 was marked
8       for identification by the Certified
9       Shorthand Reporter.)
10      MR. GARRETT: Can we go off the record?
11      (Discussion held off the record.)
12  BY MR. LUTHER:
13      Q  Exhibit 10. This is SU 100007. Are you
14  familiar with the Whole Harvest product, Mr. Splane?
15      A  Yes.
16      Q  Is that manufactured by Ventura?
17      A  No, it is not.
18      Q  Is this container yellow?
19      A  In this shot it appears to be translucent.
20      Q  And that would make the product yellow in
21  color?
22      A  I don't believe it has any impact on the
23  product itself.
24      MR. GARRETT: That is a vague question.
25  BY MR. LUTHER:

Page 60

1       Q  If you put a yellow-colored product into a
2  translucent jug, what would be the resulting color of
3  the product?
4       A  It doesn't create yellow, but it is yellow by
5  its nature.
6       Q  Okay.
7       A  But the jug itself is obviously not yellow.
8       MR. LUTHER: Let's go to the next document.
9       (Defendant's Exhibit 11 was marked
10      for identification by the Certified
11      Shorthand Reporter.)
12  BY MR. LUTHER:
13      Q  Exhibit 11 is SU 100008. Do you see the
14  products depicted in Exhibit 11, Mr. Splane?
15      A  Yes.
16      Q  Are you familiar with any of the names?
17      A  I am not.
18      Q  What color are the products in the front row?
19      A  All products in the front row of this family
20  shot I would call them gold in nature.
21      MR. LUTHER: Let's go on to the next exhibit.
22      (Defendant's Exhibit 12 was marked
23      for identification by the Certified
24      Shorthand Reporter.)
25      MR. LUTHER: Exhibit 12 is SU 100001.

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                    TERRY SPLANE

Page 61

1    Q  Do you see the products depicted in this
2  exhibit, Mr. Splane?
3    A  Yes.
4    Q  What color are the products depicted in this
5  exhibit?
6    A  There is a range.  But I would say they are
7  primarily gold.
8    MR. LUTHER: Let's go on to the next exhibit.
9    (Defendant's Exhibit 13 was marked
10    for identification by the Certified
11    Shorthand Reporter.)
12    MR. LUTHER: This is exhibit SU 100002.
13    Q  Do you see the products depicted in this
14  exhibit, Mr. Splane?
15    A  Yes.
16    MR. GARRETT:  Again for the record, I would
17  object that all of these questions are vague to the
18  extent you are asking product.  Is the product -- you
19  referred previously to the container.  Are you
20  referring to the liquid or the product?  When you say
21  "product," I am confused as to what you are referring
22  to exactly.
23    MR. LUTHER: The product depicted, the color.
24    MR. GARRETT: In other words, the container,
25  the whole --

Page 62

1    MR. LUTHER: The product depicted in the
2  exhibit.
3    MR. GARRETT: Okay.
4  BY MR. LUTHER:
5    Q  Do you see the product depicted in this
6  exhibit, Mr. Splane?
7    A  Yes.
8    Q  Starting from the left there are five jugs I
9  believe.  Do you see that?
10    A  Yes.
11    Q  What color are they?
12    A  What color are the jugs?
13    Q  Yes.
14    A  I would say the jugs appear to be clear.
15    Q  What color is the product in the jugs?
16    A  Gold.
17    MR. LUTHER: Let's go on to the next one,
18  Exhibit 14.
19    (Defendant's Exhibit 14 was marked
20    for identification by the Certified
21    Shorthand Reporter.)
22    MR. LUTHER: This is exhibit SU 100003.
23    Q  Do you see the products depicted in this
24  exhibit, Mr. Splane?
25    A  Yes.

Page 63

1    Q  Do you see there are two rows, a top row and a
2  bottom row?
3    A  Yes.
4    Q  May I refer to the left, top row.  Do you see
5  a jug there similar to the one used for the Mel-Fry
6  product?
7    A  Yes.
8    Q  Do you see a label that says C-A-M-A-R?
9    A  I see a label that says something close to
10  that.  Again, it's not -- the quality is not all that
11  high.  So I can't make it out that specifically.
12    Q  Are you familiar with a liquid shortening
13  product of that name?
14    A  I am not.
15    Q  What color is the product depicted -- what
16  color is the jug we are referring to right now?
17    A  It appears to be a translucent jug.
18    Q  And what color is the product within the jug?
19    A  Gold.
20    Q  And what are the colors of the other products
21  directly next to it in that upper left-hand corner?
22    A  The one directly to the left, which appears to
23  be a taller gallon, again gold, looks to be a clear
24  jug.  The two products to the left of that look to be
25  solid colored stand-up pouches.  Can't see any product

Page 64

1  within them.
2    Q  Okay.
3    May we go to the bottom row.  We're going to
4  go all the way over to the right in the bottom row.  Is
5  that a jug -- do you see the jug there?
6    A  Yes.
7    Q  Is that similar to the one used with the
8  Mel-Fry product?
9    A  Similar.  Appears to be wider and squatter.
10    Q  Can you tell us what color it is?
11    A  Appears to be translucent.
12    Q  Does it have a label on it?
13    A  Yes.
14    Q  What color is the label?
15    A  Bright yellow.
16    Q  Let's go back to the top row, left.  Do you
17  see a jug -- I am referring to the jug there that's
18  similar to the Mel-Fry jug, do you see that?
19    A  Yes.
20    Q  What color is the label?
21    A  Bright yellow and orange.
22    MR. LUTHER: Let's go to the next exhibit.
23    (Defendant's Exhibit 15 was marked
24    for identification by the Certified
25    Shorthand Reporter.)

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                                    TERRY SPLANE

Page 65

1       MR. LUTHER: This is document SU 100004.
2    Q  Do you see a product depicted in this exhibit,
3  Mr. Splane?
4    A  Yes.
5    Q  What color is the product?
6    A  The product itself appears to be goldish in a
7  clear jug.
8       MR. LUTHER: Let's go on to the next exhibit.
9       (Defendant's Exhibit 16 was marked
10         for identification by the Certified
11         Shorthand Reporter.)
12      MR. LUTHER: This is exhibit SU 100006.
13   Q  Are you familiar with a product called
14  Sunfoil, Mr. Splane?
15   A  I am not.
16   Q  Do you see the product depicted in this
17  exhibit?
18   A  Yes.
19   Q  And what color are the products depicted in
20  this exhibit?
21   A  They are a multitude of colors.
22   Q  Okay.
23      Is there a yellow product depicted in this
24  exhibit?
25   A  Yes.

Page 66

1    Q  Are there golden products depicted in this
2  exhibit?
3    A  Yes.
4       MR. LUTHER: Let's go on to the next exhibit.
5       (Defendant's Exhibit 17 was marked
6         for identification by the Certified
7         Shorthand Reporter.)
8       MR. LUTHER: This is exhibit SU -- 17 is SU
9  100009.
10   Q  Do you see a product depicted in this exhibit,
11  Mr. Splane?
12   A  Yes.
13   Q  Does -- can you tell me what the color of the
14  product is? Products are, excuse me.
15   A  Product appears to be gold, again in a clear
16  jug.
17      MR. LUTHER: Okay.
18      (Defendant's Exhibit 18 was marked
19        for identification by the Certified
20        Shorthand Reporter.)
21      MR. GARRETT: Counselor, do you see that
22  these --
23      MR. LUTHER: Yeah, Exhibit 18 is different Web
24  pages, but I'd like to keep it all together as a
25  conglomeration and call it all Exhibit 18.

