Page 121

1    Q   Does Ventura hire bad attorneys?
2    A   They don't hire bad people in general.
3        MR. LUTHER: Okay. Next question, then.
4    Q   Is it true to say that these are not very good
5  attorneys because they failed to oppose Supreme's
6  trademark application?
7        MR. GARRETT: It's argumentative.
8  BY MR. LUTHER:
9    Q   Is that true?
10       MR. GARRETT: It's argumentative.
11       MR. LUTHER: You can answer.
12       MR. GARRETT: It's argumentative.
13       THE WITNESS: I wouldn't make that leap, no.
14  I wouldn't make that leap.
15       MR. LUTHER: Okay.
16    Q   So they are pretty good attorneys is what you
17  are saying?
18    A   I believe so, yes.
19    Q   Paragraph three, the email from the Ventura
20  legal manager. That is the Earl guy; right?
21    A   Correct, Earl Leising.
22    Q   Okay.
23       Let's go to paragraph four. It says email
24  indicated that one of Ventura's distributors Maximum
25  foods had informed. I already asked you that. And you

Page 122

1  don't know his name; right?
2    A   The specific individual?
3    Q   Yeah.
4    A   I do not.
5    Q   Okay.
6        And let's go to Exhibit 1. Not the email but
7  this invoice.
8    A   Yes.
9    Q   Next page. Right? Do you know exactly who
10  composed this invoice?
11    A   Beyond the Wonder Foods company, no.
12    Q   Do you know who actually listed the name "new
13  Mel-Fry"?
14    A   In the way systems work it would have been
15  pulled out of a system, not listed specifically on this
16  invoice by an individual.
17    Q   So you can only answer to speculation; is that
18  correct?
19    A   Yes.
20    Q   Okay.
21        So we don't even know if this invoice is -- it
22  could be fake; right?
23    A   I guess anything is possible. But I wouldn't
24  take it as fake. And this --
25    Q   Of course you wouldn't take it as fake. But

Page 123

1  it is possible, isn't it?
2        MR. GARRETT: Counselor, can you let him
3  finish his --
4        MR. LUTHER: I apologize. That's my fault.
5        THE WITNESS: And I don't know if it's really
6  the invoice that is in question here. The invoice is
7  what opened our eyes to what we are here to talk about
8  today in the trade dress infringement.
9  BY MR. LUTHER:
10    Q   Now -- are you finished?
11    A   Yes.
12    Q   Now, I see some writing on this invoice.
13  Whose handwriting is that?
14    A   Came to us that way. It could even be from
15  the operator whose invoice this is. Because this would
16  be an invoice that would go to an end user or a
17  restaurant. So it's gone through many hands. I can't
18  tell you exactly who has written on it. It came in
19  scanned that way.
20    Q   So we have absolutely no idea what the
21  original looks like? We have absolutely no idea if
22  this is the original; is that correct?
23       MR. GARRETT: It's --
24       MR. LUTHER: Let me rephrase that. Strike
25  that.

Page 124

1    Q   Do you know where the original is?
2    A   I do not. I know this is just a scanned
3  version.
4    Q   So you have never seen the original?
5    A   I have not seen the original.
6    Q   Okay.
7        Let's go to paragraph five. You see Ventura
8  promptly investigated. That word -- what does
9  "promptly" mean? Does it mean three months? Four
10  months? Six months?
11    A   As expeditiously as we could get all the
12  elements in place.
13    Q   Can you give me a time frame, please.
14    A   Well, there -- specifically what time frame?
15  There was a number of steps involved here.
16    Q   Well, I'm trying to get a handle on what
17  "promptly" means. You know, how many months.
18       MR. GARRETT: Objection. It's vague. Are you
19  talking about promptly as used in this sentence or
20  promptly in general?
21       MR. LUTHER: We are referring to paragraph
22  five of this declaration of October 9th. And I am
23  referring to "promptly" in paragraph five. The word
24  "promptly," I want to know what it means in this
25  statement.

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.

TERRY SPLANE

Page 125

1    MR. GARRETT: I believe that's asked and
2  answered.
3    But go ahead.
4    THE WITNESS: Promptly --
5    MR. LUTHER: No, it's not asked and answered.
6  I said how many months, and I want an answer.
7    THE WITNESS: There's a number of steps that
8  were performed promptly, but cumulative there is some
9  time associated with it.
10 BY MR. LUTHER:
11   Q  But you cannot tell me the magnitude of the
12 time associated with it; is that correct?
13   A  The magnitude of the time. By the time we got
14 sample in, which was the final step of investigation,
15 again inside legal counsel, so it was about a
16 three-month time frame.
17   In the middle of that we also had to seek
18 another invoice. Because the scanned invoice that came
19 in had been crumpled and was pretty illegible. So it
20 took some time to get another invoice. Of which they
21 did secure one. Which would tell me that the first one
22 wasn't a fake.
23   Q  We will get to that.
24   In the first line of page five -- paragraph
25 five it says "the investigation." Do you see that?

Page 126

1    A  Yes. Yes.
2    Q  Where were the results of the investigation?
3    A  I believe they are embodied in the complaint.
4    Q  Who conducted the investigation?
5    A  Legal counsel. We also did some R&D
6  investigation.
7    Q  And if they're in the complaint, then I guess
8  they are not privileged; right? So you can tell me all
9  about the investigation now; is that correct? I want
10 to know -- I want to know the exact names of the
11 lawyers and how they conducted the investigation, which
12 is not privileged.
13   MR. GARRETT: Objection. I would dispute that
14 they are not privileged. However, if you'd like to ask
15 specific questions, we can do it on a question by
16 question basis.
17 BY MR. LUTHER:
18   Q  How was the so-called investigation conducted?
19   MR. GARRETT: To the extent you know, go ahead
20 and answer.
21   THE WITNESS: First invoice came in, prompted
22 conversations around -- you know, what was happening in
23 the market, request to get a cleaner copy of the
24 invoice, invoice came in. Request to secure product so
25 we could physically take a look at the item in

Page 127

1  question. Once we got that in, then corporate legal
2  began their investigation in terms of trade dress. And
3  I wasn't privy to all of those conversations.
4  BY MR. LUTHER:
5    Q  Did you bother to investigate who actually
6  wrote the term "new Mel-Fry" before you filed the suit?
7    MR. GARRETT: Did Mr. Splane personally? Or
8  you are saying anyone --
9    MR. LUTHER: Well, he's here speaking for the
10 entire company of Ventura today. So "you" means
11 Ventura.
12   MR. GARRETT: So did Ventura, yes.
13 BY MR. LUTHER:
14   Q  Did you bother to investigate --
15   MR. GARRETT: It's your record. If you want
16 to ask -- I'm trying to clarify for you.
17   MR. LUTHER: I know. I understand that.
18 Thank you very much for that.
19   Q  Did you bother to investigate -- read the
20 question back, please.
21   (Record read as follows:
22   "Question: Did you bother to investigate
23   who actually wrote the term 'new Mel-Fry'
24   before you filed the suit?")
25   MR. GARRETT: Again, to the extent you know.

Page 128

1    THE WITNESS: Not to my knowledge, nor is it
2  in my mind material to this. Because that in and of
3  itself is not trade dress infringement. That's what we
4  are here talking about today. I don't believe that's
5  named anywhere.
6  BY MR. LUTHER:
7    Q  Paragraph five it says the investigation was
8  turned over to Ventura's inside counsel. You gave me
9  that name already, didn't you?
10   A  John Poggi. Dan Mc- --
11   Q  And -- and outside counsel. Who is the
12 outside down you turned it over to?
13   A  Named specifically, I'm not sure. But
14 Pillsbury, Winthrop-Pillsbury.
15   Q  Was an infringement -- an opinion produced as
16 a result of this investigation?
17   MR. GARRETT: By counsel? Or by the
18 investigating attorney?
19   MR. LUTHER: By anybody.
20   MR. GARRETT: Okay.
21   THE WITNESS: Yes.
22 BY MR. LUTHER:
23   Q  Do you have a copy of it?
24   A  Not with me, no.
25   Q  Do you know where a copy is located?

Page 129

1      A   I'm sure there's one in the file in the
2   records of legal counsel.
3      Q   Why wasn't it produced?
4      MR. GARRETT:  For the record, to the extent
5   that counsel either inside or outside produced a -- a
6   document that is the summary of the investigation of
7   counsel, it would be work product under any definition.
8   And providing it to counsel would also be
9   attorney/client privileged.  As such it would be
10  privileged from disclosure and would be in the course
11  put on a privilege log, as I understand both parties
12  are in the process of doing.
13  BY MR. LUTHER:
14     Q   Did you send any emails to nonlawyers
15  concerning this investigation?
16     A   Only correspondence with Earl when we were
17  going through our investigation looking for a cleaner
18  invoice and also looking to source product.
19     Q   Where are those emails located?
20     A   Don't know that I've hung onto them.
21     Q   You think they were erased from the system?
22     A   Our system has a pretty low floor -- or
23  ceiling, I should say, when it comes to quantity that
24  we can maintain.  And I frequently, once a week, once
25  every other week, clean email from my system.

Page 130

1      Q   Now, pertaining to paragraph five, what date
2   exactly was the investigation turned over to in-house
3   counsel?
4      A   The investigation would have begun --
5   discussions around the investigation would have begun
6   -- not sure what the definition of "investigation
7   beginning" -- would have been -- I am going to give you
8   a range -- exactly the 23rd or 24th of February,
9   initiated by Earl Leising's first email.
10     Q   Okay.
11         Let's go to paragraph six.  We are talking
12  about Exhibit 2, huh?
13     A   Uh-huh.
14     MR. GARRETT:  "Yes" or "No."
15     THE WITNESS:  Yes.
16     MR. LUTHER:  Okay.
17     Q   And whose writing is that on this exhibit?
18     A   There's a multitude of items underlined here,
19  what looks to be straws, looks to be garlic powder,
20  that aren't connected with what we are talking about.
21  So I have no idea who would have marked up that
22  invoice.  Could be anywhere from the distributor to the
23  operator through the channel.
24     Q   How did you get a copy of this exhibit, this
25  invoice?

Page 131

1      A   It was obtained by our sales organization.
2      Q   By your sales organization?
3      A   (No audible response.)
4      Q   Can you give me an exact name at your sales
5   organization who obtained it?
6      A   Well, it ultimately came to me through Earl
7   Leising, again.
8      Q   So one of Earl's underlings obtained it?
9      A   I wouldn't refer to any of our sales
10  organization as underlings.  But we do have a --
11     (Discussion held off the record.)
12     THE WITNESS:  My response was I wouldn't
13  refer to any of our direct sales organizations as
14  underlings.  But they do manage a network of brokers in
15  all territories.
16     MR. LUTHER:  Let me rephrase the question.
17     Q   Did a Ventura employee obtain it?
18     A   Ultimately, yes.
19     Q   And you are not sure of the name?
20     A   Earl Leising.
21     Q   But somebody got it before Earl; right?
22     A   But he ultimately obtained it.
23     Q   But it's true somebody got it before Earl?
24     A   Yes.
25     Q   But you don't know who the name is?

Page 132

1      A   No.
2      Q   You don't know how many people it passed
3   through, in other words?
4      A   No, sir.
5      Q   Okay.
6          Now, it says here in paragraph six, Ventura
7   requested and subsequently -- subsequently received --
8   you see that?
9      A   Yes.
10     Q   Do you know what date is associated with
11  that?  How long a -- how long after they requested and
12  before they received -- how much time passed?
13     A   Before it was received?
14     Q   Yeah.  Yes.
15     A   The request for an additional invoice was a
16  matter of days.  To receive it would have been about an
17  additional 30 days.
18     Q   But you are not sure?
19     A   I don't have the exact dates in front of me,
20  no.  I know --
21     Q   Now, who at Maximum --
22     MR. GARRETT:  Are you done?
23  BY MR. LUTHER:
24     Q   -- sent it?
25     A   No.

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                                    TERRY SPLANE

---

Page 133

1       I was just going to say I know it did take
2   time to get it.
3       Q   Okay.  Thank you.  I don't mean to cut you
4   off.
5       Who at Maximum sent it?
6       A   Not sure of the exact individual.
7       Q   Why would Maximum send an invoice to Ventura
8   on request?
9       A   Maximum is the distributor that was running
10  into this in the marketplace.  It was disrupting their
11  business.  And they felt they wanted to help us, being
12  their partner, alleviate the situation.
13      Q   I see.  And is -- so Maximum is not part of
14  Ventura?
15      A   They are not.
16      Q   Okay.
17      Did I ask you the name of the person at
18  Maximum who sent it?
19      A   You did.
20      Q   And you don't know?
21      A   I do not know.
22      Q   And we don't know where the original is; is
23  that correct?  We are speaking of Exhibit 2.  We don't
24  know where the original is?
25      A   We only have scanned copies.

---

Page 134

1       Q   And further on in paragraph six it says a
2   redacted version of the invoice was -- do you see that?
3       A   Yes.
4       Q   Why was a redacted version attached?
5       MR. GARRETT:  I would object to the extent it
6   calls for the disclosure of attorney/client or work
7   product information.
8       To the extent you can answer without reference
9   to what you may have been told by counsel.  This may
10  have been a decision by counsel, I don't know.
11      THE WITNESS:  Yeah.  Attached as an exhibit.
12  BY MR. LUTHER:
13      Q   But you don't know why portions were redacted?
14      A   Oh.  I do not, no.
15      Q   And you don't know who redacted it?
16      A   Do not.
17      Q   Was it redacted at Ventura or was it redacted
18  at Maximum?
19      A   I do not know that.
20      Q   So really we have no idea who marked it up?
21      A   (No audible response.)
22      Q   Is that correct?
23      A   Correct.
24      Q   Now on this Exhibit 2, second invoice it says
25  -- I see "new Mel-Fry" with some handwriting around it

---

Page 135

1   and some -- looks like some initials.  Do you see that?
2       It says -- or some writing next to it.
3       A   I honestly can't make it out.
4       Q   I am just saying do you see the writing next
5   to it, a scribbling there?
6       A   A see a lot of scribbling on the page.
7       Q   I can't make it out either.  I was going to
8   ask you what it says.  We don't know; right?
9       A   No.
10      Q   We don't know who wrote "new Mel-Fry," do we?
11      MR. GARRETT:  Objection.
12      MR. LUTHER:  Let me rephrase the question.
13      Q   Do we know who wrote "new Mel-Fry" here?
14      MR. GARRETT:  My objection is to the term
15  "we."  Does this witness know as he sits here today who
16  wrote these things?
17      MR. LUTHER:  Let me rephrase the question.
18      Q   Do you know who wrote "new Mel-Fry" here?
19      A   I do not.
20      Q   Did you have any occasion to have contact
21  with the product that was allegedly sent with this
22  invoice?
23      A   After the invoice, yes, we requested a sample
24  case of the product be sent in to us.
25      Q   Did you analyze the product?

---

Page 136

1       A   Yes.
2       Q   And it was inferior; is that correct?
3       A   No.
4       Q   Okay.
5       Let's go to the end of paragraph six.  The
6   purchaser of the Mega-Fry product on the invoice is a
7   New York -- is a restaurant in New York.  Do you see
8   that?
9       A   Uh-huh.
10      Q   What's the name of the restaurant?
11      A   Kennedy.
12      Q   And is that where you got the product from
13  that you tested?
14      A   Not sure where the product came from that we
15  tested.
16      Q   It's called Kennedy's restaurant?
17      A   Well, I'm looking at the invoice.  This
18  invoice would be made out to the customer that
19  purchased the product.
20      Q   Ah.  So you are just guessing; is that
21  correct?
22      MR. GARRETT:  Counselor, it's argumentative.
23  He's not just guessing.  He's reading the invoice.
24  BY MR. LUTHER:
25      Q   Are you 100 percent sure of the name of the

---

## Page 137

1  restaurant Kennedy?
2      A  That the product came from?
3      Q  Yes.
4      A  I am not.
5      Q  Do you know what the name in the restaurant in
6  New York is?
7      A  It might not have even come from a restaurant.
8      Q  Okay.
9          Now, it says the purchase of the Mega-Fry
10 product on the invoice is a restaurant in New York
11 typical of the customers of Ventura's Mel-Fry product.
12 Does this mean that restaurant purchases are typical of
13 the Mel-Fry product?  Is that the typical user of the
14 Mel-Fry product?
15     A  They are the typical end user, correct.
16     Q  Is it true that restaurants operate on a
17 pretty short margin sometimes?  Is that correct?
18     MR. LUTHER:  Calls for speculation.  Lacks
19 foundation.
20     THE WITNESS:  There are many restaurants that
21 operate on a day-to-day basis.  They will buy products
22 the following day that they sold out of the day before.
23 It can be that tight.
24 BY MR. LUTHER:
25     Q  They order, reorder?