Page 67

1       MR. GARRETT: This whole thing?
2       MR. LUTHER: Correct. We can refer to each
3  individual document by -- how can we?
4       MR. GARRETT: These don't have Bates numbers
5  on them. It looks like the last three pages --
6       MR. LUTHER: Have Bates numbers?
7       MR. GARRETT: Correct. They don't have a
8  Bates numbers on them. Neither do any of these pages.
9  These are all printouts from web pages.
10      MR. LUTHER: Well, I got to talk to this
11  associate here.
12      MR. GARRETT: Do you know if these have been
13  produced or not?
14      MR. LUTHER: If they don't have a Bates number
15  on it, they haven't been produced.
16      MR. GARRETT: Okay.
17      MR. LUTHER: Can we keep the whole thing
18  together and -- as Exhibit 18?
19      MR. GARRETT: I would only object to the
20  extent that if they haven't been produced I'm not sure
21  whether or not in the context of this litigation you
22  are allowed to use them. But that's fine. If you
23  would like to use 18, all -- for the record one, two,
24  three -- first five pages of this exhibit are from a
25  printout from w-w-w dot s-a-p-o-r-i-t-o foods, dot

Page 68

1  com.
2       The last three pages appear to be from a -- a
3  foreign company's website, clubentrepot, p-o-t.
4       MR. LUTHER: Okay.
5    Q  Do you see the first page, Mr. Splane?
6    A  Yes.
7    Q  Are you familiar with a company called
8  Saporito Foods?
9    A  No.
10   Q  And do you see three products depicted on page
11  one of exhibit -- of this exhibit?
12   A  Yes.
13   Q  Can you tell me what the color of the product
14  to the left is?
15   A  It's almost a greenish gold.
16   Q  And the product to the right?
17   A  Light beige.
18   Q  Okay.
19      Can we go to the next page of this exhibit.
20  You see products depicted at the top there?
21   A  Yes.
22   Q  Okay.
23      Can you tell me what the colors of the two
24  products to the left are?
25   A  Gold.

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.

---

**Page 69**

1    Q  Can you tell me what the color of the product
2  all the way to the right is?
3        MR. GARRETT:  The one that's cut off?
4        MR. LUTHER:  Yes.
5        THE WITNESS:  Very bright yellow.
6  BY MR. LUTHER:
7    Q  Can we go to the next page of this exhibit.
8  Oh, excuse me, excuse me.
9        Okay.  We are going to go to one, two, three
10  -- the fourth page of this exhibit.  Do you see a
11  depiction of a 20 kilogram cube to the right?
12    A  Yes.
13    Q  And do you see text underneath it?
14    A  Yes.
15    Q  And does the text say "heavy duty solid
16  shortening"?
17        MR. GARRETT:  For the record, the text is cut
18  off because this is a printout from a website.  And the
19  document speaks for itself.
20        If you would like to read what you can read
21  from there, feel free.
22        THE WITNESS:  No, I don't see "heavy duty."  I
23  see "high performance."
24        MR. LUTHER:  Okay.
25    Q  Do you see a label on this cube?

---

**Page 70**

1    A  I see that there is a label, yes.
2    Q  What color is the label?
3    A  Bright yellow.
4        MR. LUTHER:  Let's go to --
5        MR. GARRETT:  Counselor, if I could interject
6  -- if you'd like, I will do it off the record.
7        MR. LUTHER:  Sure.  Off the record.
8        (Discussion held off the record.)
9        MR. GARRETT:  We are on page whatever of
10  Exhibit 18?
11        MR. LUTHER:  We are going to go to another
12  exhibit.
13        (Defendant's Exhibit 19 was marked
14        for identification by the Certified
15        Shorthand Reporter.)
16        MR. LUTHER:  This is Exhibit 19.  And it's a
17  series of --
18        MR. GARRETT:  Again has two different
19  websites.
20        MR. LUTHER:  -- series of documents.
21        MR. GARRETT:  I'm sorry to interrupt.
22        MR. LUTHER:  Oh, go ahead.
23        MR. GARRETT:  None of these are also marked
24  with Bates numbers.  I don't believe any of these have
25  been produced to date.

---

**Page 71**

1        MR. LUTHER:  Well, we are producing them today
2  as deposition exhibits.
3        MR. GARRETT:  If you'd -- okay.
4        I will object to the extent they have not
5  already been produced.  I seem to recall -- I could be
6  incorrect; I will look at a break.  But I -- I will let
7  it in for this limited purpose.  But I believe that
8  only documents already produced are to be used at
9  deposition.
10        Go ahead.
11        MR. LUTHER:  Did you see that in an order?
12        MR. GARRETT:  As I said, I may be incorrect.
13  I'm making the objection to the extent there is
14  something out there.  If there's not -- but you may ask
15  questions.
16        MR. LUTHER:  If you want to institute a
17  running objection, that's okay with me.
18        MR. GARRETT:  To the extent -- correct.  Thank
19  you.
20        To the extent you introduce any documents
21  today that have not been produced, that's my objection.
22        MR. LUTHER:  Okay.  That's fine.
23        MR. GARRETT:  You want to use all these even
24  though they are from different --
25        MR. LUTHER:  Yeah, I want to go through them

---

**Page 72**

1  one by one.
2        MR. GARRETT:  Okay.  So these are all
3  Exhibit 19.
4        MR. LUTHER:  Yes.
5    Q  Do you see the second page of Exhibit 19,
6  Mr. Splane?
7    A  Yes.
8    Q  Do you see a picture of fried foods?
9    A  Yes.
10    Q  Okay.
11        Can we go to page four of this exhibit.  Do
12  you see a picture of fried foods?
13    A  Yes.
14    Q  Okay.
15        Can we go to -- I guess page six of this
16  exhibit.  Do you see a picture of fried foods?
17    A  Yes.
18    Q  All right.
19        Can we go to the last page of this exhibit.
20  Do you see a picture of fried foods?
21    A  Yes.
22        MR. LUTHER:  Next exhibit.
23        (Defendant's Exhibit 20 was marked
24        for identification by the Certified
25        Shorthand Reporter.)

---

Page 73

1       MR. GARRETT:  Is there only one?
2       MR. LUTHER:  Oh, sorry, sorry, sorry.
3       MR. GARRETT:  That's all right.
4       MR. LUTHER:  This hasn't been produced.
5   Doesn't have Bates numbers on it.  This is going to be
6   deposition Exhibit 20.
7       MR. GARRETT:  Counselor, do you note that they
8   appear to be two totally separate things?  Do you want
9   to keep them as one?
10      MR. LUTHER:  Yes.  Yes, I want to keep them as
11  one.
12      MR. GARRETT:  Okay.
13  BY MR. LUTHER:
14      Q   The first page, Mr. Splane?
15      A   Yes.
16      Q   Are you familiar with the Spectra company?
17      A   No.
18      Q   Okay.
19          And do you see products depicted on the first
20  page of this exhibit?
21      A   Yes.
22      Q   Are some of those products yellow in color?
23      A   Very bright yellow, yes.
24      Q   Can we go to the second page of this exhibit.
25  Do you see the top where it says "vegetable oils"?

Page 74

1       A   Yes.
2       Q   Below that to you see a yellow product?
3       A   The Alfa product?  Yes.
4       Q   Okay.
5           Can we go to the fourth page of this exhibit.
6   No.  Excuse me.
7           Let's go to the next exhibit.
8       (Defendant's Exhibit 21 was marked
9       for identification by the Certified
10      Shorthand Reporter.)
11  BY MR. LUTHER:
12      Q   Mr. Splane, who is E-T-A Mel-Fry?
13      MR. GARRETT:  The question is "who is?"
14      MR. LUTHER:  Yes.
15      MR. GARRETT:  Okay.
16      THE WITNESS:  This is the first I've heard of
17  them.  Appears to be in Australia.
18  BY MR. LUTHER:
19      Q   Who is Goodman Fielder, do you know?
20      A   Do not.
21      Q   Do you see two products depicted to the left?
22      A   Yes.
23      Q   Do you see "Mel, hyphen, Fry" in one of the
24  depictions?
25      A   Yes.