## Page 138

1      A  Sure.
2      Q  They can't afford to have inventory; right?
3      A  They cannot.  Mom and pop business.
4      Q  So they have to pay attention to who they are
5  buying from; is that correct?
6      A  They have to pay attention to inventory level,
7  to --
8      Q  Do they --
9      A  -- cash flow.
10     Q  Do they pay attention to who they are buying
11 from?
12     MR. GARRETT:  Again, lack of foundation.
13 Calls for speculation.
14     THE WITNESS:  Who they buy from typically is a
15 distributor.  If not exclusively.  So, yes, they know
16 the distributor that's distributing products in to
17 them.  And they will typically buy from anywhere from
18 at least two and upwards distributors with a multitude
19 of products and brands available.
20     MR. LUTHER:  Okay.
21     Q  So going back to Exhibit 2, it is possible
22 that this invoice could be fake; is that correct?
23     A  In this day and age of technology, anything is
24 possible.
25     Q  Let's go to the next question.  Paragraph

## Page 139

1  seven.  We already talked about that.
2          Let's go to paragraph nine.  Therefore,
3  Ventura sought to purchase a Mega-Fry product sample.
4  How long did it take Ventura to get the sample?
5      A  Several weeks.
6      Q  Who at Ventura purchased the sample?
7      A  It was actually purchased by our broker.
8      Q  Do you have the name for me?
9      A  Do not have the name.
10     Q  How did they get a sample?  How did they do
11 it?
12     A  There's a multitude of ways.  Could be having
13 a relationship with the distributor that they would be
14 calling on and pick it up at will call.  There is a
15 number of cash and carry outlets in the New York area,
16 Restaurant Depot being one of them.  They very well
17 could have been carrying the product and they could
18 have bought it right off the shelf.
19     Q  Now, paragraph ten, Ventura received a
20 product sample of the Mega-Fry product in late April.
21 Did it take a month?
22     A  We are dealing with a broker relationship that
23 has a number of priorities.  Sometimes it takes a
24 little while to get yours on the list.
25     Q  So it wasn't done with any particular urgency,

## Page 140

1  then; is that correct?
2      MR. GARRETT:  Misstates the prior testimony.
3  It's also --
4      MR. LUTHER:  New question.
5      MR. GARRETT:  Let me finish my --
6  BY MR. LUTHER:
7      Q  Was it performed with any urgency?  Let me
8  rephrase the question.
9          Was the Mega-Fry product obtained with any
10 urgency?
11     A  It was obtained within the time frame it took
12 to obtain it.  Whether you determined that's urgency or
13 not, there's a number of challenges in business that
14 sometimes -- you can't just walk out and buy products.
15 It's not like buying it off of a Winn-Dixie store
16 shelf.
17     Q  Paragraph ten, received the product in late
18 April.  What does this mean?  April 30th?  Do we know
19 what date?
20     A  Late April to me means anywhere between the
21 20th and the 30th.
22     Q  Fair enough.
23          And who -- paragraph ten again, pertaining to
24 paragraph ten.  Who at Ventura evaluated the trademark
25 and trade dress claims against Supreme?

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                TERRY SPLANE

## Page 141

1    A   Would have been evaluated by our in-house
2    legal counsel.
3    Q   Was there an evaluation report produced of
4    some kind?
5         MR. GARRETT:  Asked and answered.
6         THE WITNESS:  What's that?
7         MR. GARRETT:  You may answer the question.
8         THE WITNESS:  Oh, okay.
9         We had conversations around it.  But I'm --
10   and we talked about the particulars.  But I don't
11   recall seeing a report at that time.
12   BY MR. LUTHER:
13   Q   If there was a report produced, where would it
14   be located?
15   A   In the files of corporate legal counsel.
16   Q   Here in L.A.?
17   A   Brea.
18   Q   Brea right here?
19   A   Brea, California.
20   Q   The corporate headquarters?
21   A   Yes.
22   Q   Do we have an exact date of this evaluation,
23   pertaining to paragraph ten?
24        MR. GARRETT:  Again, it misstates the prior
25   testimony.

## Page 142

1         MR. LUTHER:  This is a new question.
2         THE WITNESS:  Don't recall the exact date.
3         Should be housed in the records, though.
4         MR. GARRETT:  Assuming there was one.
5         THE WITNESS:  Correct.
6         MR. GARRETT:  That was your testimony.
7    BY MR. LUTHER:
8    Q   I thought you said earlier there wasn't a
9    record.  Is that right?
10   A   I don't believe I said that.
11   Q   What did you say, then?
12   A   If there was a record, then it would be housed
13   in Brea at our corporate offices.
14   Q   So you are not exactly sure if a report was
15   composed or not; is that correct?
16   A   I'm not familiar with every single exact step
17   that got us to the point to where we are today.
18   Q   Let me go on to the next question here.
19   So, therefore, you can't tell me if the
20   evaluation was performed with urgency; is that correct?
21        MR. GARRETT:  Misstates the prior testimony.
22   It's argumentative.
23        MR. LUTHER:  Answer the question, please.
24        THE WITNESS:  I believe once we got all the
25   necessary information that we did act promptly.

## Page 143

1    BY MR. LUTHER:
2    Q   What's "promptly" mean?  Months?
3    A   It's all in the context of the number of steps
4    that gets you to an end point.  Yes.  30, 60 days.
5    Q   Now, paragraph 11 it says your -- Ventura's
6    investigation culminates in a May 22nd cease and desist
7    letter.  And that's about three months from the date of
8    the first invoice; is that correct?
9    A   Yes.
10   Q   So I guess the investigation took three
11   months; is that correct?
12   A   The real investigation when we finally got the
13   sample after going through the multiple invoices did
14   not take three months.  That would have been in the 30
15   day window.  If we consider late April being the 20th
16   to the 30th, then there is a 30 day window there.
17   Q   Then why did you wait until May 22nd to send
18   out a cease and desist letter?
19        MR. GARRETT:  Go ahead.  Try to answer the
20   question.
21        THE WITNESS:  I don't think we waited.  I
22   think we went through our due diligence on our side
23   which takes some time to make sure everything is in
24   order before it's issued.  I wouldn't consider that
25   waited.  That's putting the thoughtfulness into the

## Page 144

1    event necessary.
2    BY MR. LUTHER:
3    Q   Where is your due diligence?  You don't even
4    know who wrote the term "new Mel-Fry."  Where is the
5    due diligence?
6         MR. GARRETT:  Can you read back the question
7    to me, please.
8         (Record read as follows:
9         "Question:  Where is your due diligence?
10        You don't even know who wrote the term 'new
11        Mel-Fry.'  Where is the due diligence?")
12        MR. LUTHER:  Can you answer?
13        MR. GARRETT:  It's, again, argumentative.
14   It's already been asked for the last half an hour.
15   But feel free to answer the question again.
16        THE WITNESS:  The term "new Mel-Fry" on the
17   distributor invoice to me is immaterial to the trade
18   dress issue we are discussing here.  They are two
19   completely separate issues.
20        MR. LUTHER:  Okay.  Next question.
21   Q   Paragraph 12.  After Ventura sent the cease
22   and desist letter, Ventura and Supreme spent nearly the
23   next three months attempting to settle.  To your
24   knowledge why did Ventura spend three months?
25   A   Not being familiar with the process, my

VENTURA FOODS, LLC -v- SUPREME OIL COMPANY                                  TERRY SPLANE

Page 145

1  speculation is that there was a lot of back and forth
2  and it wasn't just Ventura but between the two
3  companies in that span of time.
4      Q  Now, this is approximately six months since
5  Ventura first became aware of – of the first invoice;
6  is that correct?
7      A  End of February, yes.
8      Q  So is it fair to say the matter wasn't urgent
9  because Ventura waited six months to file a suit?  Is
10 that correct?
11         MR. GARRETT:  Misstates the prior testimony.
12 It's also argumentative.
13         MR. LUTHER:  This is a new question.
14         MR. GARRETT:  You can say new question all you
15 want.  You distort what he says and then ask it back to
16 him and ask for confirmation.  Ask him a
17 straightforward question, and he'll give you a
18 straightforward answer.
19         MR. LUTHER:  Can you repeat the question,
20 please.
21         (Record read as follows:
22           "Question:  So is it fair to say the
23           matter wasn't urgent because Ventura waited
24           six months to file a suit?  Is that correct?")
25         MR. GARRETT:  You can answer the question.

Page 146

1         THE WITNESS:  I think there was an attempt to
2  try to handle it in a different method.  Didn't resolve
3  it.  So that's when the suit was filed.
4         May I get a glass of water real quick?
5         MR. LUTHER:  Sure.  Let's go off the record.
6         (Discussion held off the record.)
7  BY MR. LUTHER:
8      Q  Mr. Splane, are you going to testify at the
9  preliminary injunction hearing?
10         MR. GARRETT:  Objection to the extent it calls
11 for disclosure of attorney/client communication.
12         MR. LUTHER:  Can he answer?
13         MR. GARRETT:  I don't know how he could answer
14 that question without disclosing whether or not he's
15 communicated with his attorneys and his attorneys have
16 told him what their strategy is.  If you want to tell
17 me how you think that would not otherwise be
18 privileged?
19         MR. LUTHER:  I guess your witness list is not
20 privileged, is it?
21         MR. GARRETT:  Has the witness list been
22 disclosed?  I don't know.
23         MR. LUTHER:  You can answer.
24         MR. GARRETT:  You can answer the question.
25         Do you know whether or not you will be a

Page 147

1  witness at the -- at the preliminary injunction hearing?
2         MR. LUTHER:  Can you answer?
3         THE WITNESS:  I haven't received that request,
4  no.
5         MR. LUTHER:  Okay.
6         Now let's go to the -- let's go to the
7  declaration, the first declaration.
8         MR. GARRETT:  This will be Exhibit 39.
9         (Defendant's Exhibit 39 was marked
10          for identification by the Certified
11          Shorthand Reporter.)
12 BY MR. LUTHER:
13     Q  Mr. Splane, I have a declaration here executed
14 on August 16th, 2007.  And are you the person who
15 executed this --
16     A  Yes.
17     Q  -- declaration?
18         You are.  Okay.
19         And did you write this declaration?
20     A  Drafted by legal counsel, with guidance from
21 me.  And then modified.
22     Q  How many drafts?
23     A  I would say three to four.
24     Q  Do you know where the drafts are?
25     A  Do I know where they are?

Page 148

1      Q  Yes.
2      A  If we were to keep them, they would be with
3  legal counsel.
4      Q  So you are not sure -- you are not sure if you
5  have them or not?
6      A  Not my job responsibility to hang on to the
7  drafts.
8      Q  And this is the same with the October 9th
9  declaration, you have a few drafts there but you don't
10 know where the drafts are; is that correct?
11     A  If we were to keep them, then they would be
12 with corporate legal counsel.
13     Q  Okay.
14         Paragraph two, Ventura is one of the leading
15 producers in the United States of shortening,
16 et cetera, et cetera, et cetera.  Who are the other
17 leading producers?
18     A  Taken in the context of those categories, it
19 is national manufacturers that I mentioned this morning
20 in shortenings and oils.  In dressings it is Ken's
21 Foods.  It's Kraft Foods.  It's Marzetti.  In soup
22 bases category it is Nestles with the Minor's brand.
23 In margarine it's ADM.
24     Q  We can limit it to shortening.
25     A  Okay.

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                                              TERRY SPLANE

---

Page 149

1  Q  Is Supreme considered a leading producer?
2  A  I would not consider them a leading producer.
3  To the best of my knowledge they are not national in
4  scope. The people we go up against are across the
5  nation.
6  Q  Would you consider Supreme regional?
7  A  Yes.
8  Q  East Coast regional?
9  A  I wouldn't even peg it to the entire East
10  Coast.
11  Q  Northeast?
12  A  I would say northeast. Mid-Atlantic to the
13  northeast.
14  Q  Are we going to say the tri-state area maybe?
15  New York, Jersey, Connecticut?
16  A  I gave you broader than that.
17  Q  Broader than that?
18  A  Mid-Atlantic.
19  Q  Philly. Okay.
20      Now, you have paragraph four you mention you
21  have manufacturing, distribution plants 13 locations.
22  I may have asked you this. Where is -- I may have
23  asked you this.
24      Where is the Mel-Fry manufactured?
25  A  It's manufactured at a number of locations,

---

Page 150

1  from City of Industry, to Salem, Oregon, to St. Joe,
2  Missouri. Alabama.
3  Q  Is it a 100 percent soybean oil product?
4  A  Yes.
5  Q  Except for what? Additives --
6  A  Yes.
7  Q  -- to make it last longer?
8  A  Yes.
9  Q  And you can't tell me those additives, it's a
10  trade secret; is that right?
11  A  It's actually disclosed on the ingredient list.
12  Q  Disclosed on the ingredients on the side of
13  the product?
14  A  Sure.
15  Q  What are they? Preservatives and things like
16  that?
17  A  Yes.
18  Q  Okay.
19      And paragraph five Ventura's total annual
20  sales are over $1 billion. What percentage of that are
21  the Mel-Fry sales?
22  A  Well, it is pretty simple math if we are at
23  $75 million. That one billion refers to all channels
24  of trade, refers to our retail as well as our
25  industrial. Food service specific sales would be

---

Page 151

1  obviously then less than that number.
2  Q  75 million for Mel-Fry. Is that annual sales?
3  A  Yes.
4  Q  Is that increasing?
5  A  Yes.
6  Q  Has it increased every year since Ventura
7  purchased the Mel-Fry label?
8  A  I can't speak to the late '90s on. But for
9  the last two years, yes, it has increased as a brand.
10  Q  Paragraph six you say that the product is a
11  clear vegetable oil. Clear -- by clear you don't mean
12  transparent; is that correct?
13  A  Do not mean crystal clear no. Refers to the
14  other option, which is creamy.
15  Q  Or colloidal in nature?
16  A  Creamy, yes.
17  Q  So for liquid shortening products I take it
18  there are only two options, clear or creamy; is that
19  correct?
20  A  There's cubed shortening as well, like a
21  Crisco.
22  Q  I am talking about the liquid products.
23  A  Yes.
24  Q  There is clear and creamy?
25  A  Correct.

---

Page 152

1  Q  And that's it?
2  A  (No audible response.)
3  Q  There's two choices?
4  A  (No audible response.)
5      MR. GARRETT: "Yes"?
6      THE WITNESS: Yes.
7  BY MR. LUTHER:
8  Q  Now, we get to paragraph seven. Mel-Fry
9  shortening has a number of important quality
10  specifications. Again use that term "superior," for
11  superior frying. Is it necessary -- you see where it
12  says that in paragraph seven; right?
13  A  Yes.
14  Q  The question is is it necessary for the
15  Mel-Fry product to be clear to have these quality
16  specifications?
17  A  No. The one advantage that comes out of the
18  clear is what we call cold filtering. Creamy product
19  cannot be cold filtered. It has to be hot filtered.
20  So you actually have to pour it through the filter hot.
21  And you can imagine the claims that come out of pouring
22  hot grease in the back of the house. The advantage of
23  -- one of the advantages of the clear product is it is
24  always clear and a viscosity that can be poured through
25  a filter even at a cold state.