Page 75

1       MR. LUTHER:  Let's go to the next exhibit.
2       (Defendant's Exhibit 22 was marked
3       for identification by the Certified
4       Shorthand Reporter.)
5   BY MR. LUTHER:
6       Q   Do you see the first page of Exhibit 22,
7   Mr. Splane?
8       A   Yes.
9       Q   Can you see down at the bottom it says ADM?
10      A   Yes.
11      Q   You have testified that you know who ADM is.
12  They are a competitor?
13      A   Yes.
14      Q   Did you know that they use the color yellow to
15  advertise their shortenings?
16      MR. GARRETT:  Calls for speculation.  Vague.
17  Actually just vague.
18      MR. LUTHER:  You can answer.
19      THE WITNESS:  I see yellow on the front page.
20  Don't know that it's the consistent yellow color
21  through all their communications.
22  BY MR. LUTHER:
23      Q   Can we go to the last page.  Do you see the
24  color yellow here?
25      A   Multiple colors of yellow, yes, and orange.

Page 76

1       MR. LUTHER:  Let's go to the next --
2       THE REPORTER:  Could we take a short break.
3       MR. LUTHER:  Go ahead.
4       (Brief recess.)
5   BY MR. LUTHER:
6       Q   Mr. Splane, can you tell me what is more
7   effective advertising, French fries or fried carrots?
8       MR. GARRETT:  Calls for speculation.  It's
9   vague.
10      MR. LUTHER:  Can you answer?
11      THE WITNESS:  More effective in advertising?
12  What am I advertising?
13      MR. LUTHER:  Liquid shortening.
14      THE WITNESS:  Then clearly it would be French
15  fries.
16  BY MR. LUTHER:
17      Q   Now, would you ever advertise lamb chops being
18  fried in liquid shortening?
19      A   Would we ever?
20      Q   Yes.
21      A   If it were a common use in a market we are
22  going after, yes.
23      Q   Is it a common use?
24      A   Today no.
25      MR. LUTHER:  Okay.  Now let's on to the next

18  (Pages 73 to 76)

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                    TERRY SPLANE

---

Page 77

1   document.
2        (Defendant's Exhibit 23 was marked
3        for identification by the Certified
4        Shorthand Reporter.)
5        MR. LUTHER:  23 has been produced.  It is SU
6   100015.  Looks like my associate got this one right,
7   it's all one web page.
8        Q  Do you see a picture up in the upper
9   right-hand corner depicting yellow products?
10       A  Yes.
11       Q  Are you familiar with the company called Moi,
12  M-o-i?
13       A  Looks to be from Malaysia.  No, I'm not.
14       MR. LUTHER:  Okay.  Let's go on to the next
15  exhibit.
16       (Defendant's Exhibit 24 was marked
17       for identification by the Certified
18       Shorthand Reporter.)
19       MR. LUTHER:  This has been produced as SU
20  100087.
21       Q  Do you see a picture in the upper left-hand
22  corner?
23       A  Yes.
24       Q  Are those French fries in a basket?
25       A  French fries falling out of a basket.

---

Page 78

1        MR. LUTHER:  Let's go to the next exhibit.
2        (Defendant's Exhibit 25 was marked
3        for identification by the Certified
4        Shorthand Reporter.)
5        MR. LUTHER:  This has been produced as SU
6   100125.
7        Q  Do you see a picture of French fries
8   advertised here?
9        A  I see a picture of French fries, not
10  necessarily advertised.
11       MR. LUTHER:  Let's go to the next exhibit.
12       (Defendant's Exhibit 26 was marked
13       for identification by the Certified
14       Shorthand Reporter.)
15       MR. LUTHER:  This has been produced as SU
16  100128.
17       MR. GARRETT:  Do you have a copy for me?
18       MR. LUTHER:  Oh, sorry.
19       MR. GARRETT:  No worries.
20  BY MR. LUTHER:
21       Q  Do you see a picture on the first page of this
22  exhibit, Mr. Splane?
23       A  Yes.
24       Q  Is it a box of French fries?
25       A  Container of French fries, yes.

---

Page 79

1        Q  With a yellow background?
2        A  Gradated dark orange to yellow.
3        MR. LUTHER:  Okay.  Let's go to the next
4   exhibit.
5        (Defendant's Exhibit 27 was marked
6        for identification by the Certified
7        Shorthand Reporter.)
8        MR. LUTHER:  This exhibit is a series of --
9   looks like different Web pages.  But the documents are
10  numbered SU 100130 sequentially through to SU 100134.
11       Q  Do you see the first page of this exhibit,
12  Mr. Splane?
13       A  Yes.
14       Q  Do you see fried foods being depicted?
15       A  Yes.
16       Q  Can we go to the third page.  And it looks
17  like -- excuse me.
18          Do we see a series of pictures here on the
19  left-hand side?
20       A  Yes.
21       Q  Are they fryers?
22       A  Yes.
23       Q  Are there fried foods in the fryers?
24       A  I believe so, yes.
25       MR. LUTHER:  Let's go to the next exhibit.

---

Page 80

1        (Defendant's Exhibit 28 was marked
2        for identification by the Certified
3        Shorthand Reporter.)
4        MR. LUTHER:  This has been produced as SU
5   100088 through 100089.
6        Q  Do you see the first page of this exhibit,
7   Mr. Splane?
8        A  Yes.
9        Q  Does it show French fries in a fryer?
10       A  Yes.
11       MR. LUTHER:  Next exhibit.
12       (Defendant's Exhibit 29 was marked
13       for identification by the Certified
14       Shorthand Reporter.)
15       MR. GARRETT:  Can we go off the record
16  briefly?
17       MR. LUTHER:  Yes.
18       (Discussion held off the record.)
19       MR. LUTHER:  This is Exhibit 29.  We see the
20  first page.
21       Q  We see the first page of this exhibit,
22  Mr. Splane?
23       A  Yes.
24       Q  Are those French fries in a basket?
25       A  Looks to be steak fries, yes.

---

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.    TERRY SPLANE

| Page 81 | Page 83 |

**Page 81**

1    (Defendant's Exhibit 30 was marked
2    for identification by the Certified
3    Shorthand Reporter.)
4        MR. LUTHER:  This has been produced as SU
5    100014.
6        Q   Do you see the products in the upper
7    left-hand corner?
8        A   Yes.
9        Q   Right in the middle is there a jug similar to
10   the Mel-Fry jug?
11       A   Appears to be similar, yes.
12       Q   What color is that?
13       A   Bright yellow.
14       Q   Let's go to the next exhibit.
15           To your knowledge is the phrase "long
16   lasting" used with the Mel-Fry product?
17       A   Yes.
18       Q   Do you know how long it has been used?
19       A   Don't know the extent of the length.  It has
20   been on there for the last two years that I'm aware of.
21       Q   Has it ever been used -- to your knowledge has
22   it ever been used with any other product in any other
23   industry?
24           MR. GARRETT:  Calls for speculation.  It's
25   vague.

**Page 82**

1        THE WITNESS:  Yeah, broad question.  Not to my
2    knowledge.
3        MR. LUTHER:  Okay.  Next exhibit.
4    (Defendant's Exhibit 31 was marked
5    for identification by the Certified
6    Shorthand Reporter.)
7        MR. LUTHER:  This has been produced as SU
8    100106 and SU 100107.
9        Q   Do you see the upper left-hand corner it says
10   Stride?
11       A   Yes.
12       Q   Does it say "the ridiculously long lasting
13   gum" underneath it?
14       A   It does.
15       MR. LUTHER:  Let's go to the next exhibit.
16    (Defendant's Exhibit 32 was marked
17    for identification by the Certified
18    Shorthand Reporter.)
19       MR. LUTHER:  This exhibit has been produced
20   as SU 100108 through -- sequentially through SU
21   100110.
22       Q   And on the first page right in the middle,
23   Mr. Splane, it says "view all products by Shiseido."
24   Do you see that?
25       A   Yes.