---

Page 153

1    Q  So that's the advantage of having a clear
2  product?
3    A  Yes.
4    Q  And the milky-colored products, do they
5  have -- are they golden brown?  Are they yellow?
6    A  I'd say a white-ish gold.
7    Q  So they are always clear or white-ish gold?
8    A  Yes.
9    Q  Do some products have color additives added to
10  them?
11    A  We do not, no.
12    Q  Do you know what color the Mega-Fry product
13  is?
14    A  It is the color of Mel-Fry.  It is a goldish
15  color, clear goldish color.
16    Q  Now, paragraph eight you have the Mel-Fry
17  brand is a companion to Ventura's Melvo brand.
18    A  Yes.
19    Q  I see M-e-l in both marks here.
20    A  Correct.
21    Q  Is that just arbitrary?  Does it mean
22  something to your knowledge?
23    A  Doesn't mean anything in the world of
24  Ventura.  But it did -- my guess is it meant something
25  to previous owners.  Not sure what it does refer to, if

Page 154

1  a gentleman named Mel invented it or not.  But it has
2  no relevance other than it's one of our flagship brands
3  in the Ventura world.
4    Q  Now paragraph 11.
5    A  Yes.
6    Q  Let's go back to paragraph ten.  You say
7  Ventura acquired the Mel-Fry mark, goodwill, and
8  registration from Cono- -- whatever it is.
9    A  Conopco.
10    Q  Conopco.
11      To your knowledge are there documents in
12  existence backing up this statement?
13    A  I would assume there are.  I have not
14  requested to see them.
15    Q  Okay.
16      Now, let's go to paragraph 11.  You state one
17  reason that Ventura acquired Mel-Fry was because
18  Mel-Fry was a strong brand in the northeast.
19    A  Correct.
20    Q  How do you know it was a strong brand?
21    A  Due diligence at the time, identifying what
22  the customer base looked like, what percentage of the
23  market that made up.
24    Q  So that means you are going to have a bunch of
25  documents backing up this statement.  Is that correct?

Page 155

1    A  A bunch of documents backing this statement
2  up.
3    Q  How about some documents?
4    A  We should have some documents, yes.
5    Q  Where would they be located?
6    A  Again, if it was a part of the acquisition and
7  identifying a business case to go through with the
8  acquisition, they would be with corporate legal
9  counsel.
10    Q  Okay.
11      And then paragraph 12.  We have a true and
12  correct -- true and accurate copy of the original
13  Mel-Fry label.  Starting to slur my words.
14      The 1962 Mel-Fry label is not the same as the
15  label in use today; is that correct?
16    A  That was Exhibit 2?
17      MR. GARRETT:  Exhibit B.
18      As compared to?  Which one?
19      Doesn't appear to have a date or exhibit tabs
20  on it.
21      MR. LUTHER:  Well, just let me ask you this.
22    Q  Is the Mel-Fry label -- you know, pertaining
23  to paragraph 12, is the Mel-Fry label submitted to the
24  USPTO in 1962 the same label as in use today?
25    A  To truthfully answer that question I would

Page 156

1  have to see what it looked like in 1962.  And I'm not
2  sure where that is in this stack.
3    Q  Okay.
4      We have paragraph number 13.  True and
5  accurate copies of the Mel-Fry labels used for '84,
6  2004 renewal are attached to it as Exhibit C.  We have
7  no exhibit numbers here; right?
8    A  Right.
9    Q  How about this?  Can we go to this -- I don't
10  know what number it has.  But this portion of the
11  declaration -- is this label in use today?
12      MR. GARRETT:  For the record, counsel is
13  holding up a colored photograph, one of the exhibits.
14  It's a yellow container with the Mel-Fry black label on
15  the front with the basket with the fries in it.
16  BY MR. LUTHER:
17    Q  Can you identify this as the label in use
18  today, Mr. Splane?
19    A  It looks to be the label we have in use today,
20  again with the low quality of the shot.
21    Q  Was this label in use in 1962 to your
22  knowledge?
23    A  Do not know.
24    Q  Okay.
25      Let's go to paragraph 14.  Mel-Fry is usually

Case 1:07-cv-07338-PKC    Document 33-2    Filed 10/25/2007    Page 10 of 33

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.    TERRY SPLANE

## Page 157

1  sold in two bulk sizes -- 10-quart jugs, 35 pound
2  containers. Do you see that?
3     A  Yes, sir.
4     Q  Now, 10 quarts is what? Two and a half
5  gallons? Is that correct?
6     A  If your math is correct, then, yes.
7     Q  Four quarts to a gallon; right?
8     A  Yes.
9     Q  The 10-quart jugs are the Mel-Fry products
10 which are in issue in this lawsuit; is that correct?
11    A  Correct.
12    Q  Now, it says the 10-quart yellow jugs
13 accounted for a substantial portion of Ventura's total
14 Mel-Fry sales. Which portion is that? Can you give me
15 a number?
16    A  As it's related to the Mel-Fry brand in the
17 northeast, I would put it at 21, 22, 23 percent by --
18    MR. GARRETT: I'm sorry. Looking at paragraph
19 14?
20    MR. LUTHER: Yes.
21    MR. GARRETT: Doesn't it say right there?
22    MR. LUTHER: Oh. Approximately one third.
23 And then in the northeast about one half. Okay.
24    Q  That's correct?
25    A  (No audible response.)

## Page 158

1     Q  "Yes"?
2     A  Yes.
3     Q  Now, there are documents in existence
4  someplace to back up the statements of paragraph 14; is
5  that correct?
6     A  Yes.
7     Q  And those will probably be at Ventura's
8  headquarters?
9     A  Correct.
10    Q  Paragraph 15. Ventura has rigorous special
11 programs in place to insure the food safety of its
12 products including the Mel-Fry shortening. Are these
13 programs reduced to writing to your knowledge?
14    A  Are they reduced to writing?
15    Q  Yes.
16    A  In other words, do we have documented
17 procedures, methodology, and protocols in place for
18 QA/QC?
19    Q  Yes, that's the way to put it.
20    A  The answer is yes.
21    Q  And those documents would be located where?
22    A  At the plant level.
23    Q  Here in Los Angeles?
24    A  In the multitude of plants that we have.
25    Q  Okay. All right.

## Page 159

1     And who formulates those programs to your
2  knowledge?
3     A  They would come out of our QA/QC department.
4     Q  Is there a central QA/QC department?
5     A  In Brea, California.
6     Q  Let's go to paragraph 16. Okay.
7     We have the Mel-Fry product on the left and
8  the Mega-Fry product complained of on the right; is
9  that correct?
10    A  Correct.
11    Q  What color is the fry basket in the Mel-Fry
12 product?
13    A  Looks to be multicolored. I would say that
14 it's silver or stainless and yellow.
15    Q  What color is the I guess facsimile of metal
16 basket in the Mega-Fry product?
17    A  I would call it stainless or silver.
18    Q  It's not blue?
19    A  I don't see blue.
20    Q  Let's go to paragraph 17. You see both these
21 jugs have rounded edges? Do you see that?
22    A  Yes.
23    Q  Do any other jugs for storing liquid
24 shortening have round edges? To your knowledge.
25    MR. GARRETT: At Ventura? Or --

## Page 160

1     MR. LUTHER: Anyplace.
2     MR. GARRETT: Okay.
3     THE WITNESS: Saw a multitude of them this
4  morning.
5  BY MR. LUTHER:
6     Q  How about twist top openings?
7     A  Twist top is a standard closure.
8     Q  How about rectangular handles?
9     A  In the shortening category it is a portion of
10 the sales, but not the dominant portion of sales. Most
11 of it is jug in a box.
12    Q  Okay.
13    Paragraph 18, please.
14    MR. GARRETT: Can you read back the last
15 question for me.
16    (Record read as follows:
17    "Question: How about rectangular handles?
18    "Answer: In the shortening category it is
19    a portion of the sales, but not the dominant
20    portion of sales. Most of it is jug in a
21    box.")
22    THE WITNESS: Different packaging
23 configuration.
24    MR. LUTHER: Let's go to paragraph 17 and
25 compare it to paragraph 22. There seems to be an

| Page 161 | Page 163 |
|---|---|
| 1 inconsistency here which I want to ask you about. | 1 who they are buying from; correct? |
| 2     MR. GARRETT: 17 and 22? | 2    A  A good portion of them are, yes. |
| 3     MR. LUTHER: Yes. | 3    Q  Okay. |
| 4    Q  In paragraph 22 you mention that the trade | 4     Let's go to paragraph 22 again.  Now, in |
| 5 dress consists of the 10-quart container, label colors, | 5 paragraph 22 are you saying that the color yellow is |
| 6 color combinations, layout and overall image.  Do you | 6 exclusively associated with the Mel-Fry product? |
| 7 see that? | 7     MR GARRETT:  The document speaks for itself. |
| 8    A  Yes. | 8     MR. LUTHER:  Can you answer the question? |
| 9    Q  But no mention is made of fried or frying | 9 Please answer if you can answer. |
| 10 food items.  Why is that? | 10     THE WITNESS:  The question is very broad and |
| 11    A  I would say it's encompassed in the overall | 11 goes back to some of the conversations we had this |
| 12 image. | 12 morning.  In the context of three 10-quart shortenings, |
| 13    Q  But consisting as a -- strike that.  Okay. | 13 frying oil, we've been in that container color and it |
| 14     Now, paragraph 21.  The Mel-Fry mark | 14 is a part of our trade dress. |
| 15 symbolizes Ventura's reputation and goodwill.  Does | 15 BY MR. LUTHER: |
| 16 Ventura -- do you see where it says that? | 16    Q  Does Ventura think it owns the yellow color |
| 17    A  Yes. | 17 for use with liquid shortening? |
| 18    Q  Does Ventura have documents on hand to back | 18    A  Do we think we own it?  I'm not familiar |
| 19 this statement up? | 19 whether we can own it or not. |
| 20    A  Of goodwill for consistent high quality | 20    Q  Okay. |
| 21 products? | 21     Paragraph 23.  You say, like the Mel-Fry word |
| 22    Q  Whatever it says in 21. | 22 mark this trade dress -- this trade dress I assume is, |
| 23    A  Yes, I would say that the reverse of that is | 23 you know, that picture we looked at before. |
| 24 true and that would be that we have a limited amount of | 24    A  Sure. |
| 25 documents on customer complaints about our products. | 25    Q  The design currently in use now.  Symbolizes |

| Page 162 | Page 164 |
|---|---|
| 1    Q  So you gauge reputation by the lack of | 1 Ventura's goodwill and indicates the true source of the |
| 2 negative criticism; is that correct? | 2 Mel-Fry shortening.  Do you see where it says that in |
| 3    A  It's one way of looking at it, yes. | 3 23? |
| 4    Q  And you -- you would probably keep the | 4    A  Yes. |
| 5 negative criticism documents in a file; is that | 5    Q  Are there any documents in existence to back |
| 6 correct? | 6 up this statement? |
| 7    A  Yes. | 7    A  No documents that I'm aware of. |
| 8    Q  Is that file located here in Los Angeles? | 8    Q  So 23 is just sheer opinion; is that correct? |
| 9    A  Yes.  QA/QC. | 9     MR. GARRETT:  Misstates the prior testimony. |
| 10    Q  Okay. | 10 It's also -- |
| 11     This is not speculation, you know this for a | 11     MR. LUTHER:  Let me ask a new question -- |
| 12 fact; is that correct? | 12 finish your objection. |
| 13    A  Yes. | 13     MR. GARRETT:  No, go ahead if you are going to |
| 14     The other part of that reputation comes from | 14 ask a new question. |
| 15 the touring of our customers through our facility and | 15 BY MR. LUTHER: |
| 16 making them aware of the stringent steps we go through | 16    Q  Is 23 your own opinion? |
| 17 in operations of manufacturing to assure the highest | 17    A  It's the opinion of many people, regardless of |
| 18 quality consistent products. | 18 what organization they are with, in what embodies the |
| 19    Q  What do you mean?  You get requests from | 19 essence of your brand.  It's the style of the Coca-Cola |
| 20 distributors to tour your plant? | 20 bottle.  Did they own that style?  I don't know.  But |
| 21    A  Yes, absolutely. | 21 is it a part of their brand in consumers' and in users' |
| 22    Q  They want to see what things look like? | 22 minds?  Yes. |
| 23    A  Absolutely.  They are concerned with who they | 23    Q  How do you know that's true what you just -- |
| 24 are buying from. | 24 what you just stated? |
| 25    Q  So they are pretty intimately familiar with | 25    A  What I just stated I think is just common |

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                                    TERRY SPLANE

Page 165

1  knowledge.
2      Q  I'm sure there has been a zillion marketing
3  studies performed for Coca-Cola and Pepsi.  Has there
4  have been, you know, similar studies performed for
5  Ventura's Mel-Fry shortening?
6      A  No.
7      Q  You don't know?
8      A  No.
9      Q  Okay.
10         Let's go to paragraph 24.  At the time Ventura
11 purchased Mel-Fry the mark and trade dress were already
12 well known and recognized.  Do you see that?
13     A  Yes.
14     Q  Ventura purchased Mel-Fry in '97; is that
15 correct?
16     A  Close to the end of '97.
17     Q  And how do you know that the mark and trade
18 dress were already well known and recognized?
19     A  Through the sheer market penetration of the
20 brand.
21     Q  You mean based on sales volume?
22     A  Yes.
23     Q  Repeat customers?
24     A  Yes.
25     Q  Let me get into that a little bit.  How do

Page 166

1  repeat customers reorder?  Do they pick up the phone?
2  Do they send an email?  Can you tell us how?
3      A  They reorder through -- well, define who the
4  customer is here.
5      Q  The restaurant.
6      A  The restaurant.  The restaurant does not buy
7  directly from Ventura Foods.  The restaurant buys from
8  a distributor.
9      Q  Okay.
10         The distributor is fulfilling the restaurant's
11 constantly depleting inventory.  Therefore, the
12 distributor needs a warehouse on hand?
13     A  Correct.
14     Q  How do they reorder?  Do they pick up the
15 phone?  Email?  How do they reorder?
16     A  Both.  Depends on the sophistication of the
17 distributor.
18     Q  Would they send a fax sometimes?
19     A  They can do that too.
20     Q  Do you keep a copy of all these orders?
21     A  Copy of orders and invoices, yes.
22     Q  How long do you keep them for?
23     A  I don't know the answer to that question.
24     Q  But they are stockpiled --
25     A  Sure, archived.

Page 167

1      Q  -- in the company?
2      A  Yes, they are.
3      Q  Now, you know you say -- you say things here I
4  have to ask you about.  You say already well known and
5  recognized in the industry indicating a single source
6  for the product.  How do you know that?  How do you
7  know what's in other people's minds?
8      A  Would have come from the due diligence that
9  was performed at the time of the acquisition.
10     Q  Based on sales volume?
11     A  Yes.
12     Q  Based on how well the product was received?
13     A  Yes.
14     Q  Growing sales?  Is that another indication?
15     A  Insight from customers.
16     Q  Insight.  Would you ever conduct a poll of how
17 customers received a product?
18     A  It would not have been that formalized.
19     Q  Sometimes companies send out, you know, a
20 little product survey.  Was that ever done?
21     A  At the time of this acquisition I was not a
22 part of the company.  So I don't know.
23     Q  Okay.
24         But since you've been part of the company has
25 that been done, sending out consumer survey forms?  Or

Page 168

1  whatever they are called.
2      A  We do it on occasion, yes.
3      Q  Obviously those are saved and put in a file
4  someplace?
5      A  Yes.
6      Q  Right here in Brea?
7      A  (No audible response.)
8      Q  You keep the good and the bad comments?
9      A  Yes.  Most of our efforts are around new
10 products not around existing brands.
11     Q  Have you gotten any bad comments about Mel-Fry?
12         MR. GARRETT:  Vague as to time.
13         MR. LUTHER:  Hm?
14         MR. GARRETT:  Ever?
15         MR. LUTHER:  Ever, yeah.
16         MR. GARRETT:  Okay.
17         THE WITNESS:  Have I personally, no.
18 BY MR. LUTHER:
19     Q  Do you know of any?
20     A  I do not.
21     Q  Well, when I speak of you, you are testifying
22 here for Ventura.
23     A  Correct.
24     Q  So you don't know for sure?
25     A  I don't know the specifics around it, no.