**Page 83**

1        Q   Then it says "the makeup stick foundation"?
2        A   Uh-huh.
3        Q   And the first sentence directly under that at
4    the end, do you see the term "long-lasting"?
5        A   Yes.
6        MR. LUTHER:  Let's go to the next exhibit.
7    (Defendant's Exhibit 33 was marked
8    for identification by the Certified
9    Shorthand Reporter.)
10       MR. LUTHER:  This has been produced as SU
11   100113 and SU 100114.
12       Q   You see the first page of this document,
13   Mr. Splane?
14       A   Yes.
15       Q   And it says "Lenox launch their longest
16   lasting blades"?
17       A   Yes.
18       Q   Now I have some questions.
19           This is -- the next exhibit is a document
20   production by Ventura, 0001 sequentially through to
21   00056.  And I will be making reference to particular
22   documents.
23       MR. GARRETT:  I believe some of those
24   documents are marked confidential.  There is only a
25   few.  But to the extent you are asking him about those,

**Page 84**

1    let's be sure to mark the section of the transcript
2    confidential, please.
3        (Discussion held off the record.)
4        MR. LUTHER:  For the record, I am referring
5    to these production numbers.  And when I refer to a
6    particular number, we will make that an individual
7    exhibit.  How's that?
8        MR. GARRETT:  That's fine.  So do you want to
9    not mark this Exhibit 34 then?
10       MR. LUTHER:  Yeah, we are not marking this as
11   an exhibit yet.
12       MR. LUTHER:  Let's go to VF 00016, about
13   halfway through.
14       MR. GARRETT:  Are we marking this as an
15   exhibit?
16       MR. LUTHER:  This will be Exhibit 34.
17       Q   Do you see a bunch of Ventura's products here,
18   Mr. Splane?
19       A   Yes, sir.
20       Q   Do see a Mel-Fry product smack dab in the
21   middle there?
22       A   Yes.
23       Q   Why is that label different than the label at
24   issue in this lawsuit?
25       MR. GARRETT:  It's vague.  Calls for

Case 1:07-cv-07338-PKC   Document 33   Filed 10/25/2007   Page 25 of 33

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.

TERRY SPLANE

Page 85

1 speculation.
2      THE WITNESS:  Which label are you
3 specifically referring to?
4      MR. LUTHER:  Mel-Fry next to the --
5      THE WITNESS:  In the 35 pound jug?
6      MR. LUTHER:  Yeah.
7      MR. GARRETT:  One that says 40025 at the top
8 of the jug?
9      MR. LUTHER:  No.
10     Q  Next to that, to the left.  Do you see that?
11     A  The one behind the Marie's salad dressing
12 bottle?
13     Q  Yes.
14     A  By looking at this reproduction I can't tell
15 you that it is different.  There is not enough
16 information here.
17     Q  Well, you can simply see that there is no
18 French fries on it; right?
19     A  I can't see that.  It looks as though there is
20 something in the basket to me.
21     Q  You can see a basket on there?
22     A  Sticking out to the right of the Marie's
23 bottle, yes.
24        (Defendant's Exhibit 34 was marked
25        for identification by the Certified

Page 86

1      Shorthand Reporter.)
2      MR. LUTHER:  Next exhibit.  Let's go to VF
3 00025.  Okay.
4      Q  And see Mel-Fry's design here in a jug; is
5 that correct?
6      A  Correct.
7      Q  Do see we "clearly superior" stated at the
8 top?
9      A  Yes.
10     Q  What does "superior" mean?
11     A  I would interpret it as high quality.
12     Q  So to your knowledge there can be a superior
13 liquid shortening?
14     MR. GARRETT:  Misstates the prior testimony,
15 to the extent it's a separate question.
16     MR. LUTHER:  Strike that.  Let me ask again.
17     Q  Can there be a superior liquid shortening?
18     A  In the context of the shortening category
19 there are superior shortenings when you equate it to
20 fry life, which is how we look at the business.
21     Q  To your knowledge is Ventura's liquid
22 shortening superior?
23     A  To various other products, yes.
24     Q  Do you have documents supporting this?
25     A  We run lab tests that document fry life,

Page 87

1 correct.
2      Q  And why haven't you provided these documents?
3      MR. GARRETT:  Argumentative.  Misstates the
4 prior testimony.  Assumes facts not in evidence.  And
5 object to the extent again this witness may or may not
6 know what has been produced by counsel.
7      MR. LUTHER:  You can answer.
8      MR. GARRETT:  You can answer if you can.
9 BY MR. LUTHER:
10     Q  I take it you can't answer the question?
11     A  I can't answer the question.  I'm not sure if
12 they were requested.
13     Q  Who would have these documents?
14     A  We would house them within our City of
15 Industry R&D facilities.
16     Q  City of Industry in Los Angeles?
17     A  In Los Angeles County, correct.
18     Q  Is Ventura's liquid shortening products
19 superior could all other liquid shortening products to
20 your knowledge?
21     A  Not to all other, no.
22     Q  How do you know this?
23     A  There are similar products on the market.
24     Q  Do you have documents showing this?
25     MR. GARRETT:  It's vague.

Page 88

1      THE WITNESS:  (No audible response.)
2      MR. LUTHER:  "Yes"?  He nodded his head yes.
3      THE WITNESS:  Yes, we should have documents,
4 competitive information on that, correct.
5 BY MR. LUTHER:
6      Q  Where are those documents located?
7      A  Would be housed either at R&D and/or through
8 communications that we've gotten from the field point
9 of sale materials in our marketing department,
10 competitive files.
11     MR. LUTHER:  Now, will you provide these
12 documents?
13     MR. GARRETT:  You are asking me?
14     MR. LUTHER:  Yes.
15     MR. GARRETT:  Whether or not they have been
16 requested and/or would otherwise be responsive to
17 requests I can't speak to right now.
18     MR. LUTHER:  Fine.  Fair enough.
19     Q  Is Ventura's liquid shortening product
20 superior to Supreme's liquid shortening product?
21     MR. GARRETT:  In your opinion -- in his
22 opinion?
23     MR. LUTHER:  To his knowledge.
24     THE WITNESS:  To my knowledge they are very
25 similar.

VENTURA FOODS, L.C. v. SUPREME OIL COMPANY, et al.    TERRY SPLANE

Case 1:07-cv-07338-PKC    Document 33    Filed 10/25/2007    Page 26 of 33

Page 89

1  BY MR. LUTHER:
2     Q  How do you know?
3     A  Because they are both fractionated soy
4  products.  And the hydrogenation gives it its
5  stability.
6     Q  Are there documents showing this, to what you
7  just testified?
8        MR. GARRETT:  Again, vague.  Calls for
9  speculation.
10       THE WITNESS:  I believe so.
11  BY MR. LUTHER:
12    Q  And those documents are located where?
13    A  In one of the R&D facilities.
14    Q  So I take it Ventura's use of the term
15  "superior" is not false advertising?
16       MR. GARRETT:  It's argumentative, calls for a
17  legal conclusion.  It's vague.
18       You can answer the question.
19       THE WITNESS:  Our sales proposition with
20  Mel-Fry is to up-sell against commodity products.  So
21  in that context when you are looking at fry life and
22  the other attributes that come along with Mel-Fry, the
23  answer is, yes, it is superior to some products on the
24  market.
25  BY MR. LUTHER:

Page 90

1     Q  Up-fry?  You mean outfry?  Outperform?
2     A  Length of fry life.
3     Q  Is part of that puffing?
4     A  "Puffing"?
5        MR. GARRETT:  Again, objection to the extent
6  it calls for a legal conclusion.  It is a legal term of
7  art.
8        Do you understand the term?
9        THE WITNESS:  Do not.
10  BY MR. LUTHER:
11    Q  Is part of that embellishment?
12    A  No.  When compared to commodity products, it's
13  absolutely substantial.
14    Q  Superior?
15    A  Yes.
16    Q  To all other liquid shortening products?
17       MR. GARRETT:  Misstates prior testimony.
18       MR. LUTHER:  This is a new question.
19       MR. GARRETT:  Can you repeat the question.
20       MR. LUTHER:  The question is -- I will repeat
21  the question.
22    Q  Is liquid -- excuse me.  Is Mel -- let me
23  start again.
24       Is the description of the Mel-Fry product
25  being superior totally accurate?