**Page 169**

1          (Telephone interruption.)
2    BY MR. LUTHER:
3       Q   Let's go to paragraph 25. The color yellow
4    that is part of the trade dress is nonfunctional. Now,
5    this is your statement, your declaration. What does
6    that mean, nonfunctional?
7       A   That it's not attached to any of the
8    functional attributes of the product, doesn't designate
9    anything specifically.
10      Q   Does it make the product more appealing?
11      A   To the degree the people like or dislike
12   yellow.
13      Q   Kind of like we talked about earlier, people
14   wouldn't really like black liquid shortening?
15      A   But they might like a black container. They
16   would not like black shortening. We are talking about
17   the container here.
18      Q   Well, if we got black shortening, horribly
19   unrefined junk in a clear container, --
20      A   Crude oil.
21      Q   -- the product is going to be black; right?
22      A   (No audible response.)
23      Q   Right?  It's not going to be appealing; is
24   that correct?
25      A   The oil would be black and unappealing,

**Page 170**

1    correct.
2       Q   Or of some green stuff. People would say,
3    what the hell's this; is that correct?
4       A   Yes.
5       Q   Okay.
6          Now, you say here it is not necessary for any
7    competitor to use yellow packaging in this way to
8    compete effectively in the marketplace. What do you
9    mean by that statement?
10      A   It means that yellow doesn't denote anything
11   significant within the category.
12      Q   In whose mind?
13      A   In my mind.
14      Q   Why do we see all these other products using
15   the color yellow?  Why is that?
16      A   I couldn't tell why other competitors use
17   yellow.
18      Q   Then we go on to paragraph 25, says the other
19   main sellers of liquid shortening use white or clear
20   containers. But we know that's not correct; right?
21      MR. GARRETT: Objection. Misstates the
22   testimony. Also somewhat argumentative.
23      MR. LUTHER: Can you answer?
24      THE WITNESS: The contention of our
25   conversation this morning, I saw brands from Malaysia,

**Page 171**

1    from Asia, from Europe. I don't have visibility of
2    those brands. I'm not speaking global within this
3    document. I'm speaking specifically of the United
4    States.
5    BY MR. LUTHER:
6       Q   But those other brands are sold -- advertised
7    on the Internet in the United States for sale; is that
8    correct?
9       MR. GARRETT: Lack of foundation. Calls for
10   speculation.
11      THE WITNESS: I don't know that Malaysia is
12   trying to sell oil in here through the Internet. Just
13   because we can pull it off the Internet doesn't mean
14   it's available in the United States.
15      MR. LUTHER: Okay.
16      Q   Paragraph 27. Sales of 75 million is a very
17   commercially successful brand compared to the industry
18   standards. In anybody's mind. Okay.
19      A   Yes.
20      Q   Again, there are documents someplace in
21   existence to back up this statement?
22      A   The $75 million statement?
23      Q   Yes.
24      A   It will have changed dramatically as of today,
25   but from that point, yes.

**Page 172**

1       Q   Is it more today?
2       A   Yes.
3       Q   How much more?
4       A   Well, dramatically more.
5       Q   Another 25 million?
6       A   Probably not that much. But it's tied to the
7    escalation, as I'm sure you've heard in the news, the
8    food for fuel and the escalating grain -- corn and
9    associated grain prices. Soybean is going through the
10   roof.
11      Q   Oh. So you are making more money?
12      A   I'm not saying we are making more money. I'm
13   saying the dollars are greater. That doesn't
14   necessarily mean we make more money.
15      Q   How long does a Mel-Fry product last typically
16   in a restaurant?
17      A   There are so many variables. What we say in
18   our lab it's a 130 to 140 hour fry life under
19   controlled environment.
20      Q   Is it ever recycled?
21      MR. GARRETT: By the end user?
22      MR. LUTHER: Yes. By anybody.
23      THE WITNESS: Is it ever recycled?
24      MR. LUTHER: By anybody.
25      MR. GARRETT: Calls for speculation.

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                          TERRY SPLANE

---

Page 173

1     THE WITNESS: Recycled and used for oil
2  again?
3     MR. LUTHER: Yes.
4     THE WITNESS: I know it's pulled away by
5  renderers from the back of operators and used for feed.
6  BY MR. LUTHER:
7     Q   For feed?
8     A   (No audible response.)
9     Q   So that's the usual bioproduct use?
10    A   Or we are seeing people now putting it in
11 their cars.
12    Q   So it's used for making biofuel?
13    A   Limited degree, but there is that, yes.
14    Q   What do they call that? Biodiesel?
15    A   Yes, exactly.
16    Q   Let's go to 28. You estimate that Mel-Fry
17 occupies 14 to 16 percent of the national market. So
18 we have documents to back this up?
19    A   Yes.
20    Q   Okay.
21        And those are here in L.A.?
22    A   Correct.
23    Q   And then same thing with 29?
24    A   Yes.
25    Q   And 30 a large majority of sales and

---

Page 174

1  deliveries are made through food service distributors.
2  How -- what percentage would you estimate?
3     A   The percentage of the food service division
4  sales going through broad line distributors is 90 to
5  95 percent.
6     Q   Okay.
7        30 referring to the Mel-Fry product; right?
8     A   It's actually all the products that we sell
9  within food service of which Mel-Fry is a piece of,
10 yes.
11    Q   So you don't know exactly what percentage of
12 whatever's stated in paragraph 30 is Mel-Fry in
13 particular?
14    A   I believe I just stated it was around
15 95 percent would be my estimation.
16    Q   Oh, okay.
17        The other 5 percent where does that go?
18    A   Be direct not through distributors. But there
19 are certain restaurants that have their own source of
20 distribution, their own owned source of distribution.
21    Q   Are we talking about a Ken's restaurants type
22 of things?
23    A   No. Would be someone like a KFC.
24    Q   Gotcha.
25    A   Or a Friendly's to put it back in the

---

Page 175

1  northeast.
2     Q   They are still in existence?
3     A   (No audible response.)
4     Q   So KFC could be a typical purchaser?
5     A   We do business with KFC, yes.
6     Q   They would buy it directly from you in bulk?
7     A   Yes.
8     Q   KFC uses that quirky pressure cooking system;
9  right? As compared to other fried chicken
10 manufacturers or providers who don't cook it under
11 pressure. Do you know anything about that?
12    A   I'm not sure what the quirky system is, no. I
13 do know that they deep fry their chicken.
14    Q   Deep fry under pressure, would that limit the
15 life of the shortening?
16    A   We've never tested that to my knowledge.
17    Q   You don't know?
18    A   My guess is KFC would not do a thing that
19 would limit the fry life. Because they want to get the
20 most value out of it as possible.
21    Q   Because it has to do with cost?
22    A   Profit, sure.
23    Q   I worked at Kentucky Fried Chicken as a kid.
24 We used these big, blue cubes of who-knows-what. But
25 that's not --

---

Page 176

1     A   That is not done today, trans fats.
2     Q   Paragraph 33. Due to its longevity as a
3  symbol of a superior product. Longevity you mean by
4  its useful life in the cooking environment?
5     MR. GARRETT: In this context right here?
6  BY MR. LUTHER:
7     Q   32, statement of 32.
8     A   No. This is the context of longevity as a
9  brand.
10    Q   Oh, how long the brand has been around?
11    A   Yes.
12    Q   And it's favorably known throughout the
13 industry. And, again, you have documents to back this
14 statement up someplace?
15    A   I believe we talked about lack of complaints
16 being documents. But not documents specifically that
17 would -- would serve this up.
18    Q   So you are just basing this statement on the
19 ten years that the current market has been used --
20 current symbol has been used?
21    A   In conversations with customers and their
22 feelings and their thoughts about the brand and the
23 product and what it delivers to them.
24    Q   Is this feedback ever recorded or reduced to
25 writing?

---

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.

TERRY SPLANE

## Page 177

1    A   No.
2    Q   Okay.
3        Paragraph 33.  Advertising.  You have
4    membership in National Restaurant Association.  Is
5    there a National Restaurant Association magazine?
6    A   Yes.
7    Q   Do you advertise the Mel-Fry mark there?
8    A   In Nation's Restaurant News, correct.
9    Q   Do you have an advertising budget?
10   A   Yes.
11   Q   Do you know what the advertising budget is for
12   Mel-Fry?
13   A   Today it's in excess of $350,000 a year.
14   Q   Okay.
15       And what does the Menu Master awards -- what's
16   that?
17   A   That is an event where we have combined with
18   Nation's Restaurant News during the National Restaurant
19   Association show to hand out awards to operators, food
20   service operators, in ten different categories, from
21   most innovative menu, most healthy concept, it's a
22   multitude of categories.  It's recognition for the
23   industry.
24   Q   What does Mel-Fry have to do with that?
25   A   Mel-Fry is a component of Ventura Foods

## Page 178

1    that -- that we represent.  When we go, people think of
2    our brands when they think of Ventura.
3    Q   Okay.
4        Now, when you participate in regional and
5    local distributor shows across the country -- I am
6    looking at "B."
7    A   Yes.
8    Q   Does that participation involve particular
9    advertising materials?
10   A   It involves point of sale materials.  It
11   involves couponing.  Sometimes there are specific
12   pieces made up specifically to that distributor show.
13   Q   And do you have copies of all of these
14   materials someplace?
15   A   Yes.
16   Q   Here in L.A.?
17   A   Yes.
18   Q   Have you got an advertising department here in
19   L.A.?
20   A   We do have a communications department,
21   correct, and we also have an ad agency.
22   Q   Are they responsible for Internet advertising
23   as well?
24   A   We are, yes.
25   Q   What's the name of the ad agency?

## Page 179

1    A   The Food Group.
2    Q   Okay.
3        And your budget -- I am looking at "C," the
4    budget, Nation's Restaurant News -- the budget you just
5    told me includes all of this?
6    A   Yes.
7    Q   And on-site fry tests.  What do you do --
8    like, fairs or something like that?
9    A   No, that's actually -- that's where when we
10   talked earlier about clearly superior and what we do to
11   help support our product, we will actually go in and
12   consult with an operator who might be using a
13   competitive product and/or using one of our commodity
14   products, show them the value of the Mel-Fry brand and
15   what the fry life means to them, along with the support
16   tools long term in terms of cost of use.  Not cost per
17   case, but cost of use.
18   Q   And you go into a -- because cost is so
19   important to a restaurant?
20   A   Correct.
21   Q   With this tiny margin they are working on?
22   A   Correct.
23   Q   Even the big restaurants have a short margin?
24   A   It's a tough year.
25   Q   Now, on-site fry tips.  We are talking about

## Page 180

1    big restaurants, little restaurants?
2    A   We try to focus our efforts on regional chains
3    on up, could be three or four.  You don't want to spend
4    -- because this takes quite a bit of time.  And you
5    don't want to spend a lot of time for a smaller sale.
6    So we focus on larger end users, yes.
7    Q   Now, is Mel-Fry a trans fat free alternative?
8    A   We do have Mel-Fry free, trans fat free
9    products, yes.
10   Q   So you have different grades of Mel-Fry?
11   A   We have different oil types within the Mel-Fry
12   franchise.
13   Q   Okay.
14       Is soybean oil trans fat free?
15   A   Correct.
16   Q   It's not hydrogenated?
17   A   It is not.
18   Q   But you do have hydrogenated versions with a
19   longer shelf life; is that right?
20   A   Correct.
21   Q   Can you tell me who buys what?  Does the
22   little restaurant want the longer shelf life?
23   A   Typically the little restaurant wants to buy
24   the commodity products, because they only see it as
25   cash out of pocket, as opposed to somebody educating or

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                    TERRY SPLANE

Page 181

1  training them on the fact that you might be paying a
2  few more dollars on a per case basis but because of the
3  fry cycle and the life, you are actually going to save
4  money in the long run. So they typically have to be
5  educated in that way.
6      Q  Educating them -- I'm not sure -- pay a little
7  bit more for what product, the hydrogenated product?
8      A  Yes, the longer the fry life.
9      Q  But there's a trade off. You got to tell the
10 public at some point that they are using trans fats;
11 right?
12     A  If, in fact, they are using a trans fat free
13 product, they don't necessarily have to tell them. But
14 they would have to respond if somebody asked, correct.
15     Q  The trend is going that way?
16     A  It is absolutely going to trans fat free.
17     Q  How are you going to extend shelf life if you
18 don't hydrogenate?
19     A  We do have -- there are beans that are trait
20 engineered.
21     MR. GARRETT: Hold on a second. To the
22 extent -- can you answer the question without divulging
23 trade secrets or along those lines?
24     THE WITNESS: I believe so.
25     MR. GARRETT: Go ahead.

Page 182

1      THE WITNESS: There are certain suppliers of
2  seeds, such as a Monsanto, that have engineered
3  stability traits at the seed level, which calls for no
4  hydrogenation to produce that stability.
5  BY MR. LUTHER:
6      Q  You mean the product is less susceptible to
7  oxidation?
8      A  Longer fry life, correct.
9      MR. GARRETT: Counselor, we've been going
10 about an hour and a half.
11     MR. LUTHER: You want to take a break?
12     MR. GARRETT: Sure.
13     (Brief recess.)
14 BY MR. LUTHER:
15     Q  Okay. 37.
16     Let's go to 35 for a second. 35 is a little
17 inconsistent with what we've been talking about
18 earlier. You have Mel-Fry uses -- principal Mel-Fry
19 users and customers are food services operations. You
20 mean restaurants?
21     A  Restaurants is a portion of it. But there is
22 health care, colleges and universities. We call them
23 in the industry the noncommercial side of the business.
24     Q  Institutional cafeteria, you're talking, like,
25 a --

Page 183

1      A  Business and industry.
2      Q  -- corporate cafeteria?
3      A  Correct.
4      Q  Everybody except the individual consumer?
5      A  As a target, yes. As long as they have a
6  fryer.
7      Q  37. You mention that Mega-Fry and Mel-Fry
8  have the same composition. How do you know that?
9      A  Through analysis at R&D.
10     Q  Let me back up for a second.
11     35. We have documents backing up this
12 statement someplace -- Ventura has documents; right?
13     A  About the users and customers?
14     Q  Yes.
15     A  Yes.
16     Q  Is that right here in L.A.?
17     A  Yes.
18     Q  37. You have analyzed the Mega-Fry product?
19     A  Correct.
20     Q  And those results are someplace -- where is
21 the R&D with Ventura? Here in Los Angeles?
22     A  We do have one in the City of Industry, yes.
23 We also have an R&D in Fort Worth and one in
24 Chambersburg, Pennsylvania.
25     Q  Do you know when the Mega-Fry product was

Page 184

1  analyzed?
2      A  Weeks following the sample being sent in to
3  us.
4      Q  But not before February 2007?
5      A  Not to my knowledge.
6      Q  Okay.
7      Now, you say these products, the Mel-Fry and
8  Mega-Fry products, are sold in virtually identical
9  10-quart yellow jugs. Do you mean identical as to
10 yellow or identical because of the shape of the jug?
11     A  I think identical to both points.
12     Q  Who else sells liquid shortening in that kind
13 of jug?
14     A  Within the United States?
15     Q  Yes.
16     A  Within our marketing territory?
17     Q  Yes.
18     A  I'm not aware of another one.
19     Q  38. Supreme's Mega-Fry infringement confuses
20 buyers and users of Mel-Fry shortening. So how are you
21 so sure Mega-Fry infringes?
22     MR. GARRETT: Calls for a legal conclusion.
23 Calls for an expert opinion.
24     To the extent you can answer as a layperson,
25 go ahead.

## Page 185

1    THE WITNESS: Just the all-around similarity
2 of both of the products, from the jug, the color, to
3 the label, to the block letters, the hyphen, the tag
4 line or the slogan. It's almost encompassed almost in
5 the entirety of the package.
6 BY MR. LUTHER:
7    Q Do you why the hyphen is there?
8    MR. GARRETT: On which product?
9 BY MR. LUTHER:
10    Q Mel-Fry, Mega-Fry, Pro-Fry. Any trademark.
11 Do you know why the hyphen is there?
12    A I'm not sure why it was put in there in the
13 first place.
14    Q To your knowledge was an infringement
15 study -- I'm looking at paragraph 38 here. Was an
16 infringement study prepared to your knowledge?
17    MR. GARRETT: Relating to Mega-Fry?
18    MR. LUTHER: Relating to the statements made
19 in paragraph 38.
20    THE WITNESS: The question again was? I'm
21 sorry. Was there an actual study?
22 BY MR. LUTHER:
23    Q Was an infringement study prepared to your
24 knowledge.
25    A An infringement study?

## Page 186

1    Q Yes.
2    A As it relates to the comments made about the
3 restaurant industry?
4    Q No, as it relates to the comments or
5 statements made in paragraph 38.
6    MR. GARRETT: It's a vague question. It's
7 also compound, then. The paragraph --
8    THE WITNESS: Speaks to restaurants.
9    MR. GARRETT: -- is a quarter page long.
10    MR. LUTHER: All right. Let me rephrase the
11 question.
12    Q 38 -- paragraph 38 says, while Supreme's
13 Mega-Fry infringement confuses buyers, blah, blah,
14 blah. I'm asking are there documents in existence
15 backing up this statement?
16    MR. GARRETT: This has already been asked and
17 answered regarding what counsel did. But you may
18 answer the question. The simple question is "Yes" or
19 "No," I think.
20    THE WITNESS: Do documents exist on the
21 infringement? Yes, I believe I am looking at some of
22 them now.
23 BY MR. LUTHER:
24    Q Are these documents stored over here in the
25 corporate headquarters of Ventura?