Page 91

1        MR. GARRETT:  It is a vague and speculative
2  question.  It also calls for an expert opinion.  If you
3  are asking for this percipient witness's testimony, his
4  opinion as to whether or not it is a superior product
5  it's already been asked, and he has answered it.
6        You can answer it again if you would like.
7        THE WITNESS:  The context of this is the
8  superiority of Mel-Fry over lower end commodity oils.
9  BY MR. LUTHER:
10    Q  How about comparable products?
11       MR. GARRETT:  Same objections.
12  BY MR. LUTHER:
13    Q  Is Mel-Fry -- can you answer?
14    A  Go ahead.
15    Q  I will go to the next one.
16       Is Mel-Fry superior to comparable products?
17       MR. GARRETT:  In your opinion?  That's what
18  you are asking?
19       MR. LUTHER:  To your knowledge.
20       MR. GARRETT:  This witness is testifying as a
21  percipient witness.  He is not an expert witness.  If
22  you want to ask him what his opinion is or what his
23  personal knowledge is, that's fine.  You are asking him
24  a legal -- you are asking him whether or not a product
25  is superior, not putting two products in front of him,

Page 92

1  not with two tests, not with data, not with anything.
2  BY MR. LUTHER:
3     Q  As a company spokesman and an official here
4  today to testify on behalf of the entire Ventura
5  company, to your knowledge is Mel-Fry superior to
6  comparable products?
7        MR. GARRETT:  You may answer the question.
8  However, again, I object to the extent that that
9  question -- well, strike that.
10       You've distorted -- this witness here is here
11  as a percipient witness designated as a person most
12  knowledgeable under 30(b)(6) for the company.  However,
13  you are asking him a question that is an opinion
14  question.
15       In your lay opinion you may answer the
16  question in that capacity, which is what is your
17  opinion about that statement?
18       THE WITNESS:  My opinion goes a little bit of
19  a different direction.  That is, that when we sell
20  products, we don't sell just the product, but it's a
21  level of services around the product, which when all
22  rolled together does present superiority.
23  BY MR. LUTHER:
24    Q  So owing to Ventura's -- owing to Ventura's
25  Mel-Fry product being superior is it fair to say that

Page 93

1  Ventura's liquid shortening products are well known to
2  its customers in the industry?
3       MR. GARRETT:  It's compound.  It's vague.  I
4  don't think you can answer that question.  But to the
5  extent you understand it, you may do so.
6       THE WITNESS:  I take it to mean awareness of
7  Mel-Fry in the industry?
8       MR. LUTHER:  Yes.
9       THE WITNESS:  Is there awareness of Mel-Fry in
10  the industry?
11       MR. LUTHER:  Owing to Mel-Fry's superiority.
12       MR. GARRETT:  Same objections.
13       MR. LUTHER:  You can answer.
14       MR. GARRETT:  And it calls for speculation.
15       MR. LUTHER:  You can answer.
16       THE WITNESS:  We position Mel-Fry as a high
17  performance long-lasting fry shortening.  That is our
18  position on it.
19  BY MR. LUTHER:
20    Q  Is that what makes it superior?
21    A  That in addition to the program sell that
22  revolves around it well beyond the product.
23    Q  What is the program?  Distribution -- what
24  other factors?
25    A  Other factors are tools that we make available

Page 94

1  for training on-site, for what we call our DFQM, deep
2  fry quality management kits, extenders, all rolled
3  together do develop a greater proposition.  To my
4  knowledge there are not competitors in the market that
5  have that much value tied into the product.
6  BY MR. LUTHER:
7    Q  So you have a pretty loyal customer base for
8  the Mel-Fry product; is that correct?
9       MR. GARRETT:  Is that a question?
10       MR. LUTHER:  I said "is that correct."
11       MR. GARRETT:  Calls for speculation.
12       But you can answer the question.
13       THE WITNESS:  Mel-Fry is a very stable,
14  growing brand.  So that would tell you that, yes.
15  There is loyalty.
16  BY MR. LUTHER:
17    Q  So owing to Mel-Fry's superiority is it fair
18  to say that customers who buy it always know that they
19  are buying from Ventura?
20       MR. GARRETT:  It calls for speculation.  It's
21  vague.  And it's compound.
22       You are asking him what -- if he knows what
23  customers think when they are buying the product.  Am I
24  understanding correctly?
25       MR. LUTHER:  We'll rephrase it.

Page 95

1    Q  Do customers who buy the Mel-Fry product want
2  a superior product?
3       MR. GARRETT:  Same objection.
4       You can answer to the extent you can.
5       THE WITNESS:  They are paying more money for a
6  superior product.  So I would assume that, yes, they
7  do.  Because there are less expensive alternatives on
8  the market.
9       MR. LUTHER:  Fair enough.
10       (Discussion held off the record.)
11       (Defendant's Exhibit 35 was marked
12       for identification by the Certified
13       Shorthand Reporter.)
14  BY MR. LUTHER:
15    Q  Mr. Splane, I believe you have stated that the
16  Mel-Fry product is clear?
17    A  Yes.
18       MR. GARRETT:  To clarify, referring to the
19  liquid, the product inside the bottle; correct?
20  BY MR. LUTHER:
21    Q  The Mel-Fry liquid shortening product is clear?
22    A  The oil itself is clear, `correct.
23    Q  Let's go to VF 00034.  Is this -- is there a
24  picture of the Mel-Fry liquid shortening product in the
25  clear container here?

Page 96

1    A  Yes.
2    Q  Now, this is not in color.  But does this
3  advertisement show a yellow color?
4    A  Can't answer that.
5       MR. GARRETT:  That's vague.
6  BY MR. LUTHER:
7    Q  Why is the Mel-Fry product advertised here in
8  a clear container?
9    A  It's a -- it's a tie to the advertising.  It's
10  to break through the clutter, to get people's
11  attention.
12       And I don't know that it's actually Mel-Fry
13  product in a clear jug or if it is a computer
14  generated.  It's never sold that way.
15    Q  Let me ask you this question.
16       What color would a clear container be if a
17  yellow colored liquid shortening product was put in it?
18    A  The clear container would still be clear.
19    Q  What color would be the resulting product?
20    A  It would be the natural color of the product,
21  a gold.
22    Q  If it was a yellow color, would it be yellow?
23    A  Yes.
24    Q  And what color would a clear container be if a
25  clear colorless product was put inside of it?

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, ET AL.