## Page 187

1    A Yes.
2    Q Now, you have shortening in all categories.
3 What do you by "in all categories"? Users of Mel-Fry
4 shortening in all categories. Do you mean all
5 restaurants -- inclusive of all restaurants, operators,
6 institutional cafeterias? Is that what you mean?
7    A Meaning is what we've got as far as
8 infringement is including -- is confusing in all
9 categories of restaurants and would be in all marketing
10 areas. However, it's a little harsher within New York.
11 Because it goes on to say because of the style of the
12 restaurants, the amount of nonspeaking -- non-English
13 speaking restaurateurs who are back-of-the-house help
14 that use colors, looks, feels as recognition of a
15 product and can't ascertain beyond that.
16    Q How do you know all this? Is it in a study
17 someplace?
18    A I would call that common knowledge.
19    Q This is common knowledge?
20    A Sure.
21    Q You mean opinion?
22    A Yes.
23    Q Okay.
24    But not documented in writing? Is that
25 correct?

## Page 188

1    MR. GARRETT: Go ahead.
2    THE WITNESS: There is documentation in the
3 industry of the expansion of non-English speaking help
4 within restaurants. Within the United States in
5 general. That part I believe is documented.
6    MR. LUTHER: Okay.
7    Q Now, for example -- I'm looking at paragraph
8 38. For example, a typical purchaser for a food
9 service operator is one or two cases per week. We are
10 talking about three jugs in a case?
11    A Yes.
12    Q Three 10-quarts per case?
13    A Correct.
14    Q That will last how long? Couple weeks? Do
15 you know?
16    MR. GARRETT: Calls for speculation.
17    THE WITNESS: Depends on the volume of the
18 restaurant and what portion of the menu and their order
19 of pattern by consumers is made up of fried foods.
20 BY MR. LUTHER:
21    Q So you can't answer without speculating?
22    A Correct.
23    Q All right.
24    And paragraph 39 -- many food service
25 operators receive a regular replenishment -- receive

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                    TERRY SPLANE

## Page 189

1  regular replenishment shipments every week; right?
2      A   Correct.
3      Q   So once they are hooked into the Mel-Fry
4  product, they reorder, reorder, reorder?
5      A   Typically that is the way it works, yes.
6      Q   Okay.
7          And they reorder from the distributor?
8      A   They do reorder from the distributor.
9      Q   Unless they are a big chain like KFC?
10     A   And they have their own self-distribution,
11 correct.
12     Q   So by and large they know what they are
13 getting; is that correct?
14         MR. GARRETT:  Who knows what they are
15 getting?
16 BY MR. LUTHER:
17     Q   Is that correct?
18         Let's go on to the next question.  No, let's
19 go back.
20         The food service operators know what they are
21 getting; is that correct?
22         MR. GARRETT:  Calls for speculation.
23         THE WITNESS:  I would say that at a point in
24 time ordering of products by the -- because it's been
25 so automated by restaurant operators that every order

## Page 190

1  they don't know what's being ordered, nor do they know
2  what's being ordered is what is actually being shipped.
3  There is some substitution that takes place.
4  BY MR. LUTHER:
5      Q   Now, what properties do the restaurants look
6  for besides price?  Price is an important
7  consideration; is that correct?
8      A   Price is always an important consideration.
9      Q   Is longevity an important consideration?
10     A   If they are a value buyer versus a price
11 buyer.  One wants to buy lowest possible cash out of
12 pocket, the other one would be willing to listen to a
13 value proposition of longer term value.
14     Q   How about color?  Is that an important
15 consideration?
16     A   Color in the context of shortening?
17     Q   We are talking about liquid shortening.
18     A   As it relates to the performance of the
19 product, no.
20     Q   Would it take more convincing to sell somebody
21 a black liquid shortening than a golden-colored liquid
22 shortening?
23     A   Yes.
24     Q   Paragraph 40.
25         MR. GARRETT:  Objection, belated, incomplete

## Page 191

1  hypothetical.
2  BY MR. LUTHER:
3      Q   Number 40 -- paragraph 40.  You mention that
4  there are recent immigrants who are less sophisticated.
5  Do you see where it says that in here?
6      A   Uh-huh.
7      Q   Is this opinion or do you have documents
8  someplace to back these statements up?  I mean has this
9  been documented, what is stated in paragraph 40?
10         MR. GARRETT:  It's vague.
11         THE WITNESS:  I'm sorry?
12         MR. GARRETT:  It's vague.
13         MR. LUTHER:  That's okay.  You can answer.
14         MR. GARRETT:  You can answer.
15         THE WITNESS:  What do you want me to do?
16 Break this apart?
17         MR. LUTHER:  Yes.
18     Q   I want every statement, that we have documents
19 backing up every statement.
20     A   Are there a large number of restaurants in New
21 York City?  Yes.
22     Q   That serve ethnic foods?
23     A   Yes.
24     Q   We all know that.
25     A   Sure.

## Page 192

1      Q   Right.
2      A   Such as Middle-Eastern cuisine?
3      Q   Such small restaurants are often owned and
4  operated by the applicable sector of the ethnic
5  community.  How do we know that?  Do we have documents
6  showing that someplace?
7      A   I don't believe so.
8      Q   See, this is my job.  I got to ask you about
9  every statement in the --
10     A   Sure.  No, I understand.
11     Q   The owners and operators often make their
12 supply purchases for and cook the food served at the
13 restaurants.  How do we know that's true?  Do we have
14 documents supporting that statement?
15         MR. GARRETT:  Compound.
16 BY MR. LUTHER:
17     Q   How do we know that statement's true?
18     A   It's opinion based on the scope or scale of
19 the size of those restaurants and their ability to hire
20 personnel and support.
21 BY MR. LUTHER:
22     Q   Mr. Splane, whose opinion?  Your opinion you
23 mean?
24     A   Yes.
25     Q   Okay.

Page 193

1      This next sentence. These customers are often
2   recent immigrants who are not educated. You know, I
3   can look at the next sentence and say -- myself and say
4   that's probably true, but I just don't know. Do you
5   have in fact documents backing this up someplace?
6      A  No.
7      Q  How about the last sentence in paragraph 40,
8   thus, these potential Mel-Fry customers are relatively
9   less sophisticated. Again, do we have documents
10  backing up the statement or is it opinion?
11     A  Opinion.
12     Q  Okay.
13     Paragraph 41. We have a typical purchase of
14  10-quart yellow jugs. I guess you're going to have
15  documents showing that by purchase orders; correct?
16  This is paragraph 41.
17     A  We would not have documentation of these
18  purchase orders. Because these purchases take place to
19  our distributors.
20     Q  You could track it through how much the
21  distributors purchase from you; is that correct?
22     A  We know what they are purchasing from us,
23  correct.
24     Q  Of the distributors who purchase from you, do
25  they ever give you a breakdown who they sell to?

Page 194

1      A  Very seldom.
2      Q  Do they ever do any demographic studies?
3      A  There are certain distributors that have that
4   level of sophistication, yes, and they know where there
5   business is by segment in the industry.
6      ·(Discussion held off the record.)
7   BY MR. LUTHER:
8      Q  Now, the demographic breakdown of the last
9   question, do these distributors ever pass that
10  information on to Ventura?
11     A  We do have distributors that disclose that
12  information, yes.
13     Q  And so those documents showing that
14  information are available at Ventura someplace?
15     A  They are not typically disclosed at the
16  corporate level. It would be more of a sales
17  initiative, targeting initiative in the field. So we
18  wouldn't house them corporately.
19     MR. GARRETT: It also misstates the prior
20  testimony to the extent -- and assumes facts not in
21  evidence to the extent that information was passed on
22  in documents.
23     Go ahead.
24  BY MR. LUTHER:
25     Q  The 10-quart three pack is a most popular size

Page 195

1   with the small guys. And how do you know this? By
2   purchase orders; is that correct?
3      A  Yes.
4      Q  And, again, this is memorialized in documents
5   someplace?
6      A  Yes.
7      Q  Provable by documents, okay.
8      Paragraph 42. You say Supreme sells its
9   Mega-Fry shortening in the containers illustrated
10  above. You don't mean Mega-Fry sells its shortening in
11  the Mel-Fry containers; right?
12     A  Correct.
13     Q  Okay.
14     And you say Supreme has infringed by confusing
15  and attempting to confuse customers and potential
16  customers. And how do you know that statement is true?
17     A  There is so many components that are
18  immaterial to -- that we've talked about -- the hyphen,
19  the letters, the color of the jug -- that are mimicked,
20  that I wouldn't see any other reason to do that other
21  than to attempt to leverage the equity of the Mel-Fry
22  brand.
23     Q  Now, I see you used the word "infringed" here
24  again. Do you have any special training in trademark
25  infringement?

Page 196

1      A  I do not.
2      Q  Okay.
3      Paragraph 43. We have Supreme also uses its
4   Mel-Fry look-alike Mega-Fry to get a foot in the door
5   to make sales. What does that mean, to get a foot in
6   the door?
7      A  Use it as a flagship, to open up the door to
8   sell other products of the categories that Supreme
9   plays in.
10     ·  Q  And how do you know that?
11     A  The typical sales scenario was to open the
12  door and penetrate the account to the best of your
13  ability with a multitude of categories.
14     Q  And how do you know Supreme is in fact doing
15  that, or attempting to do that?
16     A  We see evidence of them selling multiple
17  categories within that market area, including
18  mayonnaise which Ventura manufactures and margarines
19  which Ventura also manufactures.
20     Q  And are there documents in existence someplace
21  backing up the statements in paragraph 43?
22     A  No.
23     Q  Let's go to the last sentence of paragraph
24  43. Even if by the time of actual purchase the
25  customer realizes that Mega-Fry is not Mel-Fry, the

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.

TERRY SPLANE

Page 197

1  damage to Ventura has been done. Okay? Do you see
2  that?
3     A  Yes.
4     Q  What damage?
5     A  The confusion of the brands.
6     Q  Is that irreparable damage?
7     A  Depends on what the outcome of using the
8  Mega-Fry product was.
9     Q  How much -- how much in the -- in dollars in
10  lost sales do you think Ventura has lost to Supreme
11  because of this -- because of the Mega-Fry label?
12     MR. GARRETT:  Objection.  To the extent it
13  calls for expert testimony, that damage analysis --
14  that testimony should properly be before an expert in
15  damages -- or damages expert.  This witness is not a
16  damages expert.
17     To the extent you can -- it would, therefore,
18  call for speculation.  Beyond the scope of a lay
19  witness.
20     Go ahead.
21     THE WITNESS:  To my knowledge we haven't
22  calculated that as of yet.
23  BY MR. LUTHER:
24     Q  So any figure would be absolutely pure
25  speculation?  Is that what you are saying?

Page 198

1     MR. GARRETT:  Misstates the prior testimony.
2     MR. LUTHER:  Well, if he hasn't calculated it,
3  then it would be speculation; is that correct?
4     MR. GARRETT:  It misstates prior testimony.
5  He said -- and I quote -- to my knowledge we have not
6  done it.
7     If you would like him to read it back.
8     MR. LUTHER:  Oh.
9     Q  You don't have personal knowledge if it was
10  done or not?  Is that what you are saying?
11     A  Yes.
12     Q  Do you have a guess?
13     MR. GARRETT:  We are not here to guess.
14     MR. LUTHER:  I am asking him to guess.
15     MR. GARRETT:  Calls for speculation.
16     MR. LUTHER:  I am asking him to speculate.
17     THE WITNESS:  Not willing to wager a guess.
18  Because it goes above and beyond the categories we are
19  talking about here.
20     MR. LUTHER:  But I'm asking you to answer.
21     MR. GARRETT:  He's not going to guess.  It's
22  inadmissible anyway, if it were a guess.
23  BY MR. LUTHER:
24     Q  So you are telling me is you have no idea if
25  there is irreparable harm or not; is that correct?

Page 199

1     MR. GARRETT:  Misstates prior testimony.
2  BY MR. LUTHER:
3     Q  Is that correct?
4     A  That I have no idea?
5     Q  Yeah.
6     MR. GARRETT:  Can you read back the question
7  for me, please.
8     (Record read as follows:
9     "Question:  So you are telling me is you
10     have no idea if there is irreparable harm or
11     not; is that correct?")
12     MR. GARRETT:  That question was asked and
13  answered.  And the nature of the question misstates the
14  prior testimony.
15     MR. LUTHER:  You can answer.
16     THE WITNESS:  In my opinion there is.
17  BY MR. LUTHER:
18     Q  How so?
19     MR. GARRETT:  Asked and answered.
20     MR. LUTHER:  You can answer.
21     MR. GARRETT:  You can answer.
22     THE WITNESS:  I can't quantify it today.
23  BY MR. LUTHER:
24     Q  Why can't you quantify it?
25     MR. GARRETT:  Again, objection to the extent

Page 200

1  it -- if you are asking for a damage calculation based
2  on irreparable harm, that is the testimony of an expert
3  witness.  This witness is here today to talk about
4  certain topics, one of which may be damage to some
5  extent as outlined in his declaration.  If you are
6  looking at 43, he's already testified to that.  You've
7  asked him repeatedly the same question, which is can he
8  tell you a dollar figure.  He cannot.
9     MR. LUTHER:  Well, he said in his opinion
10  there is irreparable harm.  I want to know what's the
11  basis for his opinion.
12     MR. GARRETT:  I believe he already answered
13  that.  But what is the basis for -- actually you asked
14  him a question about irreparable harm.
15     Can you go back to the question that -- search
16  for the word "irreparable" that's about three questions
17  ago.
18     (Discussion held off the record.)
19     MR. GARRETT:  Rather than continue, you
20  already asked him whether or not you believed there was
21  irreparable harm, and he gave you an answer.
22     MR. LUTHER:  He said in his opinion there is.
23     Q  My question is what's the basis of your
24  opinion?
25     MR. GARRETT:  Go ahead and answer that

Page 201

1  question again.
2      THE WITNESS:  What is the basis of my
3  opinion?
4  BY MR. LUTHER:
5    Q  Yeah, why do you think there is irreparable
6  harm?
7    A  Because they are in one of the strongest
8  Mel-Fry markets with a product that has a lot of
9  similarities.  And they are selling it.
10  BY MR. LUTHER:
11    Q  They are selling it?  You don't even know if
12  they are selling Mel-Fry right now.  You testified to
13  that earlier.  Is that right?
14      MR. GARRETT:  Counselor, let him finish his
15  answer.  You spent him a long time trying to get him to
16  give it.  Let him answer.  And then you can jump in
17  with that one.
18      MR. LUTHER:  Jim?  Jim, I can --
19      MR. GARRETT:  Go ahead and finish your answer.
20      MR. LUTHER:  -- screw this up on my own,
21  please.
22      MR. GARRETT:  You want to finish your answer?
23  You are talking about irreparable harm.  Sorry.  Go
24  ahead.
25  BY MR. LUTHER:

Page 202

1    Q  We want to know the basis of your opinion why
2  you think there is irreparable harm.
3    A  What I have seen from the exhibits with the
4  invoices and actually pulling the product in, that to
5  me tells me it's being sold in that area.
6    Q  So you base your opinion in part on these
7  undocumented invoices; is that correct?
8      MR. GARRETT:  You are referring to the email
9  and the invoices?
10      MR. LUTHER:  The invoices.
11    Q  We talked about two invoices; is that correct?
12    A  The ones I had visibility of, yes.
13    Q  And what else?  What else are you basing your
14  opinion on?
15    A  The comments coming in -- from Earl Leising,
16  that this product is being sold through Wonder Foods.
17  To me that tells me that they are selling it in the
18  marketplace.
19    Q  You think they are still selling it now; is
20  that correct?
21    A  I'm not making that statement.  I'm going back
22  to when they started it.
23    Q  Do you know for a fact that they are still
24  selling it now?
25    A  The only insight I have to that is the way you

Page 203

1  started this, saying all harmful product has been
2  pulled from the marketplace.  This is the first I've
3  heard of that.
4    Q  So if all harmful products are -- if -- strike
5  that.
6      If all complained of products are off the
7  market, how can there be irreparable harm?
8      MR. GARRETT:  Calls for a legal conclusion.
9      MR. LUTHER:  You can answer.
10      MR. GARRETT:  To the extent you can answer as
11  a lay witness, you can do so.
12      THE WITNESS:  There as a time frame at which
13  it was in the marketplace.  Harm caused during that
14  period.
15      MR. LUTHER:  Wait a second.  Wait a second.
16    Q  Are you a lawyer?
17    A  No.
18    Q  But you testified to infringement in here; is
19  that correct?  Right?
20    A  (No audible response.)
21    Q  So you can certainly testify that -- I want to
22  know how you base your opinion on irreparable harm and
23  I want to know what the basis is.  I want to know how
24  there can be irreparable harm if there is no products
25  on the market.  Can you answer that?