Case 1:07-cv-07338-PKC   Document 33   Filed 10/25/2007   Page 28 of 33

TERRY SPLANE

Page 97

1    A   Clear.
2    Q   And why is the Mel-Fry product clear and
3  colorless?
4    A   In this particular advertisement?
5    Q   No, in general.  Why is the Mel-Fry product
6  clear?
7    A   It is not colorless.  It has a natural color
8  of vegetable oil.
9    Q   Is it clear?
10    A   It is clear, meaning it's not a creamy,
11  compared to creamy alternatives.
12    Q   Is it translucent?
13    A   I would not call it translucent.
14    Q   In your experience would somebody buy a
15  blue-colored liquid shortening product?
16    A   The actual oil itself being blue?
17    Q   Yeah.
18    A   I would say that they would not.
19    Q   Would somebody buy a black-colored liquid
20  shortening product?
21    A   I would say they would not.
22    Q   Would somebody buy an orange-colored liquid
23  shortening product?
24    A   No.
25    Q   Would somebody buy a golden-colored liquid

Page 98

1  shortening product?
2    A   Yes.
3    Q   Would somebody buy an aqua-colored liquid
4  shortening product?
5        MR. GARRETT:  Aqua being blue?
6        THE WITNESS:  If that were the standard color
7  of oil -- in that context if all other oils were aqua,
8  it would be the standard offering and the answer would
9  be yes.
10  BY MR. LUTHER:
11    Q   But it's not the standard, is it?
12    A   Correct.
13        In the context that we are talking about
14  today, aqua would stand out as a little bit odd unless
15  it's got some dramatic benefits and it's something new
16  and innovative.  Going back to all the other colors you
17  mentioned associated with it, then maybe.  But we are
18  talking very conceptual.
19    Q   Is that the reason somebody would not
20  particularly want to buy a green-colored liquid
21  shortening product?
22        MR. GARRETT:  Again, calls for speculation.
23        THE WITNESS:  The reason they would not want
24  to buy a green is?  Restate.
25  BY MR. LUTHER:

Page 99

1    Q   Because it's a little odd.  Is that correct?
2    A   It's a little unusual.  It's not the standard.
3    Q   What are the most common colors for liquid
4  shortening products?
5    A   They are either gold, clear, or creamy.
6    Q   And what would be the color of the resulting
7  product if a gold, clear, or creamy liquid shortening
8  product is put in a clear container?
9    A   Gold for the fractionated clear vegetable
10  oil.  More of a -- a white-ish gold on a creamy
11  product.
12    Q   Well, if these products were put in a clear
13  container, the resulting product would be the color of
14  the product; right?
15    A   Correct.
16    Q   Why is the Mel-Fry product put into a yellow
17  container?
18    A   With my longevity with the company, I'm not
19  sure why yellow was chosen.  Not sure that it has any
20  actual tie.  But it has become well known in the
21  industry as our product in that yellow jug.
22    Q   So to your knowledge what food product does a
23  yellow color describe?
24        MR. GARRETT:  Objection.  It's vague.  Calls
25  for speculation.

Page 100

1        THE WITNESS:  What --
2        MR. GARRETT:  In this industry or in any
3  industry at all?
4        MR. LUTHER:  Let me rephrase the question.
5    Q   In the food industry what color -- what food
6  product does a yellow color describe?
7        MR. GARRETT:  Same objection.
8        MR. LUTHER:  You can answer.
9        THE WITNESS:  Lemon.
10  BY MR. LUTHER:
11    Q   What does the term "long-lasting" mean or
12  describe?
13    A   Describes the hours of fry life that you get
14  out of a product.
15        MR. GARRETT:  Again, a belated objection,
16  calls for speculation.  Vague.
17  BY MR. LUTHER:
18    Q   What does the term "longest lasting" mean or
19  describe?
20    A   The term "longest" to me means that you are
21  claiming that you are superior to everything else in
22  the marketplace.
23    Q   Just like Mel-Fry is superior to everything in
24  the marketplace; is that correct?
25        MR. GARRETT:  It's argumentative.

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                TERRY SPLANE

---

Page 101

1      MR. LUTHER: "No"? Your answer was "No"?
2      THE WITNESS: Yes.
3  BY MR. LUTHER:
4      Q  So "superior" does not mean longest lasting?
5      MR. GARRETT: To clarify the record, he said
6  "Your answer was 'No'?" And you said "Yes."
7      Can we go back and read the previous answer so
8  we can get a correct -- previous question so we can
9  get a correct answer.
10     (Record read as follows:
11     "Question: Just like Mel-Fry is superior
12     to everything in the marketplace; is that
13     correct?
14     "Mr. Garrett: It's argumentative.
15     "Mr. Luther: 'No'? Your answer was 'No'?
16     "The Witness: Yes.")
17     MR. GARRETT: All right. Sorry. We can do
18  this one of two ways, we can read the second question
19  before that or can you just reask your question again.
20     MR. LUTHER: Let's go on to the next question.
21     MR. GARRETT: Well, I'd like to clarify the
22  record. Otherwise, we're going to have to do it when
23  he reviews it. Because I don't think there was clarity
24  there.
25  BY MR. LUTHER:

---

Page 102

1      Q  Does "longest lasting" mean "superior"?
2      A  Yes.
3      Q  Okay.
4      Have you seen the term Pro-Fry before, "P-r-o,
5  hyphen, F-r-y"?
6      A  I have not.
7      Q  Do you have kids?
8      MR. GARRETT: You can answer question.
9      THE WITNESS: Yes.
10  BY MR. LUTHER:
11     Q  Would you let your kids eat green chicken?
12     A  Couple years ago they ate green catsup.
13     Q  Would you like to see them eat green
14  hamburgers?
15     A  If it's what they want to do and it's healthy
16  for them.
17     Q  Is that standard in the industry?
18     MR. GARRETT: Green chickens?
19  BY MR. LUTHER:
20     Q  We will start with green chickens. Is that
21  standard in the industry?
22     A  Maybe in some restaurants you don't want to
23  eat in.
24     MR. LUTHER: Fair enough. Let's go on to the
25  next question.

---

Page 103

1      MR. GARRETT: For the record, I've heard of
2  blue chicken.
3      MR. LUTHER: Jim, it's not your deposition.
4      MR. GARRETT: I know. But since we are
5  talking about colored chickens, I figure it's a good
6  time to throw it in.
7      MR. LUTHER: Okay.
8      Q  Now, at some point you became aware of
9  Supreme's trademark application for Mega-Fry; is that
10  correct?
11     MR. GARRETT: You can answer the question.
12     THE WITNESS: Yes.
13  BY MR. LUTHER:
14     Q  Why didn't Ventura oppose Supreme's trademark
15  application for Mega-Fry?
16     MR. GARRETT: To the extent you can answer
17  without divulging communications with legal counsel,
18  you may do so. If your answer is based on those
19  conversations, I instruct you not to answer.
20     In other words, if you have some independent
21  knowledge, you may answer.
22     THE WITNESS: First time I became aware of it
23  was in February of this year.
24  BY MR. LUTHER:
25     Q  First time you became aware of it?

---

Page 104

1      A  Correct.
2      Q  How about the first time anybody at Ventura
3  became aware of it? Can you answer that question?
4      MR. GARRETT: Calls for speculation.
5      THE WITNESS: Can't speak to that.
6  BY MR. LUTHER:
7      Q  So it's true that somebody at Ventura may very
8  well have been aware of it before you; is that true?
9      A  I say I can't speak to it. I don't have any
10  knowledge of it.
11     Q  But it is possible; is that correct?
12     MR. GARRETT: Calls for speculation.
13  You can answer.
14     THE WITNESS: Could be possible, yes.
15     MR. LUTHER: Okay.
16     Q  To your knowledge why did Ventura delay for
17  six months before bringing this lawsuit after it was --
18  you know, had found out about the Mega-Fry application?
19     MR. GARRETT: It's argumentative, assumes
20  facts not in evidence, misstates the prior testimony.
21  Calls for speculation.
22     And to the extent it calls for you to reveal
23  attorney/client communications I will instruct the
24  witness not to answer. If you have an independent
25  knowledge of that, you may do so. And may answer to

---

VENTURA FOODS, LLC VS. SUPREME OIL COMPANY, et al.                    TERRY SPLANE

Page 105

1   the extent you understand the question.
2       THE WITNESS: I will choose not to answer
3   that.
4   BY MR. LUTHER:
5       Q  Because of attorney/client privilege?
6       MR. GARRETT: Is it -- go off the record
7   briefly?
8       MR. LUTHER: Yes.
9       MR. GARRETT: Let's step outside.
10      To be clear your question is why to his
11  knowledge did -- why was there a delay of six months in
12  filing the lawsuit?  Is that where we are going?
13      MR. LUTHER: After they had knowledge of the
14  Mega-Fry application.
15      MR. GARRETT: Okay.
16      THE WITNESS: And your starting point is
17  February?
18      MR. GARRETT: Knowledge of the litigation.
19      MR. LUTHER: Well, you know what, let me
20  strike that question.
21      MR. GARRETT: I want to get you an answer if I
22  can.
23      MR. LUTHER: Let's strike that question.  I
24  will formulate it a different way.
25      While you are up, I was faxed this.  Judge