Page 204

1      MR. GARRETT:  Objection.  You asked about
2  irreparable harm.  So you've asked a question.  It's a
3  term of art.  It's a legal term of art.  You've asked
4  it of a lay witness.  I objected at the time.  Now you
5  are asking him how come he can't answer a legal
6  question.
7      Feel free to try to answer question again if
8  you'd like.
9      THE WITNESS:  I can't.
10      MR. GARRETT:  Again, this is the subject of
11  expert testimony and damage analysis, and this witness
12  is not here --
13      MR. LUTHER:  Okay.
14      MR. GARRETT:  -- to talk about that.
15      MR. LUTHER:  Well, let me ask him another
16  question.
17    Q  Today if there is no market -- if there is no
18  offending product on the market today, is there
19  irreparable harm today?
20      MR. GARRETT:  Same objections.
21      MR. LUTHER:  Same question.
22      THE WITNESS:  I would go back to the scope of
23  this is larger than just the shortening category.  If
24  in fact this virtually identical item was used to open
25  the door, to get into accounts, to then penetrate with

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                    TERRY SPLANE

Page 205

1  mayonnaise and margarine and other products that
2  directly compete against us and those products are
3  still on the market, then the answer would be yes.
4  BY MR. LUTHER:
5      Q   Do you have documents showing that the door
6  was opened?
7      A   No.
8      Q   Do you have documents showing -- documents
9  showing that these other products are being sold?
10     A   I believe we have some marketing materials on
11  the products.
12     Q   On whose products?
13     A   On Supreme's products, the margarine and
14  mayonnaise products in question. And also comments
15  from sales organizations.
16     Q   And how long has Supreme been selling these
17  margarine and mayonnaise products?
18     MR. GARRETT: Calls for speculation.
19     THE WITNESS: Yeah.
20  BY MR. LUTHER:
21     Q   You don't know? I mean if you answered, you
22  would be speculating; is that right?
23     A   I would be speculating as to how long they
24  have been in business, correct.
25     Q   Okay.

Page 206

1      Now, you say paragraph 44, Supreme also
2  threatens the reputation of Mel-Fry as a symbol of high
3  quality shortening. Do you see that?
4      A   Uh-huh.
5      Q   Are you saying that Mega-Fry is not a high
6  quality shortening?
7      A   I would say that what I know and have heard of
8  Supreme, with no documentation, is that they do not
9  follow the stringent QA/QC guidelines that we do.
10     Q   And this is word of mouth but no
11  documentation; is that correct?
12     MR. GARRETT: You can answer that question.
13     THE WITNESS: Yes.
14     MR. LUTHER: Okay.
15     Q   Paragraph 45. If customers who buy Mega-Fry
16  are dissatisfied with the product, they are likely to
17  turn elsewhere for their shortening needs and certainly
18  not to Ventura. Do you see that?
19     A   Yes.
20     Q   How do you know that?
21     A   If, in fact, because of what we see as
22  infringement the operator is confused and sees the
23  Mega-Fry as the new improved, longest lasting Mel-Fry
24  from Ventura Foods, and doesn't perform, to me that
25  would cast a negative halo over the rest of our goods.

Page 207

1      Q   That's the theory; right?
2      A   Correct.
3      Q   But you have no documents actually showing
4  that; right?
5      A   Correct.
6      Q   Okay.
7      Now, 46. And we are talking about a 2002
8  lawsuit; right?
9      A   Yes.
10     Q   This is way before your time -- right? -- at
11  Ventura?
12     A   Way before, yes.
13     Q   How can you testify to this lawsuit if it's
14  way before your time?
15     MR. GARRETT: Objection. The first paragraph
16  of this declaration sets forth the foundation for that
17  statement.
18     MR. LUTHER: First paragraph of what now?
19     MR. GARRETT: Of the declaration states,
20  Ventura is one of -- excuse me.
21     I am the vice president of marketing of
22  Ventura Foods, LLC. The statements made herein are
23  based on my personal knowledge, company records, or as
24  otherwise indicated. The basis -- foundational basis
25  is a legal conclusion. And the witness would not

Page 208

1  otherwise know that.
2      MR. LUTHER: But the witness has testified to
3  many statements here which he has testified no company
4  records exist. And that's true.
5      MR. GARRETT: The testimony speaks for itself.
6      MR. LUTHER: That's right. It does.
7      Q   So how can you testify about a lawsuit in 2002
8  which you had absolutely no part of?
9      MR. GARRETT: Again, to clarify, there are
10  documents that exist related to a 2002 investigation.
11  And the witness may have reviewed those.
12  BY MR. LUTHER:
13     Q   But did you?
14     A   Yes.
15     Q   You reviewed documents in this lawsuit?
16     A   Yes.
17     The My-Fry lawsuit?
18     Q   Yes.
19     A   Yes.
20     Q   Did they make sense to you, legal documents
21  make sense to you?
22     MR. GARRETT: Which ones?
23     MR. LUTHER: Oh. The 2002 My-Fry lawsuit
24  documents.
25     THE WITNESS: To understand a baseline of

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.

Case 1:07-cv-07338-PKC     Document 33-2     Filed 10/25/2007     Page 23 of 33

JERRY SPLANE

Page 209

1  knowledge of it yes.
2      MR. LUTHER: Well, let me ask you about your
3  baseline knowledge of it.
4      Q   When you sued -- when Ventura sued My-Fry --
5  right? -- did My-Fry answer?
6      A   Did My-Fry answer?
7      MR. GARRETT: I will --
8  BY MR. LUTHER:
9      Q   That's the question. You said you read the
10 records and you understood them. I am asking you about
11 them now.
12     MR. GARRETT: Objection to the extent this
13 declaration was set forth in August of this year. The
14 documents that the client -- excuse me -- that the
15 witness has -- may have reviewed at the time he doesn't
16 have those in front of him. You are asking him about
17 an answer which is a legal term of art.
18     To the extent you can answer, go ahead and
19 answer.
20     THE WITNESS: Did they answer in what fashion
21 or form?
22 BY MR. LUTHER:
23     Q   Did they answer the complaint?
24     A   Did they respond?
25     Q   No. Did they answer the complaint?

Page 210

1      A   I believe they did, yes.
2      Q   Did Ventura file a motion for preliminary
3  injunction in the 2002 case?
4      MR. GARRETT: Same objections.
5      To the extent you can recall or know, go
6  ahead.
7  BY MR. LUTHER:
8      Q   You can't recall?
9      A   (No audible response.)
10     Q   So you don't recall if My-Fry opposed the
11 motion for preliminary injunction, do you?
12     A   I do not.
13     Q   Okay.
14     So for all you know My-Fry could have just
15 laid down and let this whole thing happen; correct?
16     A   It's possible.
17     Q   Right.
18     And that ain't happening here, is it?
19     MR. GARRETT: Argumentative.
20 BY MR. LUTHER:
21     Q   Correct?
22     MR. GARRETT: It's argumentative.
23 BY MR. LUTHER:
24     Q   Correct?
25     MR. GARRETT: You don't need to answer the

Page 211

1  question.
2  BY MR. LUTHER:
3      Q   No, you have to answer. Is that happening
4  here?
5      MR. GARRETT: That your client is laying down?
6  Is that the question?
7      MR. LUTHER: Yes.
8      Q   Is that happening here?
9      MR. GARRETT: Go ahead. You can answer the
10 question.
11     THE WITNESS: Doesn't seem to be.
12 BY MR. LUTHER:
13     Q   So this is not like the My-Fry lawsuit, is it?
14     MR. GARRETT: Misstates the prior testimony.
15 BY MR. LUTHER:
16     Q   Is that correct?
17     MR. GARRETT: It's also vague.
18     THE WITNESS: In terms of process, maybe not.
19 BY MR. LUTHER:
20     Q   So paragraph --
21     MR. GARRETT: Are you done with your answer?
22     THE WITNESS: No I'm not.
23     MR. LUTHER: Okay, keep going.
24     THE WITNESS: But in terms of elements of
25 trade dress infringement, I believe there are

Page 212

1  similarities.
2  BY MR. LUTHER:
3      Q   To your knowledge was an opposition to a
4  preliminary injunction ever filed in the 2002 case?
5      MR. GARRETT: Same objection.
6      THE WITNESS: I have no knowledge.
7      MR. LUTHER: Okay.
8      Q   Paragraph 47. Ventura learned of the
9  Mega-Fry infringement on or about March 2007. Do you
10 see that statement?
11     A   Yes.
12     Q   So you got the invoice somehow -- or what is
13 purported to be an invoice somehow in February. And
14 you learned of the infringement in 2007 how? Through a
15 study? There's a time difference, you see from
16 February to March?
17     A   Sure. From February 23rd to March -- could be
18 March 1st.
19     MR. GARRETT: Objection to the extent it also
20 says "on or about."
21     So if you want to try to clarify the date, go
22 ahead.
23 BY MR. LUTHER:
24     Q   Why don't you -- you said you only learned of
25 the infringement later than you got the purported

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                              TERRY SPLANE

---

Page 213

1  invoice. I'm just wondering why.
2      A  I would define on or about March to include
3  the last week of February.
4      Q  Okay. All right. Okay.
5          Way down about six months later after
6  getting -- first seeing the purported invoice in
7  June -- I'm looking at paragraph 48. We see February,
8  March, April, May, June -- five months later you
9  received a letter from Supreme's counsel rejecting
10 Ventura's demand. Through those five months from
11 February to June did Ventura think it was being
12 irreparably harmed?
13         MR. GARRETT: Objection to the extent that it,
14 again, calls for a legal conclusion and that
15 "irreparable" is a legal term of art.
16         To the extent you can answer the question.
17         THE WITNESS: If in fact it was being sold in
18 the market at that time, then yes.
19 BY MR. LUTHER:
20     Q  Well, five months passed. Where was the sense
21 of urgency?
22     A  I think we've already discussed that.
23     Q  No, we have a new question here. Does five
24 months show a sense of urgency?
25         MR. GARRETT: Objection. It's been asked and

---

Page 214

1  answered about an hour and a half this morning.
2          MR. LUTHER: You can answer.
3          THE WITNESS: I agree. I believe we've gone
4  over that thoroughly.
5          MR. GARRETT: Go ahead and answer it to the
6  extent you can.
7          The question is does --
8          MR. LUTHER: If you can't --
9          MR. GARRETT: -- five months show a sense of
10 urgency.
11         MR. LUTHER: If you can't answer it, you can't
12 answer it.
13         THE WITNESS: With the amount of steps it
14 takes to get to that point, then, yes. Not a simple
15 process.
16         MR. LUTHER: Okay.
17     Q  Paragraph 49. In sum -- in sum, Supreme's
18 marketing of its Mega-Fry product is likely to confuse
19 customers, divert sales, to tarnish the goodwill
20 with inferior or potentially inferior shortening
21 product. So we get a lot of words in 49. What's --
22 let's go to the first -- the first accusation, likely
23 to confuse customers. How do you know that?
24     A  Just confusion of the brand because of the
25 infringement elements.

---

Page 215

1      Q  Do we have any documents showing confusion?
2      A  No, just opinions on lack of distinction
3  between the two.
4      Q  Do we -- we have likely to divert sales. Is
5  that -- do we have any documents backing up that
6  statement?
7      A  No.
8      Q  And to tarnish the goodwill of Mel-Fry.
9  How -- do you have any documents showing that
10 Mel-Fry -- Mega-Fry is going to tarnish the goodwill of
11 Mel-Fry?
12     A  Documents, no.
13     Q  And do we know that Mega-Fry has inferior or
14 potentially inferior shortening products?
15     A  Speculation on knowledge of their business.
16     Q  But no documents?
17     A  No documents.
18     Q  Didn't we hours ago talk about a side by side
19 lab test where the Mega-Fry product lasted as long as
20 the Mel-Fry product?
21     A  At one point in time. When I spoke before,
22 we talked about quality and consistency throughout,
23 day-in, day-out. You can't pull one product, do a GC
24 analysis, gas chromatograph analysis, and say that that
25 is the consistency day-in, day-out.

---

Page 216

1      Q  That was a snapshot?
2      A  That was one speck of time.
3      Q  I gotcha.
4      A  The question is what's the --
5      Q  So then --
6      A  -- consistency throughout year.
7      Q  Then that paragraph 49, that's sheer
8  speculation, this statement here; is that right?
9          MR. GARRETT: Misstates the prior testimony.
10 BY MR. LUTHER:
11     Q  Is that right?
12         MR. GARRETT: It also is argumentative.
13         MR. LUTHER: Wait a second. If you don't
14 know, 49 is sheer speculation.
15         MR. GARRETT: He's testified all afternoon
16 that that is not in fact the case.
17         MR. LUTHER: He just testified that he doesn't
18 know. So it has to be sheer speculation, doesn't it?
19 It's either one or the other.
20         MR. GARRETT: Counsel, that's not what he
21 said. You are playing games with his words.
22         MR. LUTHER: It's either one or the other,
23 either you know or you don't know. Either you make it
24 up or you know. Which one is it? I want to know.
25         MR. GARRETT: Is there a question pending?

---

Page 217

```
 1        MR. LUTHER: Yeah.
 2     Q  Did you make up 49 or do you know for a fact
 3  based on documents?
 4        MR. GARRETT: There are several questions
 5  there. You want to break them out? Did he make up
 6  number 49? Is that the question?
 7        MR. LUTHER: Let's make it easy. Let's just
 8  say this.
 9     Q  Do we have any documents to back up anything
10  in 49?
11        MR. GARRETT: I believe -- objection to the
12  extent he's already testified to the email and the two
13  invoices.
14  BY MR. LUTHER:
15     Q  Oh, all you have is those two dubious
16  invoices, who knows where they came from?
17        MR. GARRETT: It's argumentative.
18  BY MR. LUTHER:
19     Q  Is that right? Is that the basis of 49, those
20  two invoices?
21     A  The other portion of it comes from other
22  individuals within Ventura, as we -- no documentation,
23  but talk about the reputation and the manufacturing
24  capabilities of Supreme.
25     Q  Oh, by that I mean -- you mean Ventura
```

Page 218

```
 1  employees bad-mouthing Supreme? Is that right?
 2        MR. GARRETT: Objection.
 3  BY MR. LUTHER:
 4     Q  Is that what you mean by that?
 5        MR. GARRETT: Misstates prior testimony. It's
 6  also argumentative.
 7        MR. LUTHER: You can answer.
 8        THE WITNESS: Not to say bad-mouthing, but
 9  talking about manufacturing capabilities. And how they
10  differ from Ventura.
11  BY MR. LUTHER:
12     Q  Don't you think Ventura employees would be a
13  little biased? "Yes" or "No."
14     A  Perhaps.
15     Q  How long would a Ventura employee keep his job
16  if he's bad-mouthing Ventura's products?
17        MR. GARRETT: Calls for speculation. It's
18  argumentative.
19  BY MR. LUTHER:
20     Q  You don't know?
21        MR. GARRETT: It's also vague. It's a silly
22  question.
23  BY MR. LUTHER:
24     Q  Would it be a career enhancer?
25     A  I wouldn't expect an employee of any company
```

Page 219

```
 1  to bad-mouth the products. Otherwise they wouldn't be
 2  working there.
 3     Q  Paragraph 50. Supreme's continuing sales and
 4  marketing of its Mega-Fry product are irreparably
 5  harming Ventura's rights and reputation. Here we have
 6  "irreparably harming" again. Do we have documents to
 7  back up this statement in paragraph 50? I'm asking
 8  you.
 9     A  Again, it's an area that we've covered
10  extensively.
11     Q  Yeah. But I have another paragraph here. You
12  mention it again.
13        MR. GARRETT: I will object again --
14        MR. LUTHER: Yeah.
15        MR. GARRETT: -- that it's asked and
16  answered. He's already testified this was drafted and
17  signed in August. He's already testified to the
18  irreparable harm issue ten different times, ten
19  different ways.
20        MR. LUTHER: Wait a second. You're trying to
21  shut a portion of my client's company down. I want to
22  know how you are being irreparably harmed.
23        MR. GARRETT: You can ask that question.
24        MR. LUTHER: I know I can. I'm asking it.
25        MR. GARRETT: I want to make the record clear
```