Page 106

1   handwrote an order.  Do you have this?  You want to
2   make a copy for yourself?
3       MR. GARRETT: Due to the urgency plaintiff is
4   directed to fully -- what does it say? -- respond?
5       MR. LUTHER: Yeah.
6       MR. GARRETT: By 5:00 p.m. --
7       MR. LUTHER: Yesterday.
8       MR. GARRETT: -- October 10th.  So ordered.
9   And this is respond to discovery request?
10      MR. LUTHER: Yeah.
11      MR. GARRETT: I believe you were sent
12  documents yesterday.
13      MR. LUTHER: Do you have a copy of this order?
14  Do you want a copy of this?
15      MR. GARRETT: Actually if you have a copy,
16  great.  I'm not sure I do.
17      MR. LUTHER: Why don't we make a copy.
18  Let's go off the record for a minute.
19  Leave it aside.
20      MR. GARRETT: We can do it over lunch.
21      MR. LUTHER: Or we can just make a copy of
22  everything here.
23      MR. GARRETT: You want to enter it in when we
24  come back on and then just make it an exhibit?
25      MR. LUTHER: Could do it that way.

Page 107

1       Q  Did I ask you why Ventura did not oppose
2   Supreme's trademark application for Mega-Fry?  Was that
3   asked?
4       MR. GARRETT: I believe that was asked.
5       MR. LUTHER: And you answered you don't know
6   why.
7       Q  Do you know that Supreme has removed all
8   offending products from the marketplace?
9       A  I am not aware of that, no.
10      Q  Okay.
11      Who is the -- who is the CEO of Ventura?
12      A  Rick Mazer.
13      Q  Rick Mazer?
14      A  Richard Mazer.
15      MR. GARRETT: Can you spell that for the
16  record.
17      THE WITNESS: M-a-z-e-r.  First name Richard.
18  BY MR. LUTHER:
19      Q  Are you aware of any correspondence, telephone
20  correspondence, between Richard Mazer and the CEO of
21  Supreme?
22      A  No.
23      Q  To your knowledge how is Ventura being harmed
24  by Supreme right now?
25      MR. GARRETT: Again, just to clarify, you are

Page 108

1   a percipient witness, not an expert witness.  I believe
2   that calls for a legal conclusion.
3       To the extent you answer of your personal
4   knowledge that's fine, or your personal understanding.
5       THE WITNESS: We believe there is confusion,
6   brand confusion, in the industry.  And we have very
7   strict high standards as it relates to quality control,
8   customer service.  And anybody who infringes on our
9   brands we believe could if -- could lend to a bad taste
10  in customers' minds -- or mouths and could spread in --
11  not only in our shortening category, but play in a
12  multitude of categories, could get that ill will of
13  Ventura in general which affects even beyond shortening
14  and oils.  Can't calculate what that's worth today.
15      MR. LUTHER: So to say -- sorry.  Are you
16  finished?
17      THE WITNESS: To me, that's my opinion on it.
18  BY MR. LUTHER:
19      Q  To summarize, is would be fair to say that
20  Supreme pays a lot of attention to the quality of its
21  products?  I mean -- excuse me.
22      Ventura pays a lot of attention to the quality
23  of its products; is that correct?
24      A  Yes.
25      Q  And would it be fair to say that Ventura

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                    TERRY SPLANE

---

Page 109

1  keeps a watchful eye out for infringers?
2       MR. GARRETT: Calls for speculation. It's
3  also vague.
4       To the extent you can answer, go ahead.
5       THE WITNESS: That's why we are sitting here.
6       MR. LUTHER: Okay.
7       Let me go on to these documents produced by
8  Ventura. VF 00050.
9       MR. GARRETT: This will be 37?
10      (Discussion held off the record.)
11      (Defendant's Exhibit 36 was marked
12      for identification by the Certified
13      Shorthand Reporter.)
14      MR. GARRETT: The next will be 37. This is
15  document, FV 00050.
16      (Defendant's Exhibit 37 was marked
17      for identification by the Certified
18      Shorthand Reporter.)
19      MR. LUTHER: I want to make it FV 00050
20  through VF 00052.
21  BY MR. LUTHER:
22   Q  Mr. Splane, you see FV 00050?
23   A  Yes.
24   Q  Ventura versus Nice Blends?
25   A  Yes.

---

Page 110

1   Q  Were you at Ventura at the time of this suit?
2   A  What is the date?
3   Q  Don't know.
4      2002?
5   A  No.
6   Q  So you wouldn't have any knowledge of this?
7   A  (No audible response.)
8      MR. LUTHER: Okay.
9      MR. GARRETT: Well, personal knowledge of
10  that?
11  BY MR. LUTHER:
12   Q  Do you have any knowledge whatsoever of it?
13   A  The only knowledge I have is basic, and it was
14  a suit, trade dress infringement with My-Fry.
15   Q  My-Fry?
16   A  Correct.
17   Q  Okay.
18      Is My-Fry still a product out there to your
19  knowledge?
20   A  Not to my knowledge under that name.
21   Q  Why not?
22   A  I believe it settled in our favor.
23   Q  Okay.
24      Let's go to, Mr. Splane, your declaration of
25  October 9th.

---

Page 111

1       MR. GARRETT: Are you done with these other
2  documents by chance?
3       MR. LUTHER: Which ones are these?
4       MR. GARRETT: The documents produced by
5  Ventura.
6       MR. LUTHER: For now, yes.
7       MR. GARRETT: We will put them over here so we
8  don't get them mixed up as exhibits.
9       MR. LUTHER: Okay.
10   Q  Do you have a copy of your declaration of
11  October 9th? You don't? I only have the first one.
12      Well, we will have to do a quick fix here.
13      MR. GARRETT: Do you want to take an early
14  lunch and get that done?
15      MR. LUTHER: You want to start lunch now?
16      MR. GARRETT: We can do that.
17      MR. LUTHER: Let's do it. Save some time.
18      MR. GARRETT: Be back at 12:30?
19      MR. LUTHER: 12:30.
20      (LUNCH RECESS.)
21
22
23
24
25

---

Page 112

1   LOS ANGELES, CALIFORNIA; THURSDAY, OCTOBER 11, 2007
2                    12:32 p.m.
3
4       EXAMINATION (CONTINUED)
5  BY MR. LUTHER:
6   Q  Mr. Splane, the Mel-Fry design -- is it
7  correct that is not registered at the U.S. Patent and
8  Trademark Office?
9       MR. GARRETT: To the extent you can answer.
10  It calls for speculation.
11      Go ahead.
12      THE WITNESS: Yeah, I don't know that to be
13  true.
14  BY MR. LUTHER:
15   Q  You don't know if that's registered or not?
16   A  The design?
17   Q  Yes.
18   A  Not sure.
19      MR. GARRETT: Just to clarify, when you refer
20  to the design, you are referring to the entire look of
21  the bottle, not just the label? Or are you talking
22  about the Mel-Fry name, the label, the
23  bottle-name-label combination? What are we talking
24  about?
25  BY MR. LUTHER:

## Page 113

1    Q   Are you familiar with the Mel-Fry label which
2  is at issue in this lawsuit?
3    A   Yes.
4    Q   Is that label registered at the U.S. Patent
5  and Trademark Office?
6    MR. GARRETT:  Calls for speculation.
7    To the extent you know.
8    THE WITNESS:  Yes, as I understand it,
9  elements are registered, Mel-Fry name.  But in terms of
10  registering the entire label, I don't know if that's
11  possible.  But there are elements that are registered.
12  BY MR. LUTHER:
13    Q   The name Mel-Fry is registered?
14    A   Yes.
15    Q   So why isn't the entire design registered?
16    MR. GARRETT:  Calls for speculation.
17    You can answer to the extent you know.
18    THE WITNESS:  Not sure.
19    MR. LUTHER:  I may have asked this.
20    Q   Does Ventura sell liquid shortening products
21  directly to home consumers?
22    A   Directly to home consumers.  No.
23    MR. LUTHER:  Let's mark as exhibit --
24  whatever number it was.
25    MR. GARRETT:  38.