Page 220

```
 1  that I'm objecting again on that ground.
 2        MR. LUTHER: Sure. Objection noted. Get the
 3  objection on the record. But I want to know the
 4  answer.
 5        MR. GARRETT: Go ahead.
 6        THE WITNESS: I believe it's already been
 7  covered.
 8        MR. GARRETT: You can --
 9        Can we go off the record for a minute?
10        MR. LUTHER: Sure.
11        (Discussion held off the record.)
12  BY MR. LUTHER:
13     Q  I'm still not clear how Ventura is being
14  irreparably harmed if it took so long to file this
15  lawsuit. Do we have an answer for that?
16     A  By the nature of Mega-Fry having product as we
17  understand it being sold in the marketplace and
18  expanding their offerings in the other categories that
19  we manufacture, we believe that's how it's taking
20  place.
21     Q  And even if there is no offending product in
22  the marketplace you still believe there is irreparable
23  harm; is that correct?
24     A  I have no personal knowledge of the product
25  not being available in the marketplace today.
```

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.       TERRY SPLANE

---

### Page 221

1    Q Mr. Splane, that's not the question. The
2  question is is there irreparable harm even if there is
3  no offending product in the marketplace?
4       MR. GARRETT: If that's your question, then
5  it's an incomplete hypothetical. It also still calls
6  for an expert opinion and a legal conclusion.
7       You may answer the question to the extent that
8  you can.
9       THE WITNESS: If, in fact, the product never
10  existed -- never existed -- then, no, there would not
11  be harm.
12  BY MR. LUTHER:
13    Q Well, if the product existed for a brief
14  amount of time and it was removed from the shelves, is
15  there harm then?
16       MR. GARRETT: Same objections.
17       MR. LUTHER: Same question.
18       THE WITNESS: As it relates to any sales
19  attached to that product in other categories.
20       MR. LUTHER: Oh.
21    Q You mean the damage has been done to sell
22  mayonnaise? Is that what you mean?
23    A (No audible response.)
24    Q They got a foot in the door and sold
25  mayonnaise?

### Page 222

1    A Correct.
2    Q But they were selling mayonnaise before the
3  Mega-Fry product was out there; is that correct?
4    A Correct.
5    Q They how can there be -- how can your theory
6  hold water? How can there be irreparable harm then?
7       MR. GARRETT: Same objections.
8       MR. LUTHER: Same question.
9       THE WITNESS: At the point Mega-Fry was
10  introduced, they would have been bundling those
11  products together for perhaps new customers.
12  BY MR. LUTHER:
13    Q They would have. Do you know for a fact they
14  were?
15       MR. GARRETT: Counselor, we are in a
16  hypothetical here. Right? This is all hypothetical.
17  He has no personal knowledge whether or not they are on
18  the market. You said hypothetically if they had been
19  pulled off the market. So now we are in a big
20  hypothetical world here. He's adding more to the
21  hypothetical, that's all. It's all speculation.
22       MR. LUTHER: That's right.
23       MR. GARRETT: This section is, yes. Because
24  he is not an expert on damages.
25       MR. LUTHER: Okay.

### Page 223

1    Q So the -- your theory of irreparable harm is
2  sheer speculation; is that correct?
3       MR. GARRETT: That's not what I said or that
4  the witness said.
5       MR. LUTHER: Well, that's my question.
6    Q Is that correct?
7    A Sheer speculation, no.
8    Q Oh, then you have hard evidence to prove it;
9  is that correct?
10    A No documents, but an understanding of how the
11  industry works.
12    Q Okay.
13    I want to go to your declaration here of
14  August 16th. And we have this redacted version of the
15  invoice.
16    A Where are we?
17    Q Your declaration of August 16th.
18       MR. GARRETT: I believe it is Exhibit I to the
19  declaration we are looking at, which is Exhibit 39.
20       MR. LUTHER: Right. There is a schedule of
21  exhibits.
22       MR. GARRETT: It's actually an exhibit to the
23  cease and desist letter. For clarity.
24       MR. LUTHER: Exhibit I. I concur.
25    Q Okay.

### Page 224

1    Do you see this Exhibit I?
2    A There it is.
3    Q Okay.
4    Did I ask this before? Do we have any idea
5  who did the redacting?
6    A You did ask me, and I do not know.
7    Q Did I ask you why it was redacted?
8    A You did. And I have no knowledge of that.
9       MR. LUTHER: We have a handwritten order by a
10  judge. I'm going to make this a record, another
11  exhibit.
12       MR. GARRETT: Exhibit 40.
13       (Defendant's Exhibit 40 was marked
14       for identification by the Certified
15       Shorthand Reporter.)
16  BY MR. LUTHER:
17    Q Now, in the complaint it's alleged that --
18       MR. GARRETT: Are we looking at 40?
19       MR. LUTHER: No. I am looking at the
20  deposition topic 11.
21       MR. GARRETT: If we could briefly for the
22  record, Exhibit 40 you showed to me briefly before
23  lunch. And I have some clarity on that.
24       If you'd like to do it on the record, I can.
25  Otherwise, we will do it off the record.

Page 225

1    MR. LUTHER: Some clarity?
2    MR. GARRETT: Clarity.
3    MR. LUTHER: Apparently the judge issued a
4  handwritten order. And, you know, this order is in the
5  file in New York where the case was filed. And I'm
6  just making the order of record in this deposition
7  here.
8    MR. GARRETT: And, again to clarify, this
9  order as we understand it, this order was in relation
10 to our response to this letter, which we did comply
11 with this order and respond to this letter pursuant to
12 this court order.
13   MR. LUTHER: Defendants -- may I go now?
14   MR. GARRETT: Yeah, go ahead.
15   MR. LUTHER: Defendants take the position that
16 plaintiff is in default of the court order to produce
17 all documents requested by yesterday afternoon at 5:00
18 o'clock. The documents were not produced and still
19 have not been produced.
20   MR. GARRETT: And is that your understanding
21 that this handwritten section right here is that order
22 that we are in default of? That's my question. Again,
23 we can do this off the record. If you'd like.
24   MR. LUTHER: Yes.
25   MR. GARRETT: Okay.

Page 226

1    And as I -- again, since we are on the record,
2  this order refers to our response to your letter, which
3  we compiled with. The order requiring us to produce
4  documents forthwith came later that afternoon. And we
5  did comply, provided you documents yesterday as well as
6  today. So we are in compliance.
7    We can move on.
8    MR. LUTHER: Then we have a difference of
9  opinion.
10   MR. GARRETT: Undoubtedly.
11   MR. LUTHER: Okay.
12   Q  In Ventura's complaint against Mega-Fry it's
13 alleged that Mega-Fry's complaint of design is diluting
14 the Mel-Fry mark. And I want to know how you know it's
15 diluting. Do you have any personal knowledge?
16   MR. GARRETT: Are you going to show him a copy
17 of the complaint? If you are going to ask him
18 questions about the complaint, I'd prefer you show him
19 a copy of it.
20   MR. LUTHER: Whatever the next exhibit is.
21   MR. GARRETT: 41.
22   (Defendant's Exhibit 41 was marked
23    for identification by the Certified
24    Shorthand Reporter.)
25   MR. GARRETT: This is a lengthy document. Do

Page 227

1  you want to give him some time to look at it?
2    MR. LUTHER: Take ten minutes. Go read it.
3    MR. GARRETT: Okay.
4    (Brief recess.)
5  BY MR. LUTHER:
6    Q  Mr. Splane, we have the complaint, document
7  exhibit whatever it is.
8    THE REPORTER: 41.
9    THE WITNESS: 41.
10 BY MR. LUTHER:
11   Q  Can we go to -- let me back up for a second.
12   Who is the CEO? Metzger? What's the guy's
13 name?
14   A  Rick Mazer.
15   Q  Mazer.
16   Are you aware that Mazer called the CEO of
17 Supreme and only complained about the design, but never
18 complained about the "Mega, hyphen, Fry" mark? Are you
19 aware of that?
20   A  You asked me that earlier today. And, no, I
21 was not.
22   Q  Okay.
23   Let's go to paragraph ten -- excuse me --
24 tenth claim for relief, page seven, right in the middle
25 there. Paragraph 40. Do you see that?

Page 228

1    A  Yes.
2    Q  How do Mega-Fry's actions constitute tortious
3  interference?
4    MR. GARRETT: Objection to the extent that you
5  are asking for a layperson's opinion of an allegation
6  in the complaint, which is clearly a legal -- calls for
7  a legal conclusion.
8    You can answer to the extent you know.
9    THE WITNESS: Define "tortious interference."
10 BY MR. LUTHER:
11   Q  I'm asking you.
12   A  I didn't submit this document. So I -- I mean
13 it goes back to the damage. It goes back to the
14 conversations we've had of the trade dress
15 infringement, the foot in the door, and the expansion
16 of categories within food service operators.
17   Q  Whose expansion? Mega-Fry's expansion?
18   A  Sure, yes.
19   Q  Do you know for a fact that Mega-Fry expanded?
20   A  I know for a fact that any manufacturer in the
21 food service industry would follow that process of
22 penetrating an account as much as you can to make it as
23 valuable to the organization as possible. It's
24 standard in the industry. I've been in the industry
25 long enough to see that, experience it, and it's the

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                                TERRY SPLANE

Page 229

1  process that we deploy in our sales organization.
2     Q  So you do it too?
3     A  Absolutely. Absolutely.
4     Q  You commit acts of tortious interference as
5  well?
6     A  No, I'm not talking about that.  I am talking
7  about account penetration.  Get a brand in, penetrate
8  the account further, to get more value out of the
9  account.  It has nothing to do with this document
10  that's in front of us now.
11     Q  Okay.
12        So based upon historical maneuverings in the
13  industry --
14     A  Standard business practice, yes.
15     Q  -- you feel that Mega-Fry is guilty of the
16  same thing?
17     A  If they are a company that's worth their salt,
18  then yes, that is the way they approach the business.
19  It only makes common -- it's business 101, common
20  sense.
21     Q  Fair enough.
22        And I know we have a cause of action for
23  dilution in here someplace.  Paragraph 30 on page six.
24  How are defendant's actions -- how are Mega-Fry's
25  actions diluting the distinctive quality of Ventura

Page 230

1  Foods' trademark and trade dress?
2     MR. GARRETT:  Same objections as before to the
3  extent it calls for a legal conclusion and/or beyond
4  the scope of the lay witness here today.
5        But to the extent you can answer, go ahead.
6     THE WITNESS:  Well, even in the context of lay
7  witnesses let's talk about the marketplace.  I think
8  it's comical to sit here and think that these two
9  products do not look extremely similar, from color of
10  the bottle, to the label, to the items on the label,
11  the slogan, the hyphen.  My next door neighbor would
12  think they look extremely similar.  And I would project
13  that into the industry and to common consumers.
14        That given -- I would almost look at this as
15  being positioned really as the new and improved
16  Mel-Fry, Mega-Fry.  That to me is the way they've
17  positioned this product.  You've got Mel-Fry the long
18  lasting shortening.  Well, this is Mega-Fry, the
19  longest lasting, which is to me a claim that's -- that
20  is not -- can't be substantiated, because there are
21  shortenings that can last longer than that.
22        And so to me they have taken our brand and
23  almost made it look as though it's an improvement,
24  called it Mega-Fry the longest lasting, when in fact
25  it's not a Ventura product, has nothing to do with our

Page 231

1  organization, I'm not satisfied that it's a consistent
2  quality product.  To me that dilutes our brand in the
3  marketplace.
4  BY MR. LUTHER:
5     Q  If things are that bad in your mind, how come
6  you took six months to file a lawsuit?
7     A  We've already gone through those steps
8  ad nauseam and what it takes to get this accomplish.
9     Q  So let me think.  You are saying that you own
10  the color yellow for liquid shortening; right?  Is that
11  correct?
12     MR. GARRETT:  Misstates the prior testimony.
13  BY MR. LUTHER:
14     Q  Is that correct?
15     A  I believe I said earlier I don't know that the
16  color yellow is ownable, but that as a component
17  embodied in everything else in that package makes up
18  the Ventura essence.
19     Q  And only Ventura can use a picture of fried
20  foods in their label; is that right?
21     MR. GARRETT:  Again, misstates the prior
22  testimony.
23  BY MR. LUTHER:
24     Q  Is that right?
25     A  I think it's a combination.  To sit here and

Page 232

1  think that Mega-Fry did not develop that label to knock
2  off Mel-Fry?  There are so many similarities and so
3  many commonalities that I think it's ludicrous to sit
4  here and pretend that it didn't happen.
5     Q  And in all the -- are you done?
6     A  Otherwise if -- if -- I would -- my opinion is
7  that if we had a blue bottle, Mega-Fry's bottle would
8  have been blue.  If we didn't have a hyphen, they
9  wouldn't have a hyphen.  If we didn't have the word
10  "long" on ours, they wouldn't the word -- there's so
11  much common to that, that to me it was a calculated act
12  on their behalf to develop this brand, to tap into
13  Mel-Fry's equity and the strong marketplace of ours.
14     Q  Are you finished?
15     A  Yes.
16     Q  And in your mind only Ventura can use that
17  shape of bottle for liquid shortening; is that right?
18     A  I did not say that.
19     Q  Is that part of the trade dress?
20     A  My statement was around all of those elements
21  and all of those components embodied together make up
22  the essence of the Mel-Fry brand.
23     Q  And in your mind Ventura can call their
24  product superior to all others, but Mega-Fry can't say
25  it's the longest lasting; is that correct?

Page 233

1        MR. GARRETT: Misstates the prior testimony.
2   Also argumentative.
3   BY MR. LUTHER:
4      Q   Is that correct?
5      A   That was in the context of the program sale
6   that we talked about. Even within the context of the
7   copy of that piece talked about DFQM kits and quality
8   fry management, which is the way we approach the
9   marketplace. Which is not the way Supreme approaches
10  the marketplace. I've not seen evidence of that at
11  all, beyond a price and a product and that's it. We go
12  to market completely different. Which then rolls up to
13  superior overall.
14      I don't believe that claim in that ad was that
15  the product itself is superior, but the overall
16  proposition is superior because of what we make
17  available above and beyond the rest of the competition.
18      Q   Superior to Supreme?
19      A   All that combined, yes.
20      MR. LUTHER: Let's clear up a few documents
21  here, then I'll probably be done.
22      (Defendant's Exhibit 42 was marked
23      for identification by the Certified
24      Shorthand Reporter.)
25      MR. LUTHER: This document -- these documents

Page 234

1   have been produced. It's SU 100075 sequentially
2   through to 100081.
3      Q   And I ask the witness to look at I think three
4   pages, in four pages -- four pages in. This is
5   document number SU 100079.
6      MR. GARRETT: Just for the record those are
7   from two separate websites. The first three pages are
8   from i-l-l-i-n-g company dot com. The remaining
9   documents are from plasticbottle.com.
10      MR. LUTHER: All right.
11      Q   Mr. Splane, we are on -- do you have document
12  100079 in front of you?
13      A   Yes.
14      Q   Do you see up in the upper left-hand corner
15  F-style jug?
16      A   Yes.
17      Q   Is it your impression that Ventura is the
18  only liquid shortening that may use that type of jug?
19      A   No, not that type of jug.
20      MR. LUTHER: Let's go to the next exhibit.
21      (Defendant's Exhibit 43 was marked
22      for identification by the Certified
23      Shorthand Reporter.)
24      MR. LUTHER: This document has been
25  produced. It is SU 100115, -116, and -117.