## Page 114

1    MR. LUTHER:  I immediately forgot as you told
2  me.
3    (Defendant's Exhibit 38 was marked
4    for identification by the Certified
5    Shorthand Reporter.)
6  BY MR. LUTHER:
7    Q   Mr. Splane, you are the Terry Splane that
8  signed this declaration?
9    A   Yes.
10    Q   Executed October 9th, 2007?
11    A   Yes.
12    Q   Did you write this declaration, Mr. Splane?
13    A   Um, was involved in modifying of a draft of
14  this, yes.
15    Q   Who wrote the draft?
16    MR. GARRETT:  Calls for speculation.
17    THE WITNESS:  Came out of our legal department.
18  BY MR. LUTHER:
19    Q   In-house or outside counsel?
20    MR. GARRETT:  Same objection, calls for
21  speculation.
22    THE WITNESS:  Yeah, it was presented to me by
23  in-house.  But I'm not sure.
24  BY MR. LUTHER:
25    Q   You don't know who wrote it, then?

## Page 115

1    A   Yes.
2    Q   Now, pertaining to paragraph two in this
3  declaration -- just, you know, for convenience I am
4  going to refer to paragraphs.  But I mean this
5  declaration of October 9th, 2007.
6    A   Sure.
7    Q   Pertaining to paragraph two, Ventura first
8  learned of a product called Mega-Fry in 2007.  To your
9  knowledge how did Ventura learn of Mega-Fry?
10    A   It was actually a direct email that came in to
11  me from our sales representative that handles the New
12  York area.  And it was with an invoice, a scanned copy
13  of an invoice, that actually said "the new Mel-Fry" was
14  the claim, in parentheses, parenthetical around "the
15  new Mel-Fry" and then Mega-Fry, the brand.  And that's
16  really what drew the awareness to it.
17    Q   Did it come to your attention or somebody
18  before you?
19    A   It came to my attention.
20    Q   You were the first one to see it at Ventura?
21    A   Correct.
22    Q   And that email would be Exhibit 1 of this
23  declaration?
24    A   Yes.
25    Q   Okay.

## Page 116

1    And who sent the email?
2    A   Earl Leising, our regional manager handling
3  the New York market.
4    Q   Oh.  He's a regional manager for Ventura?
5    A   He's a sales manager, yeah, works directly for
6  Ventura Foods; correct.
7    Q   And who are the other names at the top here?
8    A   Mike Castagna is a senior category marketing
9  manager reporting to me.  Holly Adrian, is a category
10  manager reporting to me.
11    (Discussion held off the record.)
12    THE WITNESS:  Holly Adrian, A-d-r-i-a-n.
13    MR. GARRETT:  And for the record, Earl Leising
14  is spelled L-e-i-s-i-n-g.  Mike Castagna is
15  C-a-s-t-a-g-n-a.
16    Go ahead.
17    THE WITNESS:  Holly Adrian, senior category
18  manager reporting to me.  Chris Sanna, S-a-n-n-a, is
19  the vice president of sales for the eastern region.
20  Jim Stolle, S-t-o-l-l-e, is the director of strategic
21  pricing.  Steve Geske, G-e-s-k-e, is the senior vice
22  president of field sales for Ventura Foods.
23  BY MR. LUTHER:
24    Q   And Terry Splane is you?
25    A   Correct.

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                    TERRY SPLANE

---

Page 117

1  Q  And why were all these people copied?
2     MR. GARRETT: Calls for speculation.
3     THE WITNESS: Yeah, I would speculate that
4  Earl wanted to have people aware of the situation.
5  BY MR. LUTHER:
6  Q  Well, let me ask you, is it normal company
7  procedure to have this many people copied?
8     MR. GARRETT: Calls for speculation. It's
9  also vague.
10    MR. LUTHER: You can answer.
11    THE WITNESS: Typically in this day and age
12 you seem to copy a lot of people on emails. So it's
13 pretty standard activity, correct.
14 BY MR. LUTHER:
15 Q  Now, does everything in your business call for
16 speculation and is it vague? Is your operation of your
17 business speculative and vague? "Yes" or "No."
18 A  No.
19 Q  Okay. Then when you copy people, is it
20 speculative and vague? "Yes" or "No."
21    MR. GARRETT: Are you -- objection. Are
22 you -- it's argumentative.
23    Are you referring to my objection?
24    MR. LUTHER: I am asking him a new question.
25 Q  When you copy people in the normal course of

---

Page 118

1  your work, is it speculative and vague?
2     MR. GARRETT: And I am going to object that
3  it's argumentative. You are raising your voice again.
4     And the reason for clarification that it's
5  speculative and vague is that you asked whether or
6  not -- why Earl Leising would have copied this many
7  people. How would this witness know whether or not --
8  why Earl Leising copied this many people?
9  BY MR. LUTHER:
10 Q  I am going to ask you once again. In the
11 normal course of your business is it speculative and
12 vague for other people to be copied on emails?
13    MR. GARRETT: Asked and answered.
14    MR. LUTHER: "Yes" or "No." You can answer.
15 Don't look at him. He can't coach you.
16    THE WITNESS: I don't understand the question.
17 Could you rephrase it? Please.
18    MR. LUTHER: Let's go on to the next
19 question.
20 Q  Who -- this invoice came from Wonder Foods; is
21 that right?
22 A  Correct.
23 Q  Who at Wonder Foods sent the invoice?
24 A  I have no knowledge of who at Wonder Foods
25 would have sent the invoice.

---

Page 119

1  Q  How did this Earl guy get ahold of it?
2     MR. GARRETT: Calls for speculation.
3  BY MR. LUTHER:
4  Q  You don't know?
5  A  I believe it from our broker representative in
6  the market.
7  Q  So it's the email that's speculative and
8  vague; is that correct?
9     MR. GARRETT: It's argumentative.
10 BY MR. LUTHER:
11 Q  Is it correct? Is that correct this email is
12 speculative?
13 A  It houses specific information that's not
14 speculative and vague, which is this invoice.
15 Q  Okay. Let's see.
16    Now, on paragraph two, it says Mega-Fry;
17 right?
18 A  Correct.
19 Q  So you had no knowledge of "Mega, hyphen,
20 Fry," in 2007; is that correct?
21 A  I would assume Mega-Fry -- "Mega, hyphen, Fry"
22 -- it's not in the proper trademark context here, but
23 it refers to the exact same product.
24 Q  Okay.
25    Did I ask -- I asked you how many in-house

---

Page 120

1  counsel. I think you said two?
2  A  Correct.
3  Q  Did I ask you their names?
4  A  No.
5  Q  May I have their names, please.
6  A  John Poggi, P-o-g-g-i. And Dan McCarrol.
7  Q  How old is he -- what's the first guy's
8  name? John?
9  A  John.
10 Q  How old is he?
11 A  How old is he?
12 Q  Yes.
13 A  A guess would put him at late 50s.
14 Q  Oh. So he's been practicing law for some
15 time?
16 A  I would believe so, yes.
17 Q  How about the second fellow you named?
18 A  I would put Dan at late 40s.
19 Q  So he probably has been practicing law for
20 some time?
21 A  I would imagine so, yes.
22 Q  Are these good attorneys?
23    MR. GARRETT: Calls for speculation. It's
24 also vague.
25    MR. LUTHER: Well, let me strike that.

---