Page 235

1      Q   You have the first page in front of you,
2   Mr. Splane?
3      A   Yes.
4      Q   Do you see the French fries, Burger King
5   there?
6      A   Yes.
7      Q   Is it common to show fried foods as golden
8   brown or yellow?
9      MR. GARRETT: In? In all advertising?
10  BY MR. LUTHER:
11      Q   Is it common to show fried foods as golden
12  brown or yellow?
13      A   Sure.
14      MR. LUTHER: Okay.
15      The next -- next.
16      (Defendant's Exhibit 44 was marked
17      for identification by the Certified
18      Shorthand Reporter.)
19      MR. LUTHER: This is produced document SU
20  100126 and SU 100127.
21      Q   Mr. Splane, is there a picture of fried food
22  in a basket depicted here?
23      A   Yes.
24      MR. LUTHER: Next document.
25      (Defendant's Exhibit 45 was marked

Page 236

1      for identification by the Certified
2      Shorthand Reporter.)
3      MR. LUTHER: This is produced document SU
4   100090, 100091, 100092.
5      Q   And, Mr. Splane, I am looking at the second
6   page in, 100091. Does it show -- does it show golden
7   brown French fries in a basket?
8      A   Yes.
9      Q   Let's go to the next page, 00092. 100092.
10  Does it show golden French fries in a basket?
11      A   Yes.
12      MR. LUTHER: Next exhibit.
13      (Defendant's Exhibit 46 was marked
14      for identification by the Certified
15      Shorthand Reporter.)
16      MR. LUTHER: This is produced document SU
17  100010. Okay.
18      Q   Do you see the yellow jug there?
19      A   I do.
20      Q   Who is grill one?
21      A   It's Grill-On.
22      Q   Are they a competitor?
23      A   It is a Sysco private label brand. Sysco is
24  the biggest distributor in North America.
25      Q   Is Sysco a competitor of yours -- of Ventura?

Page 237

1    A  Sysco is a distributor of Ventura's.
2    Q  Is grill -- Grill-On a competitive product?
3    A  We make Grill-On.
4    Q  That's a --
5    A  That is our product.
6    Q  Okay.
7    A  Could be our product. There is a number of
8  people that manufacture Grill-On under Sysco's label.
9    Q  It could be.  Oh, that's Sysco's label?
10   A  That is Sysco's private label product.
11   Q  But as far as you know sometimes your product
12  is in that bottle; right?
13   A  Yes.
14   Q  But not all the time?
15   A  Not all of the time.
16     Nor is it shortening at all.  It is a liquid
17  butter alternative.
18   Q  Why is it yellow?
19   A  Because it's a liquid butter alternative.
20  There's flavoring and colors in there to make it act
21  like butter, a liquid butter.
22   Q  So yellow is associated with liquid butter?
23   A  Yellow is kind of associated with butter, yes.
24   Q  So if it was black, it wouldn't really sell
25  that well?

Page 238

1    A  Not at all.
2    Q  Okay.
3      Let me go back to that exhibit -- Mel-Fry
4  is -- no, Mel-Fry isn't in there?
5    A  I'm sorry?
6    Q  Mel-Fry is never in there? Because it's not
7  shortening. Is that what you said?
8    A  Never in what?
9    Q  The jug in 100--
10   A  That is not. That's a translucent jug.
11   Q  Oh. That's the color of the product?
12   A  I believe that's the color of the product.
13   Q  Gotcha. Okay.
14     Do you know who else puts products in that
15  kind of jug for Sysco?
16   A  The only other manufacturer would be Cargill
17  Foods.
18   Q  Cargill?
19   A  Yes.
20   Q  Does Cargill make liquid shortening?
21   A  They do.
22   Q  Under what brand? Do you know?
23   A  They have a number of brands. They are
24  primarily private label.
25   Q  Is their liquid shortening both clear and

Page 239

1  milky?
2    A  Yes.
3    Q  So that's pretty standard in the industry?
4    A  It is absolutely standard in the industry.
5    Q  So to compete you have to have either one
6  or -- both probably; right?
7    A  Yes.
8      (Defendant's Exhibit 47 was marked
9      for identification by the Certified
10     Shorthand Reporter.)
11     MR. LUTHER: This is produced document SU
12  100023 sequentially up to SU 100029.
13     It looks like all the same Web page.
14   Q  Now we go to page three of this series. That
15  would be SU 100025. We may have looked at this
16  product --
17   A  We have.
18   Q  -- earlier. I think this is a little clearer
19  picture. Is that Camar? Are you aware of that liquid
20  shortening product?
21   A  It looks to be outside of the United States.
22  And I am not aware of it.
23   Q  And what color label does it have in that
24  F-jug?
25   A  Bright yellow and orange and red.

Page 240

1      MR. LUTHER: Next.
2      (Defendant's Exhibit 48 was marked
3      for identification by the Certified
4      Shorthand Reporter.)
5      MR. LUTHER: This is a produced document SU
6  100031 sequentially up to SU 100035. And looks to be
7  all the same Costco Web page.
8    Q  Mr. Splane, you see the first page?
9    A  Yes.
10   Q  Kirkland Signature Liquid Shortening. Is that
11  a clear brand? Do you know?
12   A  The Kirkland Signature is Costco's private
13  label. I don't know. It's not a channel I am
14  responsible for.
15   Q  Who would make product for Kirkland's label?
16  Bunch of different manufacturers?
17   A  Sure. International manufactures that I
18  mentioned.
19   Q  U.S. and abroad?
20   A  No idea on the abroad. Typically they are not
21  going to send these products overseas because of the
22  weight and the shipping and the cost associated with
23  that. It's not competitive. If in fact they don't
24  have manufacturing facilities abroad.
25   Q  Well, if they are shipping liquid from

Page 241

1  overseas, they can sell it for a lot more; right?
2  Because of the container prices?
3      A  If you can sell it. If somebody is producing
4  it in market, the answer is no.
5      Q  Okay.
6         So Kirkland could have any one of a number of
7  different manufactures make liquid shortening to put in
8  that box?
9      A  Any one of a number of manufacturers that meet
10  their guidelines.
11        Costco is one that will absolutely come and
12  visit your plant, QA/QC audit your facility, make sure
13  that you have good guidelines and protocol in place.
14  Because they put their name on it, and they want to
15  make sure that -- that it adheres to their strict
16  guidelines. So I can't say anybody. But there are a
17  number, yes.
18      Q  So you could have a number of different
19  manufacturers' products in this Kirkland container with
20  the orange label; is that right?
21      A  Not blended. But regionally you could have
22  different manufacturers of this product, correct.
23      Q  Okay.
24         Can we go page two, SU 100032. Do you see
25  that Mazola product?

Page 242

1      A  I do.
2      Q  Are they a competitor?
3      A  This is a picture of a retail type of product.
4  To a degree. But Mazola is a corn oil and plays more
5  on the commodity side of the business, as opposed to a
6  long fry life offering like Mel-Fry.
7      Q  So commercial users are not going to use corn
8  oil because it doesn't last that long?
9      A  For the most part. I'm not going to say they
10  are not going to use it, but --
11      Q  Does it cost too much?
12      A  It is fairly expensive, yes. And it gums up
13  fryers, frankly. So there are some other inherent
14  challenges with corn oil.
15      Q  So this looks like a clear container, this
16  looks like the color of the oil. Are you familiar with
17  the oil at all?
18      A  Yes.
19      Q  The color of Mazola is yellow?
20      A  It's corn oil, yes.
21      Q  Corn oil is always yellow?
22      A  Unless you get a bad batch.
23      Q  And then what color is it?
24      A  Black.
25      MR. GARRETT: Gotcha there.

Page 243

1      MR. LUTHER: On that note, fellows.
2      MR. GARRETT: Are you done?
3      MR. LUTHER: Let me see here.
4      Q  What about sunflower oil? Is that used as a
5  deep fry oil?
6      A  Sunflower oil is extremely expensive. It is.
7  But due to the expense, most people shy away from it.
8      Q  It has a high smoke point, long shelf life?
9  Is that --
10      A  It is a very stable oil, yes.
11      Q  It's a durable oil?
12      A  Yes.
13      Q  Learning a lot about liquid shortening here
14  today.
15         Do they ever blend palm oil with soybean oil?
16  Do you see blends out there?
17      A  Today we did not blend for shortening palm and
18  soy oil.
19      Q  Have they tried to blend in the past, play
20  around with formulations?
21      A  It's an element that might be coming back
22  because of the trans fat movement. But today palm is a
23  tropical oil, which when you go back 20 years ago, was
24  kind of the trans fats of the time. So there's a
25  little negative press out there on tropical oils.

Page 244

1      Q  Why would they blend palm with some other
2  tropical oil? Is it the price?
3      A  Well, it's going to be primarily due to the --
4  the consistency of the product. Palm is a very thick
5  product. You get up in the northern states, it's very
6  difficult to even pour out of the jug when it gets
7  cold.
8      Q  So why would somebody use it to blend it?
9      A  Because of what I just mentioned, yes, and
10  also it does lessen the price of the product.
11      MR. LUTHER: I'm done.
12      MR. GARRETT: I have just a couple of quick
13  follow-ups. If you think you are set.
14
15         EXAMINATION
16  BY MR. GARRETT:
17      Q  Mr. Splane, we talked earlier at length about
18  your two declarations in this case, the one that was
19  executed in August and the other just a few days ago.
20  Do you recall that?
21      A  Yes.
22      Q  And Mr. Luther asked you untold number of
23  times whether or not there were documents that -- that
24  might support each and every one of the statements you
25  made in those declarations. Do you recall that?

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                    TERRY SPLANE

Page 245

1    A  Yes.
2    Q  Okay.
3        Other than documents how might you also know
4    about the statements you made in those declarations?
5    And just I'm speaking generally.
6    A  Generally my experience in the industry, in
7    the food service industry specifically from the late
8    '80s to today, exposure through sales positions I've
9    had to the marketplace, down to the operator and
10   distributor level. Since being in marketing, working
11   in the marketplace. Numerous discussions, meetings,
12   trade shows. There's a history of knowledge that I
13   have built over that time frame that -- that leads me
14   in that direction. And I think it's a sound foundation
15   of a direction.
16   Q  So -- and, again, your declarations have
17   already been signed. But after today there has been a
18   lot of questions about those declarations. As you sit
19   here today having gone over them both at length is each
20   and every one of the statements made in those
21   declarations true and accurate to the best of your
22   knowledge?
23   A  Yes.
24   Q  Do you stand by each one of those statements
25   today?

Page 246

1    A  I do.
2    MR. GARRETT: I don't have any further
3    questions.
4    MR. LUTHER: I do.
5
6            EXAMINATION
7    BY MR. LUTHER:
8    Q  It's true that a fair number of your
9    statements are made on opinion; is that correct?
10   A  I'm sorry?
11   Q  It's true that a fair number of your
12   statements are made on opinion; is that correct?
13   A  Opinion based on the knowledge -- deep
14   knowledge of the industry that I've been in for many
15   years.
16   Q  Many years before you ever knew of Supreme;
17   right?
18   A  Yes.
19   Q  So because somebody else did something you
20   think Supreme is doing the same thing; is that right?
21   A  Not projecting from one. But projecting from
22   an industry.
23   Q  Okay.
24       But a lot of these statements, you know, like
25   infringement you have testified you don't know what it

Page 247

1    means, but you stand by that statement; is that right?
2    MR. GARRETT: Misstates the prior testimony.
3    THE WITNESS: To me infringement means
4    infringing on our brand. I go back to what I said
5    earlier, the fact that to sit in this room and act as
6    though we don't think that Supreme set out to knock off
7    or copy Mel-Fry doesn't make any sense to me. To me
8    it's painfully obvious. Painfully.
9        And you showed me I don't know how many
10   different documents with yellow jugs and French fries
11   in fryers not even tried to the oil industry but
12   selling a fryer, and a multitude of those elements that
13   say, yeah, those exist, those absolutely exist, general
14   knowledge, a lot of clip art. I could go out and buy
15   all that clip art today, stock photography. It
16   exists. Yes, it does. But you didn't show me one
17   other than what I've seen in Mega-Fry's brand that
18   embodies at least two of those elements together, most
19   of them singular in scope.
20       But Mega-Fry has wrapped it all together to
21   mimic Mel-Fry. To me that's not happenstance. To me
22   that's not accidental. To me that shows an effort to
23   truly go after and confuse the food service marketplace
24   and the customers and try to leverage the equity and
25   the power and the heritage behind the Mel-Fry brand.

Page 248

1        My opinion -- and my additional opinion is
2    that if you were to put those two bottles in front of
3    ten people, they would have the exact same opinion.
4    BY MR. LUTHER:
5    Q  And you stand by the authenticity of those two
6    invoices? You believe those are true and correct?
7    A  I absolutely do.
8    Q  And you base that on what knowledge? Past
9    knowledge in the industry?
10   A  That I believe that there is integrity of
11   people within the industry. I don't believe anybody
12   would have developed a fake invoice to send in to us.
13   I believe -- I believe today we could go into
14   operators' records if they were willing to open up
15   their records and pull factual hard copy original
16   invoices from the distributor that has that on the
17   invoice. I truly believe that today. I don't believe
18   anybody has the malice to put us through this on false
19   circumstances.
20   Q  If Supreme had a yellow liquid shortening
21   F-handle bottle with fried food on it, would that be
22   infringing?
23   MR. GARRETT: Incomplete hypothetical.
24   THE WITNESS: Yeah, I would have to see what
25   it looks like.

VENTURA FOODS, LLC vs. SUPREME OIL COMPANY, et al.                                              TERRY SPLANE

Page 249

1      And, again, you are dealing with a limited
2  amount of components. Today this case is not about one
3  or two or three. It's much more than that on that
4  package, that brand.
5  BY MR. LUTHER:
6      Q  I'm trying to get at that. What's much more?
7  What do you mean?
8      A  They are named off in there. The basket. The
9  fried foods. The capital letters. The gradation of
10 the letters. The hyphen, the bottle style. The bottle
11 color --
12     Q  But your CEO called my CEO, said there wasn't
13 a problem with the letters or the name? Do you know
14 this?
15     A  Okay. How about all the other pieces? In
16 addition to the slogan or the tag line being extremely
17 similar? I mean it's just -- it's obvious to me. Very
18 obvious to me.
19     If, in fact, this was developed by an agency,
20 an ad agency, that had no knowledge of Mel-Fry and they
21 were asked to develop a brand of liquid shortening,
22 come back to me with some concepts, I would say there
23 is absolutely no way -- maybe they would have had a
24 basket, maybe they would have had fried foods, maybe
25 they would have had a yellow bottle, but they wouldn't

Page 250

1  have all of that in one package unless in fact they
2  were going specifically after a strong brand that
3  exists in that marketplace today, the strongest brand.
4      Q  Supreme has been around for how many years?
5  Do you know?
6      A  You asked me that question. I do not know.
7      Q  Did I ask that before?
8      A  Yes, you did.
9      Q  Okay.
10     Well, they didn't start two weeks ago; right?
11     A  No, they did not start two weeks ago.
12     Q  Is Supreme a strong name in the industry?
13     A  Depends on who you ask in the northeast. They
14 are not a national player to my knowledge. We don't --
15 I don't know that they sell any product on the west
16 coast. I don't run into them in the midwest.
17     I hear virtually nothing of them at the
18 national account level, calling on national account
19 operators, such as a TGI Fridays, Dardin Restaurants.
20 We hear nothing about them when we call on Sysco, U.S.
21 Food Service, large national food service broad line
22 distributors. The name absolutely never comes up.
23     MR. GARRETT: You done?
24     MR. LUTHER: Are you done?
25     MR. GARRETT: I'm done.

Page 251

1      MR. LUTHER: All right.
2      (The deposition was adjourned at 3:55 p.m.)
3          ---oOo---
4
5      I declare under penalty of perjury that the
6  foregoing is true and correct.
7      Executed this _____ day of _____,
8  20___, at _____, California.
9
10
          _____
                TERRY SPLANE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 252

1  STATE OF CALIFORNIA    )
                          ) ss.
2  COUNTY OF LOS ANGELES  )
3
4      I, Steven W. Cornwell, CSR 7193, a
5  Certified Shorthand Reporter in and for the State of
6  California, do hereby certify:
7      That prior to being examined, the witness
8  declared under penalty of perjury that the testimony
9  given in these proceedings will be the truth, the
10 whole truth, and nothing but the truth;
11     That said proceedings were taken by me in
12 shorthand at the time and place herein named and was
13 thereafter transcribed into typewriting under my
14 direction and supervision;
15     I further certify that I have no interest in
16 the outcome of this action.
17     In witness whereof, I have hereunto
18 subscribed my name.
19
20 Dated: October 15, 2007
21
22
23
          _____
24          Steven W. Cornwell, CSR No. 7193
25